IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COMMUNITY HOUSE, INC., MARLENE K. SMITH, GREG A. LUTHER, and JAY D. BANTA,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF BOISE, IDAHO, DAVID H. BIETER, Mayor; BOISE CITY COUNCIL; MARYANN JORDAN, ELAINE CLEGG, VERNON BISTERFELDT, DAVID EBERLE, JEROME MAPP, and ALAN SHEALY, Boise City Council Members; BRUCE CHATTERTON, Director, Planning and Development Services; JIM BIRDSALL, Manager, Housing and Community Development,<br><br>        Defendants. | Case No. CV-05-283-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for preliminary injunction. The Court has heard oral argument and the motion is at issue. The Court will grant the motion in part, enjoining the City from relocating any former resident of Community House to housing that is near the known residence of a registered sex offender. In addition, the Court will enjoin the City from operating a lease with the Boise

**Memorandum Decision and Order - 1**

Rescue Mission (BRM) if the BRM is requiring attendance at religious meetings as a condition of providing services to the homeless. The Court will deny plaintiffs' request for an order requiring that the former residents of Community House be allowed to return. These rulings are explained in more detail below.

## FACTUAL BACKGROUND

Community House, Inc. (CHI) is a non-profit corporation providing housing and services to homeless and low income persons. Beginning in 1994, CHI and the City of Boise worked together to build a homeless shelter known as Community House. To finance the construction, the City obtained federal funds, while CHI raised money from contributions and secured a loan of $657,315 from the Federal Home Loan Bank (FHLB). The FHLB agreed to forgive the loan if CHI provided affordable housing through Community House for 50 years. That became the term of the lease between the City and CHI whereby CHI agreed to operate Community House and the City agreed to provide maintenance and repairs.

Community House contained both a homeless shelter and a low income housing unit. The homeless shelter could hold, in separate dorms, 66 men and 13 women. There were also ten units for homeless families. The low income, or "transitional" housing, contained ten family units and thirty-nine single residence apartments. Community House had accommodations for the disabled, and about

**Memorandum Decision and Order - 2**

75% of its residents were disabled.  *See Wray Affidavit* at p. 2 ¶ 5.

Following a dispute between the parties, the City took over operation of Community House and commissioned a committee to examine future options.  The committee expressed concern over housing homeless single men together with women and families, and recommended that the operations of Community House be turned over to a nonprofit organization with expertise in serving the homeless.

After reviewing that report, the City decided to let out for bid the operation of Community House.  After the bidding period was closed, the City chose the bid of the Boise Rescue Mission (BRM), and entered into a lease with them on September 2, 2005.

For over 50 years, the BRM has served the homeless, most recently in four facilities in Boise and Nampa.  The BRM's Boise facilities include a homeless shelter for single men known as the Boise Rescue Mission, and a shelter for women and children known as the City Light Home.

The BRM's winning bid proposal contained a plan to move homeless men from the Boise Rescue Mission to the Community House, and turn the Boise Rescue Mission into a shelter for homeless women and children.  *See Roscoe Affidavit* at Exhibit A.  BRM plans to have beds for 106 homeless single men at the Community House.  *See Belodoff Affidavit* at Exhibit 6.  Eventually, BRM will

**Memorandum Decision and Order - 3**

move the homeless men out of Community House and convert it to a shelter for homeless women, children, and families.[1]  *Id.*

In the 50 years that the BRM has served the homeless, they have developed a policy to segregate men and women, and to segregate homeless singles from homeless families.  Explaining this policy, Bill Roscoe, the BRM's Executive Director, states that "[w]e believe that our separate shelter facilities for men and women is one of the reasons why we have fewer police calls at our facilities than Community House."  *See Roscoe Affidavit* at p. 5, ¶ 8.

The chief goal of the BRM is to "help people at their physical and spiritual points of need."  *Id*. at Exhibit A, p. 2.  To accomplish this goal, the BRM offers, among other things, "Christian teaching."  *Id*.  Before each meal, the BRM offers a 60-minute Christian chapel service.  Director Roscoe explains that "we do not require guests to participate in religious services before meals or in order to sleep at our facilities overnight."  *Id*. at p. 4, ¶ 5.  He does note, however, that "[w]e, of course, require those guests [who don't participate] to establish that they hold personal beliefs on religion that would be offended by attending Christian services."  *Id*. at p. 4, ¶ 5.

---

[1] While the bid was to buy the Community House, Director Roscoe explains that the "provisions in the [bid] are identical to the plans BRM has for the facility as a tenant in the building."  *See Roscoe Affidavit* at p. 3, ¶. 3.

**Memorandum Decision and Order - 4**

There is, however, conflicting evidence on this point in the record. For example, plaintiff Jay Banta alleges that when he stayed at one of the BRM facilities, "I was told that if I refused to attend these [religious] services I would be denied food and shelter." *See Banta Affidavit* at p. 3, ¶ 9. Jim Liddell made similar allegations in his affidavit. *See Liddell Affidavit* at p. 3, ¶ 14.

Both Community House and BRM contained individuals who were disabled, either physically or mentally. Francis Wray, who helped Community House residents file disability claims, estimates that 75% of the population of Community House during her tenure had "a mental or physical disability." *See Wray Affidavit* at p. 2, ¶ 5. Director Roscoe estimates that between 20% and 30% of the homeless men at the Boise Rescue Mission have an untreated mental illnesses. *See Roscoe Affidavit* at Exhibit A, Proposal at p.4.

In June of 2005, the staff at Community House were told not to accept any more homeless people. The City intended to empty Community House by attrition, so that the new service provider could take over. At this time, i.e., June of 2005, there were 30 men on the Community House waiting list, along with 6 or 7 women and 20 families. *See Wray Affidavit* at p. 4. These statistics are consistent with the general trend that 70% of the homeless are men while 30% are women and children. *See Roscoe Affidavit* at Exhibit A, Proposal at p.4. While women and

**Memorandum Decision and Order - 5**

children are the fastest growing segment of the homeless population, *id.*, homeless men far outnumber homeless women and children, creating a greater need for shelters that can accommodate homeless men.

In August of 2005, the City informed residents of Community House that they needed to move. The City transferred rent-paying tenants to other City-owned housing, charging in some instances the same rent as the tenants paid at Community House, with the City picking up the difference in other cases. *See Chatterton Affidavit* at p. 4, ¶ 11. With regard to the homeless who were not paying anything, the City referred them to other homeless shelters, such as the Boise Rescue Mission (for single men) and the City Light facility (for women and children). *Id.* at pp. 4-5, ¶¶ 12-13.

This move caused real hardship for some residents of Community House. For example, Michael Jackson, a disabled resident, moved into a mobile home that was "dilapidated and unsafe." The "toilet was leaking, the front steps into the mobile home were unstable, there is no handrail on the front steps, and there is mold and mildew on the walls and floors." *See Jackson Affidavit* at p. 3. To make the home accessible for his handicap, Jackson states that he and his friends, including his companion Berniece Losey, "are in the process of making repairs" and have had to "purchase some of the materials for repairs." *Id.* Jackson is not

**Memorandum Decision and Order - 6**

sure if he can afford the rent because it "is more than I paid at Community House." *Id.* The City did pay an application fee, security deposit, and first month's rent, totaling $725.

Plaintiff Marlene Smith filed her affidavit stating that she lived at Community House for more than a year and a half. *See Smith Declaration* at p. 2-3. While the City alleges that she resided there rent-free, *see Morris Affidavit* at p. 4, she counters that she did pay rent when she could afford to do so. *See Smith Declaration* at p. 3, ¶ 12. She has two minor children who are disabled, and one of those children lives with her. *Id.* at p. 2, ¶ 5. The City transferred her to the State Motel and paid one month's rent.

The move hit hardest women with children and the physically disabled. There was a shortage of housing for these persons already, and the closing of Community House made things worse for them. For the most part, they have moved into housing that is much less desirable than Community House.

The plaintiffs filed this action under the Fair Housing Act (FHA) and other laws, claiming that the City improperly evicted the residents of Community House. In this injunction proceeding, plaintiffs seek to enjoin the City from removing them from Community House, and a Court order that the former residents be reinstated. The defendants allege that the plaintiffs lack standing, and that in any event they

**Memorandum Decision and Order - 7**

are not entitled to injunctive relief because they have no likelihood of prevailing on the merits.

## ANALYSIS

1. **Standing**

Among other claims, CHI seeks relief under the Fair Housing Act (FHA). The City claims CHI has no standing to bring this action. To analyze this challenge, the Court begins with the direction from the Ninth Circuit that courts "should not erect standing barriers – other than the minima required by Article III – to those seeking to vindicate [FHA] rights." *See Smith v. Pacific Properties and Development Corp.*, 358 F.3d 1097, 1102 (9th Cir. 2004). The clear tenor of this, and other, decisions is that standing to bring an FHA claim is liberally conferred so long as the minimum requirements of Article III are met. *Id.*

Here, CHI alleges that it has been exposed to a loan default due to the City's violation of the FHA. CHI's $657,315 loan, discussed earlier, was conditioned on, among other things, CHI operating Community House as a shelter with a certain mix of men, women, and families. When the City ousted CHI, and turned the shelter into a men-only facility, the Bank notified CHI that it was in default because the mix of residents had changed. As a result, the Bank demanded immediate repayment.

**Memorandum Decision and Order - 8**

These circumstances establish that CHI has at least alleged an injury-in-fact that would be redressed if CHI is restored to its prior position operating Community House. This is sufficient to confer standing on CHI. The individual plaintiffs have standing as well, since they allege that they were injured when evicted from Community House, and they seek redress by being allowed to return there. The Court therefore finds that all plaintiffs have standing.

**2.    Mootness**

The City contends that CHI's action is moot because the City has repaid all federal funds and is hence no longer obligated to comply with the conditions tied to those funds. While the repayment renders inapplicable the regulations specifically tied to the funds returned, the City has not explained why the entire FHA would be inapplicable even though the loan through the Federal Home Loan Bank is still outstanding. The Court therefore finds that the FHA claims were not rendered moot by the repayment of the housing funds.

**3.    Injunction – Standard of Review**

The plaintiffs seek an injunction setting aside the BRM lease and returning the former residents to Community House. A moving party is entitled to injunctive relief if it demonstrates that it is likely to succeed on the merits and may suffer irreparable injury, or that serious questions exist on the merits and the balance of

**Memorandum Decision and Order - 9**

hardships tips in its favor. *See Self-Realization Fellowship Church v. Ananda*, 59 F.3d 902, 913 (9th Cir. 1995). The two tests are not separate but represent a sliding scale in which the required probability of success on the merits decreases as the degree of harm increases. *Id.* "Under any formulation of the test, the plaintiff must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985).

Here, the Court will assume that the balance of hardships tips in favor of the individual plaintiffs who have been evicted from Community House. Thus, the plaintiffs need only show that serious questions exist on the merits to be entitled to injunctive relief.

### 3.     Gender & Disability Discrimination

The plaintiffs argue that the City is discriminating against the disabled and female residents of Community House because they were evicted to allow 66 men to take their place. Plaintiffs argue that "[t]he restriction would be just as discriminatory if it was limited to only 66 white people." *See Brief of Plaintiffs* at p. 13.

With regard to the disabled, the plaintiffs have not raised a serious question of discrimination. Disabled men and women were moved out, and disabled men

**Memorandum Decision and Order - 10**

were moved in. The limited record shows that both populations – the former residents of Community House who were moved out and the former residents of the Boise Rescue Mission who were moved in – have substantial numbers of disabled individuals within their ranks. The Court cannot find that plaintiffs have raised serious questions of differential treatment based on disability.

It is undeniable, however, that the City treated women differently than men. The differential treatment did not occur in the evictions – men were evicted along with women. However, the men could reapply to be admitted by BRM, while the women were shut out by the men-only policy. Thus, the issue is whether plaintiffs have raised serious questions that BRM's men-only policy at Community House constitutes gender discrimination in violation of the FHA.

In examining FHA discrimination issues, the Court must apply Title VII standards. *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246 (9th Cir. 1997). Under Title VII, the Court employs the *McDonnell-Douglas* burden-shifting test. Assuming that plaintiffs have established a *prima facie* case, the burden shifts to the City to articulate some legitimate, nondiscriminatory reason for its conduct. *Id.* If the City satisfies that test, the burden shifts back to plaintiffs to show that the City's justification is pretextual. *Id.*

The City justifies the men-only policy on two grounds: First, the policy was

**Memorandum Decision and Order - 11**

required by safety concerns.  Second, the policy was necessary to allow BRM to transfer the homeless men from the Boise Rescue Mission to the Community House, so that BRM could convert the Boise Rescue Mission into a shelter for women and children.

Both grounds are persuasive.  As discussed above, the record contains evidence supporting the safety problems inherent in housing homeless men with homeless women.  Moreover, when looking at the overall plan of BRM, the men-only policy looks less like discrimination and more like a condition necessary to increase shelter space for women.

While it is unclear whether BRM has a legal obligation to convert the Boise Rescue Mission into a women's shelter, the BRM made that commitment in its proposal to the City, and there is no evidence that the BRM intends not to honor its commitment.

It appears to the Court that with the lease, the City seized the opportunity to (1) turn over operations of Community House to an expert; (2) immediately increase the space for homeless men; and (3) eventually increase the space for homeless women and children.  In other words, the City made the political decision to trade short-term hardship for long-term gain.

If the Court were to intervene, it would simply transfer the hardship from

**Memorandum Decision and Order - 12**

one class of homeless women to another. By ordering the return of former female residents of Community House, the Court would scuttle any deal for increased space at the Boise Rescue Mission and shift the hardship to the women who would have occupied that space.

This case is about scarce resources, not discrimination. Given this, the Court is essentially being asked to inject itself into the municipal political process, and undo a decision that was driven by local considerations of finances, politics, and administration. This is not the province of federal courts.

For all of these reasons, the Court cannot find that plaintiffs have raised a serious question that the City is discriminating against women.

### 4.     Relocation Benefits & CHI Claims

Plaintiffs argue that the City failed to pay them the relocation benefits to which they are entitled. In addition, CHI claims that the City improperly deprived it of an ownership interest in Community House. If true, these claims would at most require that the City pay some form of compensation to the plaintiffs. These claims would not, however, support the granting of broad injunctive relief returning former residents to Community House.

**Memorandum Decision and Order - 13**

**5.      Religious Discrimination**

Plaintiffs argue that the City has entered into a lease with a religious organization in violation of the Establishment Clause of the First Amendment. Plaintiffs have filed affidavits, discussed above, from persons who allege that while present at a BRM facility, they were told by BRM personnel that attendance at religious meetings was required in order to obtain services from BRM. BRM denies these claims and asserts that the services are voluntary, although to access services, the person must explain he or she does not want to attend the services.

The mere fact that the BRM is a religious organization does not render the City's lease with the BRM a violation of the Establishment Clause. In *Southside Fair Housing Committee v. City of New York*, 928 F.2d 1336 (2d Cir. 1991), the Second Circuit approved New York's sale of land to a Hasidic community for urban renewal purposes even though some non-Hasidic persons were displaced. The Circuit applied the *Lemon* test, and found that the secular purpose and effect of the sale was urban renewal, and that the sale did not promote an excessive entanglement with religion.

The first element of the *Lemon* test examines whether the lease has a secular purpose. *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Here, the lease provides housing to the homeless, a clearly secular purpose.

**Memorandum Decision and Order - 14**

The second element asks whether the primary effect of the lease is secular. Here, the Court must examine the acts of BRM. While the City may be able to distance itself from the isolated and unauthorized acts of individual BRM personnel, the City cannot disavow BRM policies that were well-known at the time the City entered into a lessor/lessee relationship with BRM. As to those well-established policies, the BRM essentially acts as the surrogate of the City.

One of those BRM policies is to require an explanation from any homeless person who does not want to attend a religious meeting. As discussed above, the BRM requires the homeless person to explain why he or she would be offended by the religious meeting. This can easily amount to a subtle, and even not-so-subtle, form of coercion. It brings the BRM perilously close to advocating attendance rather than allowing an unhindered free choice. And this raises serious questions whether the purpose of the lease is secular. The Court will therefore enjoin the City from operating a lease with BRM where BRM is requiring, as a condition of providing homeless services, an explanation from a homeless person as to why he or she would be offended by attending a religious service.

There are additional serious questions raised by plaintiffs concerning whether the BRM is going even further and requiring attendance at religious meetings as a condition of receiving services. While the City and the BRM deny

**Memorandum Decision and Order - 15**

that attendance is being required, affidavits filed by plaintiffs allege otherwise. Because the City and the BRM have stated that their intent is not to require attendance at religious meetings, they will not object to the Court enjoining them from doing so.

Having enjoined the City from operating a lease with BRM where BRM is either requiring attendance at religious meetings, or requiring an explanation as to why the person cannot attend, the primary effect of the lease now appears, at least on the basis of the limited record developed in this injunction proceeding, to be unambiguously secular. Moreover, this injunction also removes any question of an excessive entanglement with religion, the third prong of *Lemon.*

The Court will therefore enjoin the City from continuing to operate as a lessor if its lessee, the BRM, directly or indirectly requires attendance at religious meetings as a condition of providing housing or other services to the homeless. This would apply to any attempt by BRM to pressure residents into attending religious meetings by requiring an explanation or justification for non-participation. Simply put, attendance must be truly optional. The Court will deny the request by plaintiffs for any broader injunction.

6. **Registered Sex Offenders**

From counsels' comments at oral argument, it appears clear that the City is

**Memorandum Decision and Order - 16**

committed to not moving any former resident of Community House into close proximity to the known residence of a registered sex offender. Obviously, the City cannot stop registered sex offenders from moving into areas where the City may have already placed former residents. And the City cannot be responsible when the former residents choose to live in a certain area. But if the City is placing the person, and making the decision about where that person will live with City assistance, the City has a duty to ensure that it is not placing that person in close proximity to a known residence of a registered sex offender. The Court understands that the City agrees with this view. The Court will enjoin the City from placing any former resident in close proximity to the known residence of a registered sex offender.

7.     **Motions to Strike**

Both sides have filed motions to strike various affidavits. The Court can find no reason to strike any of them. Hence the motions will be denied.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for injunction (Docket No. 11) is GRANTED IN PART AND DENIED IN PART. The motion is granted to the extent that it seeks (1) to enjoin the City from

**Memorandum Decision and Order - 17**

continuing to operate as a lessor if its lessee, the BRM, directly or indirectly requires attendance at religious meetings as a condition of providing housing or other services to the homeless; and (2) to enjoin the City from placing any former resident of Community House in close proximity to the known residence of a registered sex offender.  The motion is denied in all other respects.

IT IS FURTHER ORDERED, that the motions to strike (Docket Nos. 75, 78, 88, 89, 90, and 104) are DENIED.

DATED: **October 28, 2005**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision and Order - 18**