IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COMMUNITY HOUSE, INC., et al.,<br><br>Plaintiffs,<br><br><br><br><br><br>vs.<br><br><br>CITY OF BOISE, et al.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING MOTIONS TO STRIKE<br><br><br><br><br><br>Case No. CIV 05-283-S-BLW |

This matter comes before the Court on Defendants' Motion for Summary Judgment.  For the reasons discussed below, the Court will grant the Motion in part and deny it in part.  The Court will also deny the parties' Motions to Strike.

## I.  FACTUAL BACKGROUND

This dispute centers around a homeless shelter called Community House.  Plaintiff Community House, Inc. ("CHI") is a non-profit corporation that provides housing services to homeless and low income persons.

1

On February 8, 1994, CHI and the City of Boise (the "City") entered into a Memorandum of Understanding ("MOU").[1]  The MOU stated that it was "the intent of the City and [CHI] to enter into a cooperative public/private partnership with the primary objective being to provide housing and comprehensive services for the homeless in our community."[2]  The MOU goes on to state that "[l]ike any good partnership, this one must be based on trust, common interest and philosophy, good communication, and a fair and clearly defined method of dissolving the partnership."[3]  The MOU stated that the City supported CHI and would "endeavor to provide funds necessary to make the project successful."[4]

The MOU set out the goals of the project, which included entering into a partnership to construct a homeless shelter which CHI would lease for a term of fifty (50) years at a cost of one dollar ($1.00) per year.[5]  Once constructed, CHI was to operate a homeless shelter and resource center at the building and provide emergency, temporary, and transitional housing for homeless families and individuals.[6]

In addition to the MOU, CHI and the City entered into two other agreements: the Lease Agreement and the Operating Agreement.  CHI and the City entered into the Lease Agreement

---

[1]*See* Docket No. 133, Ex. 1.

[2]*Id*.

[3]*Id*.

[4]*Id*.

[5]*Id*.

[6]*Id*.

on November 2, 1994.[7]  The Lease Agreement provided for a term of fifty (50) years, ending on

October 1, 2044.[8]  Under the Lease Agreement, CHI agreed to pay the City one dollar ($1.00) per

year.[9]

The Lease Agreement contained the following provision:

> In the event [CHI's] right to Operate the Building is terminated (see "The Operating Agreement" attached as Exhibit B to this Lease Agreement), [CHI] shall assign the lease to a Successor Operation; provided, however, [CHI] shall be under no obligation to assign the lease unless the Federal Home Loan Bank of Seattle (the Bank) consents to the assignment and releases [CHI] from all liability under the construction loan obtained from the Bank by [CHI]; provided further that before [CHI] assigns its rights under the lease to a Successor Operator, [CHI] shall first offer to assign the lease to the City on the condition that the City first repay the construction loan obtained from the Bank or obtain a release of [CHI's] liability under such loan.
>
> In the event [CHI's] right to Operate the Building is terminated, and in the event the Bank has not consented to the assignment of the lease and has not released [CHI] from all liability stemming from the loan to [CHI] from the Bank, [CHI] shall have the exclusive right to continue to manage and operate the building.  *Nothing in this paragraph shall be construed as a limitation on the City's right to purchase [CHI's] lease upon termination of the Operating Agreement by repaying the construction loan obtained from the Bank or obtaining a release of [CHI's] liability under such loan.*[10]

CHI entered into the Operating Agreement on November 30, 1994.[11]  The Operating

Agreement provided for an initial term of sixty (60) months and could be renewed for an

additional sixty (60) months with the consent of both parties.  The Operating Agreement was

renewed once, but was not renewed again.

---

[7]*Id.*

[8]*Id.*

[9]*Id.*

[10]*Id.* (emphasis added).

[11]*Id.*, Ex. 2.

In January 2004, CHI notified the city that it was facing financial difficulties and requested assistance from the City.[12]  Deanna Watson, the Community House Board President, met with City Council members Vern Bisterfeldt and Peggy Sedivey, as well as Boise Mayor David Bieter to discuss the issues facing Community House.  Ms. Watson was directed to contact Jan Blickenstaff, the Manager of the Boise City Department of Housing and Community Development.

On February 2, 2004, Ms. Watson wrote to Mr. Blickenstaff informing him of the situation and asked for assistance.[13]  Mr. Blickenstaff responded, requesting various information from CHI.[14]

The City eventually took over day-to-day operations of Community House.  From March 2, 2004, through September 6, 2005, the City operated Community House.[15]  The City drafted a Management Agreement for Community House.

Under the Management Agreement, CHI agreed to transfer all of Community House's assets to the city.[16]  CHI agreed to relinquish oversight of Community House.[17]  Further, CHI agreed to terminate the Lease Agreement and Operating Agreement previously entered into

---

[12]*See* Docket Nos. 200-8 and 235.

[13]Docket No. 235, Ex. R.

[14]*Id*., Ex. S.

[15]Docket No. 133, ¶ 6.

[16]Docket No. 200-16, Ex. 1.

[17]*Id*.

between CHI and the City.[18]  In return, the City agreed to take over operations at Community House.[19]

There are disputed facts as to whether or not the CHI Board approved the Management Agreement.[20]  The Management Agreement was signed in June by Mayor Bieter and Ms. Watson.  Plaintiffs claim that Ms. Watson did not have the authority to enter into the Management Agreement.

On February 7, 2005, the City issued a Request for Interest/Request for Proposals (RFI/RFP) which invited service providers to offer proposals to assume ownership and/or management of the various programs which existed at Community House.[21]  The RFI/RFP process was divided into two phases.  First, interested parties were invited to provide the City with creative approaches to providing any or all of the services at Community House.  Second, based on the responses received, the Selection Committee would invite a shortlist of respondents to submit proposals under the Request for Proposals phase.

The City received proposals from a number of providers, including: the Boise Rescue Mission ("BRM"), the Salvation Army, Boise City/Ada County Housing Authority, Neighborhood Housing Services, Giraffe Laugh Daycare, Supportive Housing and Innovative Partnerships, Inc. ("SHIP"), and El-Ada, Inc.  CHI has presented evidence that it too submitted a

---

[18]*Id*.

[19]*Id*.

[20]*Compare* Docket No. 200-16, ¶ 3 *with* Docket No. 234, ¶ 25.

[21]Docket No. 133, Ex. 9.

proposal,[22] but that proposal was not considered by the City.  The RFP Review Committee reviewed the responses and requested formal proposals from all respondents except SHIP.  The City also did not seek a proposal from CHI as it did not consider its February 25, 2005 proposal.

The BRM and Giraffe Laugh submitted formal proposals.  CHI has presented evidence that it also submitted a formal proposal.[23]  The City states that this proposal was submitted past the deadline and did not conform with the RFI/RFP requirements.[24]

Around this same time, the City decided that it would sell Community House at a public auction to be held on July 15, 2005.[25]  The minimum bid amount was set at $2.5 million. Potential buyers would be required to accept the property with a deed restriction which would require the property to be used to operate a homeless shelter for a period of 10 years.[26]  That deed restriction was later amended by Boise City Ordinance No. 6404 to require property to be used as "a shelter for a minimum of 66, single, homeless men" for a period of 10 years. [27]

The BRM advised the City that it would not participate in the auction.[28]  The City claims that it did not receive any responsive bids at the auction.  CHI claims that it bid on Community

---

[22]Docket No. 225, Ex. C.

[23]Docket No. 225, Ex. D.

[24]Docket No. 249 at 14 n.10.

[25]Docket No. 133, Ex. 11.

[26]Docket No. 224, Ex. 41.

[27]*Id*., Ex. 42.

[28]Docket No. 201, Ex. C.

House at the auction and that its bid was accepted by the City.  The City claims that CHI's bid was nonconforming to the bid requirements and was rejected by the City Council.

After the auction, the City and the BRM negotiated a lease.  On September 2, 2005, the BRM entered into a Lease Agreement with the City for the Community House facility.[29]  The Lease Agreement would commence on September 9, 2005, and would terminate on June 30, 2006, but could be extended for up to nine more years.[30]  The Lease provided for an initial rent of $1.00 per year.[31]  The Lease required that the BRM operate an emergency homeless shelter with a capacity to serve not fewer than sixty-six (66) guests and a soup kitchen.[32]  While the Lease itself did not limit the shelter to men, as City Ordinance No. 6404 did, "City Resolution No. 18765, approving the lease of Community House to the BRM, specifically incorporates the restrictions of City Ordinance No. 6404."[33]  The Lease also contained an option that would allow the BRM to purchase the facility, subject to the deed restriction set forth above.[34]

The City had stopped leasing transitional housing units at Community House in May of 2005.  In June, the City informed the residents of Community House that Community House would be closing.  The City ceased operations and the Community House facility was closed on September 6, 2005.  On or about September 14, 2005, the BRM took possession of the vacant

---

[29]Docket No. 201, Ex. D.

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1049 (9th Cir. 2007).

[34]Docket No. 201, Ex. D.

Community House property and renamed it the "River of Life Rescue Mission."  Approximately 30 days later, the BRM reopened the facility.

The Boise City Council authorized the repayment of $716,591.00 in HOME funds and $637,750.00 in CDBG funds to HUD.[35]  These funds were wired to HUD on September 6, 2005.[36]  On September 14, 2005, Bruce Chatterton, Director of Planning and Development Services for the City, wrote to HUD concerning the repayment of CDBG and HOME funds.[37]  On November 20, 2006, the City repaid the Federal Home Loan Bank and, by doing so, obtained a release of liability on behalf of the City and CHI.[38]

On January 9, 2007, the BRM provided notice to the City that it was exercising its option under the Lease Agreement to purchase the Community House building.  The sale closed on February 21, 2007.[39]

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."[40]  "The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of

---

[35]Docket No. 224, Ex. 65.

[36]Docket No. 133, Ex. 12.

[37]Docket No. 224, Ex. 65.

[38]*Id*., Ex. 14.

[39]*See* Docket No. 200-10, Ex. 2.

[40]Fed.R.Civ.P. 56(c).

fact for trial."[41]   In considering whether genuine issues of material fact exist, the Court

determines whether a reasonable jury could return a verdict for the nonmoving party in the face

of all the evidence presented.[42]   The Court is required to construe all facts and reasonable

inferences in the light most favorable to the nonmoving party.[43]

### III.  DISCUSSION

Plaintiffs' Second Amended Complaint contains eighteen separate causes of action.[44]

Defendants now seeks summary judgment on many, but not all, of those claims.  Additionally,

Defendants seek dismissal of Plaintiffs' claims against the individual Defendants.

### A.    ESTABLISHMENT CLAUSE

Plaintiffs allege that the lease and eventual sale of the Community House property by the

City to the BRM violated the Establishment Clause of the United States Constitution.

The Establishment Clause of the First Amendment provides: "Congress shall make no

law respecting an establishment of religion."[45]   The Ninth Circuit set out the legal framework for

Plaintiffs' Establishment Clause claim in *Community House*.  Under this analysis, the Court asks:

---

[41]*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[42]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[43]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018 (9th Cir. 2004).

[44]Plaintiffs have withdrawn their nineteenth cause of action.

[45]U.S. Const. amend I.

(1) whether the government acted with the purpose of advancing or inhibiting religion, and (2) whether the governmental aid has the effect of advancing or inhibiting religion.[46]

It is the second prong—whether the governmental aid has the effect of advancing or inhibiting religion—that is at issue here.  The Supreme Court has identified three primary criteria for evaluating whether the aid has the "effect" of advancing religion: (1) whether governmental aid results in governmental indoctrination; (2) whether recipients of the aid are defined by reference to religion; and (3) whether the aid creates excessive government entanglement with religion.[47]

Plaintiffs assert the governmental aid provided by the City results in governmental indoctrination.  In order to establish this claim, Plaintiffs must show: (1) that the BRM's activities at Community House constitute or result in indoctrination; and (2) that such indoctrination is attributable to the government.[48]

First, there is sufficient evidence of indoctrination at Community House to withstand summary judgment.  "To 'indoctrinate' means [t]o instruct in a body of doctrine or principles. . . .  To imbue with a partisan or ideological point of view . . . .  The Supreme Court uses 'indoctrination' synonymously with 'inculcation.'  To 'inculcate' is [t]o impress (something) upon the mind of another by frequent instruction or repetition; [to] instill."[49]

---

[46]*Community House*, 490 F.3d at 1055 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) and *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)).

[47]*Agostini*, 521 U.S. at 234.

[48]*Community House*, 490 F.3d at 1056.

[49]*DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 414 (2d Cir. 2001) (citations and quotation marks omitted).

It is undisputed that religious activities take place at the BRM facility once known as Community House.[50]  The Ninth Circuit stated the following:

> The record shows that the BRM conducts a daily sixty-minute Christian chapel service at Community House before dinner.  The chapel service consists of singing, scripture reading, prayer, testimonies, and preaching.  It thus appears that the BRM is giving instruction in, and imbuing those Community House residents in attendance at the chapel service with, the tenets of Christianity.  This is true even assuming attendance at the chapel service is voluntary.[51]

Second, Plaintiffs have presented evidence from which a trier of fact could conclude that the indoctrination is attributable to the City.  As the Ninth Circuit pointed out, the City only charged the BRM rent of $1 per year for the building.[52]  Additionally, during the lease period, the City insured the premises and paid for necessary repairs.[53]  Finally, there is evidence, though it is disputed, that the City offered to sell, and eventually sold, the building for less than market value.[54]

Defendants argue that the sale of the Community House property to the BRM cured any constitutional issues that may have existed.  Defendants rely on the recent Ninth Circuit case of *Buono v. Kempthorne*.[55]  In *Buono*, the court addressed the constitutionality of a Latin cross located on a prominent rock outcropping in a National Preserve.[56]  The court had previously held

---

[50]Docket No. 201, ¶ 37.

[51]*Community House*, 490 F.3d at 1057.

[52]*Id*; *see also* Docket No. 201, Ex. D.

[53]*Community House*, 490 F.3d at 1057; *see also* Docket No. 201, Ex. D.

[54]*Community House*, 490 F.3d at 1057; *see also* Docket No. 201, Ex. D.

[55]527 F.3d 758 (9th Cir. 2008).

[56]*Id*. at 768.

that the presence of the cross violated the Establishment Clause.[57]  During the pendency of the

appeal, Congress had enacted a statute directing that the land on which the cross was situated be

transferred to a private organization in exchange for a parcel of privately-owned land located

elsewhere in the Preserve.[58]

     On appeal, the court examined "both the form and substance of the transaction to

determine whether the government action endorsing religion ha[d] actually ceased."[59]  The court

considered three aspects of the land exchange: (1) the government's continuing oversight and

rights in the site containing the cross after the proposed land exchange; (2) the method for

effectuating the land exchange; and (3) the history of the government's efforts to preserve the

cross.[60]

     Defendants argue that consideration of these factors in this case shows that the sale of the

Community House to the BRM "ended the City's involvement with the property and cured any

constitutional issues which may have existed."[61]  Plaintiffs, on the other hand, argue that there

are disputed facts as to each of these consideration which precludes summary judgement.  The

Court agrees with Plaintiffs.  There are genuine issues of material fact on these issues.

Therefore, the Court must deny Defendants' Motion for Summary Judgment on Plaintiffs'

Establishment Clause claim.

---

[57]*Id.*

[58]*Id.*

[59]*Id.* at 779.

[60]*Id.*

[61]Docket No. 204 at 12.

B.    IDAHO CONSTITUTION

Plaintiffs also challenge the lease and sale of the Community House property to the BRM

under Article 1, section 4 and Article 21, section 19 of the Idaho Constitution.  Article 1, section

4 provides:

> The exercise and enjoyment of religious faith and worship shall forever be
> guaranteed; and no person shall be denied any civil or political right, privilege, or
> capacity on account of his religious opinions; but the liberty of conscience hereby
> secured shall not be construed to dispense with oaths or affirmations, or excuse
> acts of licentiousness or justify polygamous or other pernicious practices,
> inconsistent with morality or the peace or safety of the state . . . . No person shall
> be required to attend or support any ministry or place of worship, religious sect or
> denomination, or pay tithes against his consent; nor shall any preference be given
> by law to any religious denomination or mode of worship. . . .

Article 21, section 19 states:

> It is ordained by the state of Idaho that perfect toleration of religious sentiment
> shall be secured, and no inhabitant of said state shall ever be molested in person or
> property on account of his or her mode of religious worship. . . .

For substantially the same reasons set forth above in relation to Plaintiffs' claim under the

Establishment Clause of the United States Constitution, Defendants' Motion for Summary

Judgment on Plaintiffs' claims under the Idaho Constitution are denied.

C.    PROCEDURAL DUE PROCESS

Plaintiffs' First Claim for Relief alleges that by taking and selling CHI's assets,

Defendants deprived CHI of its property in violation of its procedural due process rights.  The

Second Amended Complaint appears to argue that both CHI and the individual Plaintiffs were

deprived of their due process rights.  However, in Plaintiffs' Response in Opposition to Motion

for Summary Judgment Plaintiffs only argue that CHI was deprived of its procedural due process

rights.[62]  Therefore, the Court considers that any due process claims the individual Plaintiffs may

have to be conceded and will not be discussed.

Where a state action "is challenged on due process grounds, we inquire whether the State

has deprived the claimant of a protected property interest, and whether the State's procedures

comport with due process."[63]

The Supreme Court has held that leaseholds are property interests.[64]  Defendants argue

that the Management Agreement terminated any property interest that CHI had in Community

House.  As discussed above, the City drafted a Management Agreement for Community House.

The parties dispute whether the CHI Board approved the Management Agreement.  Defendants

claim that even if the board did not enter into the Management Agreement, Ms. Watson had the

apparent authority to do so.  Plaintiffs claim that Ms. Watson did not have the authority to enter

into the Management Agreement.  Defendants further argue that CHI ratified the Management

Agreement.

"For an agent to bind a principal to a third party in contract the agent must have actual or

apparent authority."[65]  As indicated, Defendants claim that Ms. Watson had the apparent

authority to enter into the Management Agreement with the City on behalf of CHI.  "Apparent

authority occurs when a principal by words or actions voluntarily places an agent in such a

position that an ordinary person of business prudence would believe the agent is acting pursuant

---

[62]Docket No. 248 at 9-10

[63]*Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 195 (2001).

[64]*Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 135 (2002).

[65]*Huyett v. Idaho State Univ.*, 104 P.3d 946, 950 (Idaho 2004).

14

to existing authority."[66]  The Court finds that there are genuine issues of material fact which prevent it from concluding as a matter of law that Ms. Watson had the apparent authority to enter into the Management Agreement.

Defendants argue that even if Ms. Watson did not have apparent authority to enter into the Management Agreement, CHI is bound by that agreement because they ratified the agreement.

Absent authority, a principal may be bound where it ratifies its agent's transaction.[67] Ratification may take many forms.[68]

> It may, of course be by way of express affirmance of the agent's act once it becomes known.  It may also be implied if the principal, with full knowledge of the material facts, receives, accepts and retains benefits from the contract; remains silent, acquiesces in or fails to repudiate or disaffirm the contract; or otherwise exhibits conduct demonstrating an adoption and recognition of the agent's acts as binding.[69]

The Court finds that CHI ratified the June 2004 Management Agreement.  From the time that Ms. Watson signed the agreement until the filing of this lawsuit, CHI remained silent, acquiesced in, and failed to repudiate or disaffirm the Management Agreement. Indeed, CHI substantially performed under the agreement by turning over operations of Community House to the City.  Under the Management Agreement, CHI agreed to terminate the Lease Agreement and Operating Agreement.  Therefore, CHI had no property interest in Community House once the

---

[66]*Id.*

[67]*Carpenter v. Payette Valley Co-op., Inc.*, 578 P.2d 1074, 1078 (Idaho 1978).

[68]*Id.*

[69]*Id.*

Management Agreement was signed.  As a result, the Court will grant Defendants summary judgment on Plaintiffs' due process claim.

Even if CHI did not ratify the Management Agreement, CHI's property interest expired once the City repaid all of the federal loan obligations associated with Community House.  As set forth above, the Lease Agreement allowed for the City to purchase CHI's lease upon termination of the Operating Agreement by repaying the construction loan obtained from the Federal Home Loan Bank.  The Operating Agreement expired on its own terms on November 30, 2004, and the City repaid the Federal Home Loan Bank on November 20, 2006.  Thus, by the time that the City sold the Community House property to the BRM, CHI had no property interest in Community House.

## D.   IMMUNITY FOR INDIVIDUAL DEFENDANTS

Defendants argue that the individual Defendants are entitled to legislative immunity.  In the alternative, Defendants argue that the individual Defendants are entitled to qualified immunity.

### 1.   *Legislative Immunity*

The individual Defendants include: the Mayor of Boise, David Bieter; members of the Boise City Council, Maryann Jordan, Elaine Clegg, Vern Bisterfelt, David Eberle, Jerome Mapp, and Alan Shealy; the Director of Planning and Development Services, Bruce Chatterton; and the Manager of Housing and Community Development, Jim Birdsall.

The Supreme Court has held that local legislators are "absolutely immune from suit under § 1983 for their legislative activities."[70]  The Ninth Circuit has recognized, however, that not all

---

[70]*Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998).  As Defendants Chatterton and Birdsall cannot be considered local legislators, this discussion does not apply to them and only applies to

government acts by a local legislature are necessarily legislative in nature.[71]  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."[72]

The Court determines whether an action is legislative by considering four factors: (1) whether the act involves ad hoc decision making, or the formulation of policy; (2) whether the act applies to a few individuals, or to the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears all the hallmarks of traditional legislation.[73]  The Court considers each factor in turn.

First, the Court considers whether the act involves ad hoc decision making.  The Ninth Circuit has stated that decision making is ad hoc if it does not "effectuate policy or create a binding rule of conduct."[74]  In *Kaahumanu*, the court held that the decision to grant or deny a conditional use permit is an ad hoc decision.[75]  Such a decision would only affect a single parcel of land and has no further force or effect.[76]

The Court finds that the actions of the Mayor and the members of the City Council with regard to lease and sale of the Community House property were ad hoc.  They do not effectuate

---

the Mayor and members of the Boise City Council.

[71]*Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 580 (9th Cir. 1984).

[72]*Bogan*, 523 U.S. at 54.

[73]*Bechard v. Rappold*, 287 F.3d 827, 829 (9th Cir. 2002).

[74]*Kaahumanu v. County of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003).

[75]*Id.*

[76]*Id.*

policy or create a binding rule of conduct.  Rather, those decisions, like the decision to grant or deny a conditional use permit, only had an impact on a single parcel of land: the Community House property.

Next, the Court considers whether the act applies to a few individuals or to the public at large.  "When the act in question applies to a few individuals rather than the public at large, legislative immunity is disfavored."[77]  Here, the actions of the Mayor and the members of the City Council applied to only a few individuals, rather than the public at large.  Specifically, the decision to take over, lease, and eventually sell the Community House Property affected CHI, the City, the BRM, and the residents of Community House.

Third, the Court looks to whether the act is formally legislative in character.  There is evidence to show that the acts were formally legislative in character.  For example, the members of the City Council voted on the resolutions that came before it concerning Community House.  However, the Ninth Circuit has stated that the Court must look beyond the formal character of the act to see whether it contains matter which is properly to be regarded as legislative in its character and effect.[78]

Finally, the Court considers whether the act bears all the hallmarks of traditional legislation.  As discussed above, these were merely ad hoc decisions relating only to Community House.  Therefore, the Court finds that the individual Defendants are not entitled to legislative immunity.

---

[77]*Id*. at 1222.

[78]*Cinevision Corp.*, 745 F.2d at 580.

    2.    *Qualified Immunity*

The doctrine of qualified immunity shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law."[79] "Once a defendant pleads qualified immunity as a defense, the plaintiff must show: (1) that the defendant's actions violated a constitutional or statutory right, and (2) that the rights alleged to be violated were clearly established at the time of the conduct at issue.[80]

As set forth above, there are genuine issues of material fact as to whether Defendants' actions violated the Establishment Clause.  Therefore, Defendants are not entitled to qualified immunity.

E.     FAIR HOUSING ACT

Plaintiffs Second, Third, Fifth, Sixth, and Seventh Causes of Action allege violations of the Fair Housing Act.[81]  Specifically, Plaintiffs' Second Claim for Relief claims discrimination under the FHA on the basis of disability/handicap; Plaintiffs' Third Claim for Relief alleges discrimination under the FHA on the basis of religion, sex, and familial status; Plaintiffs' Fifth Claim for Relief alleged that Defendants have engaged in a residential real estate-related transaction with the intent of discriminating against persons in the terms and conditions of such a transaction because of their religion, sex, handicap, and familial status in violation of the FHA; Plaintiffs' Sixth Claim for Relief alleges that Defendants have retaliated against Plaintiffs for

---

[79]*Elder v. Holloway*, 510 U.S. 510, 512 (1994).

[80]*Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Court notes that the Supreme Court recently ruled that the sequential two-step analysis set out in *Saucier v. Katz* is no longer mandatory.  *See Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 818 (2009).  However, as it is helpful here, the Court will continue to apply it.  *Id*.

[81]42 U.S.C. §§ 3601 *et seq*.

exercising or aiding another person in the exercise of rights protected by the FHA; and Plaintiffs'

Seventh Claim for Relief is brought pursuant to 42 U.S.C. § 3615.  Defendants seek summary

judgment on each of these claims.

       *1.*        *Applicability of the FHA*

       Before addressing Plaintiffs' specific claims under the Fair Housing Act, the Court must

first determine whether the Act is applicable.  The question presented here is whether the

Community House property can be considered a "dwelling" under the FHA.

       The FHA prohibits discrimination in the sale or rental of a dwelling or in the provision of

services or facilities in connection therewith, because of race, color, religion, sex, handicap,

familial status, or national origin.[82]  Dwelling is defined as "any building, structure, or portion

thereof which is occupied as, or designed or intended for occupancy as, a residence by one or

more families, and any vacant land which is offered for sale or lease for the construction or

location thereon of any such building, structure, or portion thereof."[83]

       The Ninth Circuit, when considering the preliminary injunction in this case, addressed the

applicability of the FHA in a footnote.[84]  The court noted that, in a previous case, it had applied

the FHA to a homeless shelter, but did not squarely decide the issue of whether all temporary

shelters fit within the Act's definition of dwelling.[85]  The court went on to state that it need not

decide that issue because it had little trouble in concluding that Community House qualified as a

---

[82]42 U.S.C. § 3604(a), (b), (f).

[83]*Id.* § 3602(b).

[84]*Community House*, 490 F.3d at 1048 n.2.

[85]*Id.* (citing *Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 942 (9th Cir. 1996)).

dwelling under the definition of the Act.[86]  This conclusion was based on the fact that the facility

provided more than transient overnight housing.[87]  This Court had previously found "that the

facility generate[d] up to $125,000 in rent per year from fortynine transitional housing units in

which the tenants reside for up to a year and a half."[88]

Defendants argue that the FHA does not apply to emergency shelters.  However, the

Court need not decide the larger issue presented by Defendants.  The Ninth Circuit has already

concluded that at least a portion of the Community House facility "'is occupied as, or designed

or intended for occupancy as, a residence by one or more families,' and thus qualifies as a

'dwelling' under section 3602(b)."[89]  For the same reasons set out by the Ninth Circuit, the Court

finds that the FHA is applicable here.

2.    *Second Claim for Relief*

Plaintiffs' Second Claim for Relief claims discrimination under the FHA on the basis of

disability/handicap under 42 U.S.C. § 3604(f)(1), (2), and (3)(B).  A plaintiff can establish an

FHA discrimination claim under a theory of disparate treatment or disparate impact.[90]

Additionally, a plaintiff may sue under 42 U.S.C. § 3604(f)(3)(B) if a municipality refuses to

make reasonable accommodations for handicapped housing.[91]

---

[86]*Id.*

[87]*Id.*

[88]*Id.*

[89]*Id.*

[90]*Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997).

[91]*Id.*

Plaintiffs' Second Claim for Relief contains two theories: disparate treatment and failure to accommodate. Defendants do not discuss Plaintiffs' failure to accommodate claim and neither will the Court. To the extent that Defendants' Motion can be read as seeking summary judgment on Plaintiffs' failure to accommodate claim, that Motion is denied.

When discussing Plaintiffs' disparate treatment claim, the Ninth Circuit held that the City's policies at Community House, with regard to disabled persons, were not facially discriminatory and, thus, applied the *McDonnell Douglas*[92] burden-shifting test.[93]

> Under the *McDonnell Douglas* test, the plaintiffs in this case must first establish a prima facie case of discrimination with regard to their disability discrimination claims. To establish such a prima facie case, the plaintiffs must show (1) that they are members of a protected class, (2) that [they] applied for and were qualified for shelter at Community House, (3) that they were rejected, and (4) that openings at the shelter remained available. After the plaintiffs have established a prima facie case, the burden then shifts to the defendants who must articulate a legitimate, nondiscriminatory reason for their action. If the defendants meet their burden, the burden then shifts back to the plaintiffs to prove by a preponderance of the evidence that the reason asserted by the defendants is a mere pretext.[94]

There is no dispute that at least some of the individual Plaintiffs are members of a protected class. Therefore, this element is not an issue. Defendants argue that they are entitled to summary judgment because once Community House was shut down, no one was qualified for shelter, and no openings remained available. Plaintiffs have submitted nothing to dispute this argument. Nor have they presented any evidence that any of the individual Plaintiffs: (1) applied for shelter at Community House after it was reopened by the BRM, (2) that they were rejected, and (3) that openings at that facility remained available. Therefore, Defendants are entitled to

---

[92]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

[93]*Community House*, 490 F.3d at 1052-53.

[94]*Id*. at 1053 (citations omitted).

summary judgment on Plaintiffs' disparate treatment claim with regard to disabled persons. Plaintiffs' failure to accommodate claim remains.

      *3.*     *Third Claim for Relief*

Plaintiffs' Third Claim for Relief alleges discrimination under the FHA on the basis of religion, sex, and familial status. The Court will discuss Plaintiffs' claims on the basis of gender and familial status separately from their claims based on religion.

      *a.*     *Gender and Familial Status*

The Ninth Circuit has determined that Plaintiffs' claims of discrimination under the FHA on the basis of gender and familial status are not subject to the *McDonnell Douglas* test because BRM's policy of using the Community House property as a men-only shelter is facially discriminatory.[95] Rather, these claims are subject to the test set out in the Supreme Court's decision of *Johnson Controls*.[96] Under this approach, "a plaintiff makes out a prima facie case of intentional discrimination under the [Fair Housing Act] merely by showing that a protected group has been subjected to explicitly differential—i.e. discriminatory—treatment."[97]

Here, Plaintiffs have made out a prima facie case of facial discrimination under the Fair Housing Act because they have been excluded from Community House based on their gender and familial status. The Lease between the City and the BRM required that the BRM operate an emergency homeless shelter with a capacity to serve not fewer than sixty-six (66) *guests* and a soup kitchen. While the Lease itself did not limit the shelter to men, "City Resolution No. 18765,

---

[95]*Id*. at 1048-49.

[96]*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 200-01 (1991).

[97]*Community House*, 490 F.3d at 1050 (internal quotation marks omitted).

approving the lease of Community House to the BRM, specifically incorporates the restrictions of City Ordinance No. 6404."[98]  As set forth above, City Ordinance No. 6404 required the property to be used as "a shelter for a minimum of 66, single, homeless, men" for a period of 10 years.  The City argues that it was the BRM, not the City, that implemented the men only policy and that it cannot be held responsible for the BRM's actions.  However, this argument directly contradicts the Ninth Circuit's previous ruling on this issue.

As the Ninth Circuit recognized, "this does not mean that intentional differential treatment can never be justified under the Fair Housing Act."[99]  "Some differential treatment may be objectively legitimate."[100]  To allow facial discrimination, "a defendant must show either: (1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes."[101]

Defendants argue that the men only policy responded to safety concerns.  In particular, Defendants argue that there were serious safety issues involved with mixing homeless single men with women and families.  In support of this argument, Defendants point to a higher volume of police calls that CHI had received, as compared to the BRM.  However, the Ninth Circuit stated that "[t]he 'fewer police calls' at the BRM's other facilities does not establish that the men-only policy is justified by safety concerns."[102]  Additionally, Defendants have provided affidavits of

---

[98]*Id*. at 1049.

[99]*Id*. at 1050.

[100]*Id*.

[101]*Id*.

[102]*Id*. at 1051.

women who lived in mixed shelters, including Community House.[103]  Those women describe

being threatened, intimidated, and pressured to engage in illegal activity.  However, this evidence

is disputed.[104]  Therefore, the Court finds that Defendants are not entitled to summary judgement

on Plaintiffs' FHA claim based on gender and familial status.

> b.    Religion

There is no evidence of facial religious discrimination.  Thus, Plaintiffs' claim of

discrimination on the basis of religion is subject to the *McDonnell Douglas* test, set out above in

relation of Plaintiffs Second Claim for Relief.

Only the allegations of Plaintiff Masker meet the requirements of the test set forth

above.[105]  In the Second Amended Complaint, Masker alleges that he stayed at Community

House after it was being operated by the BRM.  Makser alleges that he was asked to leave

because he did not want to be forced to participate in religious activities.  While these allegations

may rise to the level of showing a FHA violation, they remain merely allegations.  Plaintiffs have

failed to present any deposition testimony, affidavit, or other evidence to support Masker's

allegations.  Therefore, Plaintiffs' claim of religious discrimination under the FHA fail and

Defendants will be granted summary judgment on that claim.

---

[103]Docket Nos. 200-9 and 200-12.

[104]*See* Docket No. 229, ¶ 17; Docket No. 230, ¶ 34.

[105]The Second Amended Complaint contains other allegations concerning religious discrimination.  However, those claims relate to religious activities at other facilities, are based on prior experiences with the BRM, or did not result in removal from Community House.

4.      *Fifth Claim for Relief*

Plaintiffs' Fifth Claim for Relief alleged that Defendants have violated 42 U.S.C. §

3605(a).  That provision states:

> It shall be unlawful for any person or other entity whose business includes
> engaging in residential real estate-related transactions to discriminate against any
> person in making available such a transaction, or in the terms or conditions of
> such a transaction, because of race, color, religion, sex, handicap, familial status,
> or national origin.[106]

Residential real estate-related transactions include "[t]he selling, brokering, or appraising

residential real property."[107]  Residential real estate is not defined by the Act.

Defendants argue that the sale of Community House did not involve residential real

property.  This is the same argument previously advance by Defendants that Community House

is not a dwelling.  That argument has been rejected by the Ninth Circuit, as discussed above.

Defendants further argue that it was the BRM, not the city, that implemented the men

only policy at Community House.  However, as discussed above, this directly conflicts with the

previous rulings of the Ninth Circuit, which held that "City Resolution No. 18765, approving the

lease of Community House to the BRM, specifically incorporates the restrictions of City

Ordinance No. 6404."[108]  Thus, Defendants' Motion for Summary Judgment on Plaintiffs' Fifth

Claim for Relief must be denied.

---

[106]42 U.S.C. § 3605(a).

[107]*Id*. § 3605(b)(2).

[108]*Community House, Inc.*, 490 F.3d at 1049.

5.      *Sixth Claim for Relief*

Plaintiffs' Sixth Claim for Relief alleges that Defendants have retaliated against Plaintiffs for exercising or aiding another person in the exercise of rights protected by the FHA.

The Ninth Circuit applies the *McDonnell Douglas* test to claims of retaliation under the FHA.  "To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action."[109]  "If a plaintiff has presented a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision."[110]  "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive."[111]

Defendants concede, for the purposes of this Motion, that Plaintiffs have engaged in protected activity.  Defendants argue, however, that Plaintiffs have not shown any adverse action. Defendants also argue that there is no evidence of a causal link between Plaintiffs bringing this action and the sale by the City of Community House to the BRM.

The Court finds that there are genuine issues of material fact relating to this claim. Therefore, summary judgment is improper.

---

[109]*Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).

[110]*Id.*

[111]*Id.*

6.      *Seventh Claim for Relief*

Plaintiffs' Seventh Claim for Relief is brought pursuant to 42 U.S.C. § 3615.  That

provision invalidates any state or local law or ordinance "that purports to require or permit any

action that would be a discriminatory housing practice."

Plaintiffs contend that the regulation permitting the lease of the facility and requiring that

the property be used as a shelter for a minimum of 66 single, homeless men violates the FHA.

Defendants contend that this issue is moot because it only related to the attempt to auction the

Community House property.  However, as noted above and by the Ninth Circuit, the resolution

approving the lease of the property to the BRM incorporated this restriction.[112]  Therefore,

Defendants' Motion for Summary Judgment on Plaintiffs' Seventh Claim for Relief will be

denied.

F.      UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITIONS
        POLICY ACT

Plaintiffs' Eighth and Ninth Causes of Action allege violations of the Uniform Relocation

Assistance and Real Property Acquisitions Policy Act ("URA").[113]  Defendants contend that the

URA does not apply to the closure and sale of the Community House building.

The URA makes relocation benefits available to persons displaced by federal or federally

assisted state projects.  A "displaced person" is

> (i) any person who moves from real property, or moves his personal property from
> real property--
> (I) as a direct result of a written notice of intent to acquire or the acquisition of
> such real property in whole or in part for a program or project undertaken by a
> Federal agency or with Federal financial assistance; or

---

[112]*Community House*, 490 F.3d at 1048-49.

[113]42 U.S.C. §§ 4601 *et seq*.

(II) on which such person is a residential tenant or conducts a small business, a farm operation, or a business defined in paragraph (7)(D), as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, under a program or project undertaken by a Federal agency or with Federal financial assistance in any case in which the head of the displacing agency determines that such displacement is permanent; and

(ii) solely for the purposes of sections 4622(a) and (b) and 4625 of this title, any person who moves from real property, or moves his personal property from real property--

(I) as a direct result of a written notice of intent to acquire or the acquisition of other real property, in whole or in part, on which such person conducts a business or farm operation, for a program or project undertaken by a Federal agency or with Federal financial assistance; or

(II) as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, of other real property on which such person conducts a business or a farm operation, under a program or project undertaken by a Federal agency or with Federal financial assistance where the head of the displacing agency determines that such displacement is permanent.[114]

The term "Federal financial assistance" means "a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance, any interest reduction payment to an individual in connection with the purchase and occupancy of a residence by that individual, and any annual payment or capital loan to the District of Columbia."[115]

Defendants argue that the URA does not apply because there were no federal funds used to close the facility and the BRM did not acquire the property or operate the facility using federal funds. Plaintiffs argue that the URA does apply because the City received federal funds in the past in relation to the operation of Community House.

The facts, as set forth above, show that on September 6, 2005, the City repaid all HOME and CDBG funds to HUD. The City then closed the Community House facility on September 6, 2005. The BRM reopened the facility approximately 30 days later. The City did not utilize any

---

[114]*Id.* § 4601(6).

[115]*Id* § 4601(4).

federal grant money to transfer the operations of the facility to the BRM and the BRM received no monies from the City in connection with its operations of the homeless shelter or the kitchen facilities since it began operating the facility.[116]  Further, the BRM did not use any federal funds to purchase the Community House building.[117]  Based on the above, the Court finds that no Federal financial assistance was used in the closing, reopening, or sale of the Community House facility.  Therefore, Plaintiffs cannot be considered "displaced persons" and the URA is not applicable here.

G.     HOUSING AND COMMUNITY DEVELOPMENT ACT AND HOME INVESTMENT PARTNERSHIP ACT CLAIMS

Plaintiffs also seek relocation benefits pursuant to the Housing and Community Development Act and Home Investment Partnership Act claims.  For substantially the same reasons stated above in reference to Plaintiffs' URA claims, the Court will grant Defendants' Motion for Summary Judgment on Plaintiffs' claims under these acts.

H.     RESCISSION

In their Fifteenth Claim for Relief, Plaintiffs seek rescission of the Management Agreement.  Defendants argue that rescission is not an available remedy to Plaintiffs.

"Rescission is an equitable remedy that relives the parties of their duties and obligations under the contract, and returns the parties to their pre-contract positions."[118]  Defendants argue that it would be impossible to return the parties to their pre-contract positions and, thus, rescission is not an appropriate remedy here.

---

[116]Docket No. 200-10, ¶ 17.

[117]Docket No. 132, ¶ 41.

[118]*GME, Inc. v. Carter*, 817 P.2d 183, 185 (Idaho 1991).

For substantially the same reasons set forth above in relation to Plaintiffs' due process claims, the Court will grant Defendant summary judgment on Plaintiffs' claim of rescission. The Court finds that CHI ratified the Management Agreement and, thus, terminated the Operating Agreement and Lease Agreement. Even if it did not ratify the Management Agreement, the Operating Agreement has expired on its own terms and the City purchased CHI's lease by repaying the Federal Home Loan Bank. For these reasons, CHI has no continued interest in the Community House property and that property has been sold. Therefore, the Court cannot return the parties to their pre-contract positions and Plaintiffs' claim for equitable rescission fails.

I.      PLAINTIFF'S CLAIMS FOR INJUNCTIVE RELIEF

Defendants seeks summary judgment on Plaintiffs' claims for injunctive relief. Defendants argue that these claims are now moot and should be dismissed as such. Defendants point out that the Community House building has now been sold and that the City has no plans of operating a homeless shelter in the future.

A claim is moot when the Court cannot grant effectual relief.[119] The burden of demonstrating mootness is a heavy one.[120] The Court finds that Defendants have not met their heavy burden of showing that all of Plaintiffs' claims for injunctive relief are moot. Therefore, Defendants' Motion for Summary Judgment on this ground will be denied.

IV. CONCLUSION

It is therefore ORDERED that Defendants' Motion for Summary Judgment (Docket No. 200) is GRANTED IN PART AND DENIED IN PART as set forth above. It is further

---

[119]*Church of Scientology v. United States*, 506 U.S. 9, 12 (1984).

[120]*Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979).

ORDERED that Defendants' Motion to Strike (Docket No. 251) and Plaintiffs' Motion to Strike (Docket No. 257) are DENIED.

DATED   July 29, 2009.

BY THE COURT:

_____

TED STEWART
United States District Judge