Phillip J. Collaer, ISB #3447
Mark D. Sebastian, ISB #6012
ANDERSON, JULIAN & HULL LLP
C. W. Moore Plaza
250 South Fifth Street, Suite 700
Post Office Box 7426
Boise, Idaho 83707-7426
Telephone:   (208) 344-5800
Facsimile:   (208) 344-5510
E-Mail:   randerson@ajhlaw.com
              pcollaer@ajhlaw.com

Attorneys for Defendants City of Boise

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COMMUNITY HOUSE, INC., et al.<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF BOISE, IDAHO, et al.<br><br>Defendants. | 1:05-cv-00283-CWD<br><br>**DEFENDANTS' TRIAL BRIEF** |

## I. STATEMENT OF FACTS

In 1994, the City of Boise and Community House, Inc. (CHI) signed a Lease Agreement and Operating Agreement which provided for the use and operation of a homeless shelter on city-owned property. The Operating Agreement commenced November 30, 1994. The Agreement provided for an initial five year term with a single renewal for an additional five years. The Operating Agreement was renewed after its initial five year period expired. There were no further renewals and, absent a mutual agreement between the parties to extend the Agreement, the Operating Agreement would have expired on its own terms in November of 2004. The Lease Agreement was also signed in November of 1994. The Lease provided a 50

DEFENDANTS' TRIAL BRIEF - 1

year term ending October 1, 2044. The lease would be terminated in the event the Operating Agreement was either terminated or, expired.

In January of 2004, the president of CHI contacted City Council members Vernon Bisterfeldt and Maryann Jordan and advised them that CHI was in a financial crisis. Bisterfeldt and Jordan were advised that without immediate funding from the City, CHI would cease operations by the end of February. Jordan and Bisterfeldt arranged an emergency meeting with Mayor Bieter. He instructed CHI to contact the manager of the Boise City Department of Housing and Community Development and apprise him of their dilemma. Thereafter, the City audited CHI's financial records. The audit revealed serious and ongoing financial problems. At the same time, CHI also had ongoing compliance issues with the Department of Housing and Urban Development.

To avoid closing the shelter in the middle of the winter, the City provided financial assistance by paying $55,000 of Community House's expenses through March of 2004. The financial crisis CHI was experiencing was aggravated by the fact its funding, which relied heavily upon CDBG grants, had been exhausted. Additional funding would not be available from the federal government until mid to late July of 2004. In other words, CHI had exhausted its entire grant for the year in approximately six months. The City had never provided independent funding to CHI and, the Operating Agreement specifically stated that the City of Boise was under no obligation to provide independent funding.

In response to the CHI crisis, the mayor's office formed the Community House Ad Hoc Advisory Committee. The Committee was comprised of experts in the fields of social services and homelessness. It included faculty from Boise State University and, the Homeless Coalition. The Boise Rescue Mission was not represented on the Committee. On May 6, 2004, the Committee issued a report which recommended that Community House's role as an emergency

DEFENDANTS' TRIAL BRIEF - 2

shelter and transitional housing facility be re-examined. The report concluded that the various populations at Community House were not compatible as the building itself was not designed for inter-mingling programs and at risk populations. The report recommended that emergency shelter services for single persons be provided by private organizations. The report further suggested the Community House building be sold to allow the provision of shelter services elsewhere in the community.

Thereafter, the City negotiated a Management Agreement with CHI. Pursuant to the Agreement, the City agreed to operate the facility and assume the financial obligations surrounding the day-to-day operations. The Agreement was signed by CHI president Deanna Watson on June 2, 2004. After the Management Agreement was signed, CHI vacated the building and, both the City of Boise as well as CHI performed the terms of the Agreement. Consistent with its contractual obligations, from March of 2004 through September 6, 2005, the City of Boise devoted in excess of $1 million from the City's general fund to the day-to-day operations. In the last 12 months the City operated the facility, the monthly costs approached $80,000 per month. Consistent with its obligations under the Management Agreement, the City repaid the federal land bank loan and repaid all CDBG and home grant monies that had been used at Community House.

After the report from the Community House Ad Hoc Advisory Committee was received, the City staff, in addition to managing the day-to-day operations, began work to develop a plan to implement the recommendations of the committee which included transitioning services to private vendors. Through this process, the City examined whether non-profit entities would be able to absorb shelter services for men, women and families. That process revealed that services that were being provided at the CHI building to women, children and families could be absorbed by other entities already in the community. This analysis also revealed that the least desirable

DEFENDANTS' TRIAL BRIEF - 3

components were the men's shelter and, the soup kitchen. Those operations involved the greatest number of individuals seeking benefits and, were the most expensive to operate.

In the spring of 2005, the City prepared a Request For Information/Request for Proposal (RFI/RFP) which invited service providers to submit proposals to assume ownership and/or Management of the various programs offered at Community House. The RFI/RFP requested proposals for a men's shelter, a women's shelter, a family shelter, transitional housing units, single room occupancy housing units, the soup kitchen, and a low income daycare center. Responses were received from the Boise Rescue Mission, Salvation Army, Boise City/Ada County Housing Authority, Neighborhood Housing Services, Giraffe Laugh Day Care, Supportive Housing and Integrated Partnerships, Inc. (SHIP), and El-Ada Inc.

After the responses were received, they were reviewed by an RFP review committee comprised of individuals from the Boise City Council, Ada County, The Homeless Coalition, Boise State University, United Way, and Corpus Christi. The Boise Rescue Mission was not represented on the committee nor was any other faith based organization. The RFP review committee reviewed the responses and recommended formal proposals be solicited from all respondents with the exception of SHIP. The proposals were evaluated and forwarded to the City Council for its consideration. The council followed the City's recommendations and sought formal proposals from all of the respondents with the exception of SHIP.

The only proposals were submitted by Giraffe Laugh and the Boise Rescue Mission. Giraffe Laugh limited its proposal to the low income daycare center. The Rescue Mission proposal was limited to operating a men's shelter at the CHI building as well as the soup kitchen. Upon receiving the BRM proposal, the City requested clarification concerning whether it would be providing services to women and children. The BRM responded by advising the City it intended to provide overnight housing to women and children but, at a building located in close

DEFENDANTS' TRIAL BRIEF - 4

proximity to the former Community House building. Women and children would be encouraged to eat at the soup kitchen and participate in all other programs offered at the building, but they would sleep at a different building. The BRM advised the City that security concerns had, years previously, caused it to determine that homeless shelters for men and women should be located at different physical locations. It supported its position by stating it experienced fewer police calls at its facilities as compared to CHI which had operated as a mixed population facility.

Because the only proposal the City received contemplated a sale, the City Council concluded it was necessary to place the building for public auction. A public auction was scheduled with a minimum bid of $2.5 million. Potential bidders were advised the property would be transferred subject to a deed restriction which required the successful bidder to operate a homeless shelter with a minimum of 66 beds for ten years. The BRM advised the City it would not participate in the auction. The City did not receive any responsive bids.

After the auction failed to attract responsive bidders, in accordance with I.C. § 50-1404, the City engaged in negotiations with the BRM which, as indicated above, was the only entity that submitted a proposal through the RFI/RFP process to provide any services to the homeless population. Through its proposal, the BRM stated its intention to operate an overnight men's shelter and, a soup kitchen in the building. The soup kitchen would be open to men and women. Its proposal did not include long term housing or transitional housing which had previously existed at the building when it was operated by the City and, CHI. Those operations were absorbed by other service providers in the community.

Negotiations between the City and the BRM produced a lease which contained an option to purchase. The lease required the Rescue Mission to operate a homeless shelter with no fewer than 66 beds and a soup kitchen. The lease also contained an option which allowed the Rescue Mission to purchase the building pursuant to a deed restriction which required it to operate a

DEFENDANTS' TRIAL BRIEF - 5

homeless shelter and soup kitchen within the City of Boise but, not necessary at the Community House building, with no fewer than 66 beds for a period of ten years.

The BRM Lease proposal was considered and approved by the Boise City Council. Thereafter, the City posted written notice at the CHI building informing individuals who received overnight emergency shelter care services that the facility would be closed. Individuals occupying the transitional housing units were provided individual notice. The facility was closed September 6, 2005. The BRM reopened as a homeless shelter and soup kitchen 30 days later. The building was renamed "The River of Life". The BRM has never operated the building as a mixed use facility. The facility has, at all times, been open to men and women during the daytime. Women and children are free to participate in the programs at the facility and receive meals at the soup kitchen. However, women and children sleep at a different building.

On January 9, 2007, the BRM exercised its option to purchase the building for $2 million. The transaction was a cash sale. The City does not possess any liens or security interests. At closing, the Rescue Mission received a deed containing a restriction requiring it to operate a homeless shelter and a soup kitchen in the City of Boise with no fewer than 66 beds for the next ten years. After it acquired the building, the BRM undertook significant renovations. The kitchen facilities were updated, expanded, and replaced with a modern commercial kitchen. This renovation increased the number of individuals whom the BRM could provide meals. As a result, residents of the Interfaith Sanctuary receive their meals at the BRM facility.

Additionally, the BRM renovated the sleeping quarters expanding the number of available beds. Through the renovations, the number of beds was expanded. Additionally, the BRM has greatly expanded the number of beds available to women and children. The BRM constructed a new building located next to the existing women's facility which is dedicated to families.

**DEFENDANTS' TRIAL BRIEF - 6**

The BRM does not receive, and has never applied for financial assistance from the City through the CDBG funds. In 2003, CHI received $150,000.00 from those funds. It anticipated receiving $188,753.00 in 2004. Since CHI ceased operating the building, the CDBG monies it was previously receiving, were reallocated to other programs and service providers. Additionally, since the BRM assumed operations and purchased the building, the City was relieved of its financial obligation to operate the facility which, at the time of closure, was costing the City approximately $80,000 per month.

## II. PLAINTIFF'S THEORIES OF RECOVERY

The *Second Amended Complaint* contains 18 causes of action alleging violations of state and federal law. Plaintiffs moved for leave to file a Second Amended Complaint on or about December 28, 2007, which proposed nineteen (19) causes of action and sought to join additional plaintiffs. See **Docket No. 166-1**. On July 22, 2008, the Court issued its decision as to the proposed Amendment. See **Docket No. 191**. The Court granted the amendment only to the extent that it allows the addition of state law claims for Counts 12 through 17 "without any claim for monetary damages," and the addition of Count 18 (but not Count 19). The Court also permitted the addition of plaintiffs James Masker, Jessica Schafer, and Jimmy Moore, but not Jim Liddell. Plaintiffs have never filed a *Second Amended Complaint* with the changes required by the Court's July 22, 2008, *Memorandum Decision and Order*.

All claims based upon alleged violations of state law seeking compensatory damages were dismissed due to the Plaintiffs' failure to file a timely Notice of Claim. Additionally, the state law claims alleging breach of contract, breach of partnership or violation of the Non-Profit Corporations Act, or equitable estoppel or equitable rescission were dismissed through the District Court's ruling that the 2004 Management Agreement was enforceable. That Agreement terminated the prior Operating Agreement and Lease between the City of Boise and CHI. It also

DEFENDANTS' TRIAL BRIEF - 7

required CHI to vacate the building and, turn over its personal property and, accounts receivable to the City. In return, the City assumed the financial obligation of operating the facility which included responsibility for the CDBG/home grant funds and, liability under the federal land bank loan. In accordance with its contractual obligations, the City repaid the CDBG/home grant monies and, repaid the loan to the Federal Home Land Bank. CHI received written confirmation from the Federal Home Land Bank releasing them from any further liability under the loan.

A.      **Due Process Claims and Equitable Rescission**

In its July 29, 2009, *Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Motions to Strike* (Docket No. 261) (hereinafter, "Summary Judgment Decision), the Court held that Plaintiffs had conceded any claims as to the due process claims, if any, asserted by the individual Plaintiffs, and dismissed those claims. **Summary Judgment Decision**, p. 14. The Court went on to hold that CHI had ratified the June 2004 Management Agreement between CHI and the City and, therefore, "CHI had no property interest in Community House once the Management Agreement was signed." *Id.* at 15-16. Consequently, the Court granted summary judgment to Defendants as to Plaintiffs' due process claims (i.e., the First Claim for Relief). *Id.* at 16.

Based on the ratification of the Management Agreement, the District Court also dismissed Plaintiffs' claim for equitable rescission. In addition, though, this Court also held:

> Even if it did not ratify the Management Agreement, the Operating Agreement has expired on its own terms and the City purchased CHI's lease by repaying the Federal Home Loan Bank. For these reasons, CHI has no continued interest in the Community House property and the property has been sold. Therefore, the Court cannot return the parties to their pre-contract positions and Plaintiffs' claim for equitable rescission fails.

**Summary Judgment Decision**, p. 31.

Clearly, the ratification of the Management Agreement counters any claim by CHI that

**DEFENDANTS' TRIAL BRIEF - 8**

the City discriminated or retaliated against it by assuming control of the facility.

**B.    Discrimination Claims**

The disability, gender and familial discrimination claims all focus upon the BRM's practice of utilizing separate physical facilities to provide overnight shelter services to men and women. It is doubtful any of the individual plaintiffs have experienced any compensatory damages. Certainly, the plaintiffs have failed to provide, through discovery, any information detailing their damage claims. *See Affidavit of Mark D. Sebastian in Support of Defendants' Motion in Limine* (Docket No. 303-2), Exhibit A. More importantly, the claims of the individuals, Marlene Smith, Greg Luther, Jay Banta, James Masker, Jessica Schaefer, and Jimmy Moore have, in large part, been dismissed. Their individual claims are described in the Second Amended Complaint as follows:

> 1. Marlene Smith – Ms. Smith is a single parent with two boys. She alleges she was evicted from Community House when the facility was closed by the City. Prior to the closure, Smith received overnight shelter services. She alleges she did not wish to stay at the BRM City of Light facility because she has a religious philosophy which is inconsistent with the religious practices at that facility. She alleges that because the City leased and subsequently sold the CHI building to the BRM, she has become homeless. *See* **Docket No. 166-1, ¶¶ 19-20**.
>
> 2. Greg Luther – Mr. Luther alleges he suffers from a disability and was forced to vacate the Community House facility in August of 2004 when the City closed the facility. He does not allege he was subjected to either religious or any other form of discrimination when the building was reopened under the management of the BRM. *See* **Docket No. 166-1, ¶ 21**.
>
> 3. Jay Banta – Mr. Banta alleges he was forced to leave Community House when the City closed the facility. He had received overnight emergency shelter services. He contends he previously resided at the BRM and, claims it subjects residents to the Christian religion. Because he did not wish to participate in religious services, he contends accepting services from the BRM would require him to be subjected to and participate in religious services which he contends were discriminatory. *See* **Docket No. 166-1, ¶¶ 23-24**.

**DEFENDANTS' TRIAL BRIEF - 9**

4.  James Masker – Mr. Masker contends he was asked to leave the BRM River of Life facility because he told a staff member he did not wish to participate in religious activities. He did not receive services at the building while it was operated by CHI or the City. *See* **Docket No. 166-1, ¶¶ 27-28.**

5.  Jessica Schaefer – Ms. Schaefer alleges that she was forced to leave the Community House facility after it was closed by the City of Boise. Prior to the closure, she received overnight emergency shelter services. Thereafter, she has resided intermittently at the BRM City of Light shelter because she cannot stay at the former Community House building due to the fact the BRM operates it as a men's shelter. She complains that during the time she has resided at the City of Light facility, she has been subjected to religious activities and programs in order to stay at the shelter. *See* **Docket No. 166-1, ¶¶ 29.**

6.  Jimmy Moore – Mr. Moore was an overnight shelter care guest at the Community House building prior to the time it was closed by the City of Boise. He has received services after the facility was reopened by the BRM as the River of Life. He contends he was subjected to religious activities and programs by the River of Life staff and volunteers. According to the Complaint, he currently resides at the Interfaith Sanctuary because it does not subject him to religious activities and programs. *See* **Docket No. 166-1, ¶¶ 30.**

Based upon the allegations in the *Second Amended Complaint*, the only individual plaintiffs possessing discrimination claims which have not been dismissed are Jessica Schaffer and Greg Luther. This is due to the fact that, in its July 29, 2009, *Memorandum Decision and Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Motions to Strike* (Docket No. 261) (hereinafter, "Summary Judgment Decision), the District Court dismissed all claims based upon religious discrimination and disparate impact. **Summary Judgment Decision**, p. 25. Smith's, Banta's, Masker's and Moore's discrimination claims are all based upon religious discrimination. Accordingly, none of their claims survived summary judgment.

Mr. Luther contends he was subjected to discrimination based upon his disability. In its

Summary Judgment Decision, the Court held that "Defendants are entitled to summary judgment on Plaintiffs' disparate treatment claim with regard to disabled persons." **Summary Judgment Decision**, pp. 22-23. Only a claim for failure to accommodate would remain. See *Id*. To prevail on a claim for failure to accommodate under the FHA, a plaintiff must prove all of the following elements: (1) that the plaintiff is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation. *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006). No accommodation was sought. As this Court held in its Summary Judgment Decision, Mr. Luther was not treated any differently from anyone else, and, therefore, a request to remain in the facility would not have afforded "an equal opportunity to use and enjoy the dwelling." To have allowed Mr. Luther to have remained in the facility when it was being shut down was not reasonable.

Ms. Schaeffer alleges discrimination based upon her gender and familial status based on the location of sleeping facilities for women and children versus single men. The use of separate buildings advances the secular purpose of assuring the residents, namely the female guests, are safe while they are at the shelter. Women are allowed to participate in any program offered at the River of Life facility. They eat meals at the building at the same time the men are served. The only thing women cannot do is sleep at the facility overnight. According to Jean Lockhart, the Director of the City of Light Home for Women and Children, operating a mixed gender facility requires the provider, the BRM, to provide physically separate sleeping, bathing, and restroom areas within the building. These and other areas need to be separated by physical barriers and security equipment and be constantly monitored by the staff to assure the safety of

the shelter guests. The additional cost providing this level of security is substantial and diverts funds that could otherwise be devoted to providing social services to the homeless.

The use of a separate physical facility as sleeping quarters enhances the safety of women and children. Women who have received services at mixed gender facilities operated by CHI and the Interfaith Sanctuary have testified they feel safer at the City of Light facility because, in mixed facilities, homeless men have almost unrestricted access to women and children. These women have testified they have been exposed to men who were visibly drunk or, on drugs in the mixed gender facilities. They also report female guests exchanging sexual services for drugs. *See* **Docket No. 200-12** (Affidavit of Lisa Frye) and **200-9** (Affidavit of Wanda Ward). These facts establish the BRM does not operate separate facilities for men and women as an effort to discriminate based upon gender or familial status. Women and children are provided overnight shelter services and, social services of the same nature and quality as those provided to men. Maintaining separate buildings separating men from the women and children in the evenings when guests are sleeping creates a much safer environment at a much lower cost for the provider, the BRM.

C.  **Establishment Clause Claims**

Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 153 (9th Cir. 1993). In other words, "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993). *See also* ***Lower Elwha Band of S'Kallams v. Lummi Indian Tribe***, 235 F3d 443, 452 (9th Cir. 2000). "For the doctrine to apply, the issue in question must have been 'decided either expressly or by necessary implication in [the] previous disposition.'" *Thomas*, 983 F.2d at 153 (brackets in original;

internal quotes omitted; quoting *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990)). A court's discretion to not apply the law of the case doctrine is limited. Generally, a court has discretion to reopen a previously resolved question only under one or more of the following circumstances: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result. *Thomas* at 155.

As recognized in *Community House, Inc. v. City of Boise*, 623 F.3d 945 (9th Cir. 2010) the Establishment Clause does not, per se, prohibit government involvement with religion. In fact, the government may provide aid to a religious organization so long as its actions have a secular purpose rather than the advancement of religion and, does not have the primary effect of advancing religion. The BRM lease and subsequent sale undisputedly advances the secular purpose of providing shelter services to the Boise homeless.

In addressing the issue of qualified immunity for the individual defendants, the Ninth Circuit was required to address the issue of the propriety of the lease and sale, and whether it violated the Establishment Clause. The Ninth Circuit noted that the District Court, in its Summary Judgment Decision, "determined that the BRM's indoctrination was attributable to the government for two reasons": (i) during the lease period, the City only charged the BRM $1 per year for the building, insured the premises and paid for necessary repairs; and, (ii) that the record contained conflicting evidence on whether the option price of $2 million was less than the market value of the property. *Community House*, 623 F.3d at 970.

The Ninth Circuit rejected the first reason, noting that under the lease arrangement, "not only was the City neutral toward the BRM in its lease terms when compared to CHI's lease, the BRM actually got the *worse* deal." *Community House*, 623 F.3d at 971 (italics in original). The

DEFENDANTS' TRIAL BRIEF - 13

Ninth Circuit further held:

> Faced with a dearth of binding case law on the subject of non-profit leases to religious organizations—and a Fourth Circuit case holding that "rent discrimination" based on religion was unconstitutional—a reasonable official would not have known that the BRM lease violated the Establishment Clause. When the City undertook its RFI/RFP process, the BRM was the only entity that proposed to purchase Community House. Given that no other non-profit organizations were willing or able to keep the doors of the shelter open, <u>the decision to lease the building to the BRM was reasonable.</u>

***Community House,*** 623 F.3d at 971-972 (underline added).

As to the sale price, the Ninth Circuit determined that "[t]he City did not give the BRM a gift; in fact, it received substantial consideration from the BRM. In return for management and ownership of the property, the City was relieved of the obligation and costs of operating the shelter, while at the same time ensuring as a matter of City policy that the shelter stayed open." ***Community House,*** 623 F.3d at 972. The Ninth Circuit held that "[n]egotiating a $2 million option price, which under the lease would increase as time went on, seems a reasonable solution to the somewhat elusive concept of market value." ***Community House,*** 623 F.3d at 972. The Ninth Circuit further held that "[h]aving received no viable bids at the auction, the City was not required to begin the entire process all over again," and that the City was specifically empowered by Idaho law to dispose of the property however it believed was in the best interest of the City, and did so. ***Id.*** Finally, the City was not required to accept a bid, choose a secular entity over a religious entity simply because the one was secular, or continue working with CHI. ***Id.*** at 972-73.

In short, in order to decide the issue of qualified immunity, the Ninth Circuit necessarily had to decide the Establishment Clause issue as it applied to the City. It did so, and held that "[t]he City had given CHI a chance at helping the City ensure that the Boise homeless would have a place to sleep—a chance that lasted nearly 10 years. Its decision to give a similar chance

**DEFENDANTS' TRIAL BRIEF - 14**

to the BRM **did not violate the First Amendment**." *Community House*, 623 F.3d at 973 (emphasis added). That decision was not appealed, is now final, and constitutes the law of the case.

As recognized by the appellate court, even if one assumes the BRM engages in religious indoctrination at the facility, the claims against the City focus upon whether the initial lease and sale to the BRM resulted in religious indoctrination attributable to the City. See 623 F.3d at 970. The question of whether any alleged indoctrination is attributable to the government is dependent upon whether the BRM, a faith based organization, was allowed to obtain the building for less than market value in order to allow it to advance its religious message. The City received $2 million cash and, was able to assure the homeless shelter and the soup kitchen would continue to operate for at least ten years and avoid the considerable expense associated with those operations which, during the City's ownership, totaled nearly $80,000 per month. Over a ten year period of time, that monthly rate would result in a total savings of $9.6 million. Discounted to present cash value as of September 2, 2005, the operative date of the BRM lease, the City realized a financial substantial benefit. Based upon this evidence, the plaintiffs' suggestion that the City sold the former CHI building to the BRM for below market value is, without merit. For that reason, the BRM sale did not violate the Establishment Clause.

There is also little question the events leading to the BRM lease and sale involved a very public and neutral process. CHI's financial crisis was the product of years of mismanagement. The City did not assume management of the facility and then, immediately transferred to the BRM. Instead, when the Management Agreement was signed, the Salvation Army operated the facilities for a short time. Thereafter, the City took over the day-to-day operations and operated the facilities for a year and a half expending more than $1 million from the City's general fund. The City requested and received advice from a neutral Ad Hoc Committee that was empaneled to

DEFENDANTS' TRIAL BRIEF - 15

address the future of the CHI building and, the services it had previously provided. The Committee recommended transitioning services to existing serve providers within the community and, considered selling the building to a private vendor.

The mayor's office instructed City employee, Bruce Chatterton to create a plan to implement the Ad Hoc Committee's recommendations. Mr. Chatterton learned the most difficult components to transition to other vendors would be the men's shelter and the soup kitchen. Simply stated, there were very few entities interested in assuming the substantial cost of taking over those services. In hopes of involving as many potential providers as possible, the City underwent a public RFI/RFP process requesting proposals to operate the building and, the various services that were being provided. The initial response was encouraging as responses were received from the BRM, the Salvation Army, Boise City/Ada County Housing Authority, Giraffe Laugh Daycare, and, Supportive Housing and Integrated Partnerships, Inc., and, El Ada, Inc. These proposals were reviewed by a neutral RFP committee which recommended the City Council request formal proposals from each of the responders. Unfortunately, only the BRM and Giraffe Laugh submitted formal proposals. The BRM proposal was limited to purchasing the building and, operating a men's homeless shelter and, the soup kitchen. The Giraffe Laugh proposal was limited to the low income daycare facility. After the public auction for the building failed to attract any responsive bidders, the City entered into negotiations with the BRM in response to the formal proposal it had submitted.

Based upon these undisputed facts, CHI's criticism or suggestion that the City of Boise at all times intended to transfer the facility to the BRM is factually baseless. While it is true the City negotiated a lease and sale with the BRM, it was left with no other options as the BRM is the only entity that provided a formal proposal through the RFP process. If other proposals had been received, the City would have waived the merits of each proposal and, made decisions

DEFENDANTS' TRIAL BRIEF - 16

based upon what it felt best served the interest of the City of Boise.

### III. DAMAGES

CHI has not suffered any compensatory damages. Its constitutional claims challenge sale to the BRM. Its damage claims have been either dismissed due to its failure to file a timely Notice of Claim or, through the District Court's ruling enforcing the 2004 Management Agreement. CHI has not disclosed through discovery any other damages, or indicated how it calculated its alleged damages. *See Affidavit of Mark D. Sebastian in Support of Defendants' Motion in Limine* (Docket No. 303-2), Exhibit A. In short, any claim CHI was advancing surrounding its ability to regain possession of the building or the disruption of its operations have been dismissed. Even if CHI prevails on the Establishment Clause claims and the BRM sale is invalidated, the building will revert to City ownership. The City has been very clear that it will not operate the facility as a homeless shelter in the event the building is returned to City ownership.

The individual plaintiffs have never identified or disclosed any compensatory damages. *See Affidavit of Mark D. Sebastian in Support of Defendants' Motion in Limine* (Docket No. 303-2), Exhibit A. Accordingly, per F.R.C.P. 37(c), the individual plaintiffs are barred from offering evidence of damages.

Dated this 12 day of March, 2012.

ANDERSON, JULIAN & HULL LLP

By _____
Phillip J. Collaer, Of the Firm
Attorneys for Defendants

DEFENDANTS' TRIAL BRIEF - 17

## CERTIFICATE OF MAILING

I HEREBY CERTIFY that on this this __12__ day of March, 2012, I served a true and correct copy of the foregoing **DEFENDANTS' TRIAL BRIEF** by delivering the same to each of the following attorneys of record, by the method indicated below, addressed as follows:

| | | |
|---|---|---|
| Howard A. Belodoff | [ ] | U.S. Mail, postage prepaid |
| Zoe Ann Olson | [ ] | Hand-Delivered |
| James C. Cook | [ ] | Overnight Mail |
| IDAHO LEGAL AID SERVICES, INC. | [ ] | Facsimile |
| 310 N. 5th Street | [X] | Electronic Delivery |
| P.O. Box 913 | | |
| Boise, Idaho 83701 | | |

| | | |
|---|---|---|
| Cary B. Colaianni | [ ] | U.S. Mail, postage prepaid |
| Scott Muir | [ ] | Hand-Delivered |
| CITY ATTORNEY'S OFFICE | [ ] | Overnight Mail |
| P.O. Box 500 | [ ] | Facsimile |
| Boise, Idaho 83701 | [X] | Electronic Delivery |

_____
Phillip J. Collaer