Howard A. Belodoff, ISB # 2290
Richard A. Eppink, ISB # 7503
IDAHO LEGAL AID SERVICES, INC.
310 N. 5th Street
Boise, ID   83702
Telephone:  208-336-8980
Facsimile: 208-342-2561
howardbelodoff@idaholegalaid.org
ritchieeppink@idaholegalaid.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| COMMUNITY HOUSE, INC., <br> MARLENE K. SMITH, GREG A. LUTHER, <br> JAY D. BANTA, JAMES MASKER, JESSICA <br> SCHAFER, and JIMMY MOORE, <br><br>      Plaintiffs, <br><br> vs. <br><br><br> CITY OF BOISE, IDAHO, DAVID H. BIETER, <br> Mayor; BOISE CITY COUNCIL; MARYANNE <br> JORDAN, ELAINE CLEGG, VERNON <br> BISTERFELDT, DAVID EBERLE, JEROME <br> MAPP, and ALAN SHEALY, Boise City Council <br> members; BRUCE CHATTERTON, Director, <br> Planning and Development Services; JIM <br> BIRDSALL, Manager, Housing and Community <br> Development, <br><br>      Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CASE NO. CIV 05-283-S-CWD <br><br><br><br><br><br> **PLAINTIFFS' TRIAL BRIEF** |

     The plaintiffs, through their attorneys, submit the following trial brief, as required by this

Court's AMENDED PRE-TRIAL SCHEDULING ORDER (Dkt. 292):

PLAINTIFFS' TRIAL BRIEF – Page 1

## I.  INTRODUCTION

This case is about a partnership betrayed.  Community House, Inc., ("CHI") and the City of Boise ("City"[1]) formed a partnership to provide housing and services for homeless families in the community.  They entered a written partnership agreement that acknowledged the special, fiduciary trust that partnerships must be built on, promising "good communication" and a "fair and clearly defined method" in case the partnership ever had to be dissolved.  They built a homeless shelter together.  Men, women, families, and people of all faiths were welcome there.

But nine years later, the City went behind CHI's back.  Hiding it from CHI, the City started discussing new opportunities for homeless services with a religious organization—the Boise Rescue Mission Ministries ("Ministries").  And the City didn't just discuss homeless services generally with the Ministries, it started negotiating about the very homeless shelter that CHI and the City had built together as partners.  CHI had a 50-year lease with the City for the shelter, had contributed over $1.1 million to build it, and had a special loan that would be forgiven if CHI operated the shelter for 15 years, meaning CHI was only six years away from having an unencumbered ownership interest in the shelter.  The City didn't tell CHI about its side-dealings with the Ministries at all—CHI had to find out about it through the newsmedia. CHI didn't find out about the full extent of the City's negotiations until discovery in this lawsuit.

CHI filed an administrative fair housing complaint against the City, to which the City responded by threatening the CHI board with personal liability, eviction of all shelter residents, and closure of the shelter unless the board allowed a religious organization to take over shelter operations.  The result was the City physically evicting women and the disabled from the shelter,

---

[1]  Throughout the rest of this brief, the "City" will refer loosely to all of the defendants.

passing an ordinance excluding women, children, and families from it, leasing it to the Ministries

for just $1 a year, and paying back $2.1 million in federal grants and loans to the federal

government in an attempt to avoid federal anti-discrimination restrictions and clear the way for

the Ministries' religious indoctrination.

CHI and some of the homeless individuals affected were forced to file this action to

remedy the City's breach of its basic fiduciary duties in the partnership and the City's

discriminatory support of a religious organization that separated homeless families and left

women and children with no decent place to go.

## II.  ANTICIPATED FACTS[2]

Trial will focus on the City's conduct in 2003 through 2005, when it hatched a plan to

betray CHI and segregate shelter services by aiding a discriminatory religious organization.

### *The Partnership Forms.*

In 1994, CHI and the City executed a partnership agreement, titled "Memorandum of

Understanding" ("MOU"), to establish a "cooperative public/private partnership" for the purpose

of providing housing and services for the homeless.  "Like any good partnership," CHI and the

City agreed in the document, "this one must be based on trust, common interest and philosophy,

good communication, and a fair and clearly defined method of dissolving the partnership."  The

main goal was to build and operate a homeless shelter at River and 13th streets in Boise.  The

MOU, along with a 50-year lease and an "Operating Agreement," set forth the responsibilities of

the two partners and spelled out a detailed procedure for ending the partnership.

---

[2] For more detailed accounts of the facts expected at trial, see Dkt. 244.

PLAINTIFFS' TRIAL BRIEF – Page 3

**The City Betrays CHI.**

In 2003, after CHI had put nearly ten years of service into the partnership and over $1.1 million towards building and operating the shelter, the City approached the Ministries to discuss ideas for taking the shelter away from CHI.  The City did not include CHI in these discussions.  In fact, it did not even *tell* CHI about these discussions, which CHI eventually had to find out about through media coverage.  During 2003–2004, the City continued its negotiations with the Ministries, eventually publishing a Request for Proposals for operating the shelter that CHI and its agents were prevented from participating in.

**CHI Raises Fair Housing Concerns and Gets Forced out of the Shelter as a Result.**

In the summer of 2003, the Ministries made an offer to take over the shelter and convert it into a men-only facility.  Shortly afterward, CHI filed an adminstrative fair housing act complaint with the U.S. Department of Housing and Urban Development.  In response, the City went public about its negotiations with the Ministries—scaring many of CHI's existing and potential donors and grantmakers away—and pushed its federal block grant funding schedule back several months, leaving CHI with a cash-flow problem.  Despite that the City had intended to allow CHI to borrow against federal grants to cover the cash-flow gap, after spending two months on internal review of CHI's fair housing complaint, the City promptly refused CHI any cash-flow assistance and threatened to close the shelter, evict all the residents, and hold CHI board members personally liable for federal grants.  By the end of the month after the City emerged from its internal review of the fair housing complaint, the City had ousted CHI from operation of the shelter and brought in the Salvation Army.

***The City Mismanages the Shelter, then Hands it Off to The Ministries.***

The Salvation Army's operations at the shelter were brief and disastrous, but rather than allow CHI, whose fair housing complaint was still pending, to resume operations, the City decided it would take over.  The City quickly proved that its management was worse than CHI's, incurring higher staffing costs and spending more per month than CHI planned under its own budget.  When, in early 2005, the City opened a Request for Proposals process for considering other operators, it met privately with the Ministries to discuss the process before telling anyone else, including CHI, about it.  As the City's mayor explained in an internal email, the City felt that unless it could get the shelter in the hands of the Ministries, "we are in a world of hurt."  The mayor even attended a meeting of the Ministries' board to tell it that the City was "completely behind . . . [the Ministries'] effort to own" the shelter.  Just a few weeks later, the City's attorney realized that the City would have to create a "paper trail" to explain the City's plan to hand the shelter over to the Ministries.  The next day it passed an ordinance restricting residency at the shelter to "single, adult, homeless, men."  Within two months, the Ministries had a $1-per-year lease with the City for the shelter, despite that the City refused such an arrangement with a secular nonprofit just weeks before, instead requiring $300 per month for a facility one-tenth the size of the shelter.

On September 2, 2005, City employees physically and forcibly evicted women, children, and the disabled from the shelter so that the Ministries could exclude everyone except single adult men.  The City wired back the federal grants and loans that were assisting the shelter so that the Ministries could do this, all without authorization from CHI, its partner.  By January 2007, the Ministries had bought the shelter from the City for $1.2 million less than the City's

own appraiser had valued it as a homeless shelter.

## III. DISCUSSION

**A.   The Partnership Property Must be Accounted for and Distributed Equitably, Considering the City Breached its Fiduciary Duties.**

As CHI's partner in an express partnership, the City owed CHI the utmost good faith, fairness, and integrity, and a duty of loyalty. *Thomas v. Schmelzer*, 118 Idaho 353, 359 (1990); I.C. § 53-321 (1994); I.C. § 53-3-404.[3]  The severity of a breach of the duty of loyalty doesn't matter, rather "[t]he question is only whether there has been any breach at all." *First Bank & Trust v. Jones*, 111 Idaho 481, 484 (Ct. App. 1986) (citation and internal quotation marks omitted).  A partnership continues until an accounting and asset liquidation is completed. *Hyta v. Finley*, 137 Idaho 755, 757 (2002). An accounting is an equitable remedy, *Cox v. Cox*, 138 Idaho 881, 884-885 (2003), and if a partner has breached its fiduciary duty, assets can be unequally allocated as part of the accounting. *See Thomas*, 118 Idaho at 359, 362.

When the City concealed its discussions with the Ministries about the shelter from CHI, it left CHI out of opportunities to further CHI's mission and frustrated CHI's mission when the Ministries got to take over.  The City, as a result, obtained an undue advantage over its partner. The City breached its fiduciary duty and an accounting must remedy the breach:

> No undue advantage of one over another by misrepresentation or concealment will receive the approval of the law. A court of equity will always grant relief to the partner who has suffered from a breach of the obligation. One partner will not be permitted to obtain secretly any right that should belong to the partnership and put it to his own individual profit. Of such character is the securing of a contract. The criterion is not an actual evil motive, for the courts look to the result of any such action regardless of evil intent. If such action results in profit or advantage, the courts will require an accounting.

---

[3]  Joint venturers owe these duties as well.  *Trees v. Kersey*, 138 Idaho 3, 10 (2002).

*Thomas*, 118 Idaho at 359 (quoting *Stephens v. Stephens*, 298 Ky. 638, 183 S.W.2d 822, 824 (1944)). For the same reasons, the City also holds all the benefits it gained from its disloyalty in trust for CHI. I.C. § 53-3-404(b). As part of the accounting, the partnership should accordingly recover the shelter property that the City conveyed to the Ministries. I.C. § 53-310(3) (1994), *Hodge v. Garrett*, 101 Idaho 397, 399 (1980). The Court can also impose rent and interest for the use of the property since dissolution of the partnership and allocate that rent and interest to CHI as part of the accounting. *Murgoitio v. Murgoitio*, 111 Idaho 573, 579 (1986). This Court must "comprehensively investigate partnership transactions and adjudicate the rights of the partners" to determine the scope of the trust imposed on the City. *Havelick v. Chobot*, 123 Idaho 714, 718 (Ct. App. 1993). Because the City also breached the MOU, which concerned a specific and unique tract of land, CHI is entitled to an adequate equitable remedy for the City's breach of the contract. *Suchan v. Rutherford*, 90 Idaho 288, 295 (1966).

### B. The City's Herculean Efforts to Give the Shelter to the Ministries Violated the *Establishment Clause.*

The City gave unprecedented benefits to the Ministries—passing a facially discriminatory ordinance, offering lease terms it no longer offered anyone else, selling the shelter for below its appraised value, and even creating a "paper trail" after the fact—to ensure that the shelter would be operated by a religious organization. In assessing whether government aid violates the *Establishment Clause* of the U.S. Constitution, a court applies the *Lemon-Agostini* test and asks "(1) whether the government acted with the purpose of advancing or inhibiting religion, and (2) whether the [governmental] aid has the effect of advancing or inhibiting religion." *Community House, Inc.* v. *City of Boise,* 490 F.3d 1041,1054–1055 (9th Cir. 2007) (internal quotation marks omitted) [hereinafter *Community House I*]. Whether aid has the

"effect" of advancing religion depends in turn on (A) whether it results in "governmental indoctrination," (B) whether aid recipients are "defined by reference to religion," or (C) whether it creates "excessive government entanglement with religion." *Id.* at 1055.

The City's conduct results in impermissible "governmental indoctrination" if (i) the Ministries' activities either constitute or result in indoctrination that (ii) is attributable to the City. *Id.* at 1056. The Ministries' activities involved "a daily sixty-minute Christian chapel service," consisting of "signing, scripture, reading, prayer, testimonies, and preaching." *Id.* at 1057. The Ministries' purpose, indeed, is to "provid[e] for the worship of God, the teaching and preaching of the Word of God, the winning of people to a personal faith in the Lord Jesus Christ . . . and to extend the ministry of the Gospel unto all the earth." *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 657 F.3d 988, 990 (9th Cir. 2011) (holding that the Ministries' shelter programs were so pervasively religious that they qualify for the religious exemption of the Fair Housing Act). The Ministries even publishes a monthly scorecard of its religious conversions. This indoctrination is attributable to the City because the benefits the City gave the Ministries were not neutral, *see Mitchell v. Helms*, 530 U.S. 793, 839–40 (2000) (O'Connor, J., concurring regarding neutrality in part with plurality (6–3 in these parts) and in part with dissent (5–4 in those parts)), and they were also not generally available and carried with them the imprimatur of City approval. *See Christian Science Reading Room v. San Francisco*, 784 F.2d 1010, 1014 (9th Cir. 1986). Although government aid may be carefully channeled to secular aspects of a religious organization's programs, "the channel is a narrow one." *Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 775 (1973). Aid, even for maintenance and repair of facilities used by religious organizations, simply "may not be

distributed . . . without any limitations on their use." *Id.* at 777. The City's lease with the Ministries did not impose any secular limitations on the Ministries' use of the shelter. Instead, the City expressly promised to make major repairs, and it made and paid for them during the Ministries' tenancy. *See id.* ("If the State may not erect buildings in which religious activities are to take place, it may not maintain such buildings or renovate them when they fall into disrepair."). A publically financed government building cannot be diverted to religious use, even after twenty years. *See Tilton v. Richardson*, 403 U.S. 672, 689 (1971).

By the time of the Ministries' $1-per-year lease, the terms of the Ministries' lease were not available to secular organizations. They were unavailable to CHI and to other secular organizations by that time. The Ministries got to lease Community House, a 34,000 square-foot shelter for $1 a year, yet at the same time the City denied a $1-per-year lease to Giraffe Laugh, a secular day care provider, for a 3,787 square-foot facility—barely one-tenth the size of Community House—requiring $300 per *month* instead.[4] The shelter, which after the Ministries' takeover carried "JESUS SAVES" signage on a building widely known due to press coverage to have been City property, especially when coupled with the ordinance that the City passed especially for the Ministries and its gender segregation policy, carries with it the imprimatur of City approval.[5] *See Christian Science Reading Room*, 784 F.2d at 1014. This is not a case

---

[4] In fact, the higher-rent Giraffe Laugh lease included tenant covenants not to discriminate or segregate, which the City did not require of the Ministries. In fact, the City agreed to indemnify the Ministries and defend and hold it harmless from any liability arising from the Ministries' use of the shelter—including those in this lawsuit. The City even offered the Ministries the opportunity to pay no rent at all, telling the Ministries "[i]f at all possible, we would prefer some rent, but if not that is alright."

[5] The City endorsed the Ministries' religious practices because it was aware of the religious requirements eight days before signing the lease allowing them. Among a host of other

where those receiving government aid could choose between secular and religious options.  *See Mitchell*, 530 U.S. at 843 (O'Connor, J., concurring); *Bd. of Educ. of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687, 707 (1984) (noting lack of a "neutral site" for schooling within entire school district).  The City's aid advanced "specifically religious activit[ies]" in what would otherwise have been a secular setting.  *Bowen v. Kendrick*, 487 U.S. 589, 613 (1988) (citation and internal quotation marks omitted).  Because it made "no attempt . . . to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes," the City violated the *Establishment Clause.  Levitt v. Comm. for Public Educ. & Religious Liberty*, 413 U.S. 472, 479 (1973) (quoting *Nyquist*, 413 U.S. at 774).

For these violations, the plaintiffs are entitled to damages and an equitable remedy that exercises this Court's broad discretionary power to craft relief using "practical flexibility" to remedy past unconstitutional conduct.  *Lemon v. Kurtzman*, 411 U.S. 192, 199 (1973) [*Lemon II*].  Under these circumstances, this remedy should include recoupment of the shelter to the CHI-City partnership.  *See Americans United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 426 (8th Cir. 2007).

> **C.**   **The City's Efforts to Hand Over the Shelter to The Ministries Also Violated the Establishment and Free Exercise Provisions of the Idaho Constitution.**

The Idaho Constitution places greater restrictions against government aid to religious

---

aid the City channeled to the Ministries, it gave the Ministries a "publically financed" purchase option for $500,000 less than the City valued it at, granted a lease that expressly allowed religious activities at the shelter, allowed the Ministries to restrict residency on the shelter's second and third floors only to those who followed the Ministries' religious beliefs, permitted Bible readings, let the Ministries question residents about their religious beliefs, and paid back $2.1 million dollars worth of federal and Federal Home Loan Bank funds so that the Ministries could do all of this.

organizations than the *First Amendment* does. *Epeldi v. Engelking*, 94 Idaho 390, 395 (1971).

The City violated IDAHO CONST. art. I, § 4, by allowing the Ministries to subject residents to

religious indoctrination. The City also violated IDAHO CONST. art. IX, § 5, by providing "aid" to

the Ministries, that included the use of a City building to conduct religious services and

programs to indoctrinate the homeless.[6]  The words in the "no aid" clause have enormous

breadth.  *Epeldi*,  94 Idaho at 395–396. The government may not transfer "anything" without

violating this section if the transfer is "in aid of" any "sectarian society" or for any "sectarian

purpose."  *Id.*  The court held the requirements eliminated consideration of whether the aid had a

secular purpose and "a primary effect that neither advances nor inhibits religion." *Id.*   In *Epeldi*

the court held that "[b]y the phraseology and diction of this provision [section 5] it is our

conclusion that the framers of our constitution intended to more positively enunciate the

separation of church and state than did the framers of the United States Constitution." *Id.* at 865.

The City's lease and sale to the Ministries aided a sectarian organization, and this Court can

issue effective relief by voiding the sale and ordering the return of CHI assets and specific

performance under of the lease.

---

[6] IDAHO CONST. art. IX, § 5 provides:

Neither the legislature nor any county, city, town, township, school district, or
other public corporation, shall ever make any appropriation, or pay from any
public fund or moneys whatever, anything in aid of any church or sectarian or
religious society, or for any sectarian or religious purpose . . . ; nor shall any grant
or donation of land, money or other personal property ever be made by the state,
or any such public corporation, to any church or for any sectarian or religious
purpose . . . .

**D.    The Shelter Property was Never Declared Underutilized or Not Used for Public Purposes, as Required by State Law before Sale.**

The City cannot sell property unless it is "*is* underutilized" or "*is* not used for public purposes." I.C. § 50-1401 (emphasis added). The City never held that either ground was met. Instead, it passed an ordinance stating that the property "*will be* underutilized" and would "*no longer be needed* for the City's public purposes." City of Boise Ord. 6402 at § 3 (July 12, 2005) (emphasis added). The language of I.C. § 50-1401 uses the word "is," not "will" or "no longer be needed for." That plain, ordinary language cannot be interpreted to lead to an absurd result. *State v. Maybee*, 148 Idaho 520, 535 (2010). If "is" does not mean is, but instead means could be, might be, or will sometime in the future be, the last clause of I.C. § 50-1401 is superfluous, as any circumstance would satisfy its requirement. If "is" means will, such an exception swallows the requirement whole. The MOU clearly identified the shelter property as central to the City's public purpose objective of "provid[ing] housing and comprehensive services for the homeless in our community," and in the same ordinance the City expressed its intent to limit use of the shelter property to "HUD purposes." City of Boise Ord. 6402 at § 8. Moreover, I.C. § 50-1401 allows no deference to the City's self-serving findings—it expressly requires that property actually be underutilized and not used at all for public purposes. *Porter v. Lewiston*, 41 Idaho 324, 332 (1925) (holding the an Idaho city cannot declare a fact that is not actually a fact); *cf.* I.C. § 50-1402 (permitting a city to "declare" value of property); I.C. § 50-1403 (permitting a city in certain cases to act "as it deems in the best interest of the city"). Because the property was being fully utilized for public purposes, precisely as the City intended under the MOU,[7] the

---

[7]    *See* 41 C.F.R. § 102-75.50 (defining "underutilized" under analogous federal law to mean property used either "[i]rregularly or intermittently" or "[f]or current program purposes

sale of the shelter violated I.C. § 50-1401.  Accordingly, the City's sale of the shelter property to the Ministries is void, and this Court must set it aside.

> ### E.    The City Physically Removed Women, Children, and the Disabled from the Shelter, Violating Idaho Law against Self-Help Eviction.

When, in 2004, the Salvation Army temporarily operated the shelter, all existing residents got to stay.  When the City took over the shelter and handed it over to the Ministries, it had to evict the women and children so that the Ministries could segregate by gender.  City employees forcibly removed residents, including the disabled, from the shelter.  The City had never obtained a court order authorizing the eviction and breached the peace to carry it out.  The plaintiffs are entitled to this Court's declaration that the City violated I.C. §§ 6-301–302.

> ### F.    The City's Men-Only Ordinance, its Heavy-Handed Eviction of the Disabled Homeless, and its Ouster of CHI from the Shelter Operations All Violated the Fair Housing Act.

So that the Ministries could operate a segregated shelter, the City passed an ordinance allowing only single adult men to stay at the shelter.  The men-only ordinance has never been repealed and is still in place today.  After adopting it, the City physically hauled out shelter residents with disabilities, even though they had asked, as a reasonable accommodation, for additional time to find safe, sanitary shelter.  Earlier, in August 2003, once CHI learned about the City's secret side-dealings with the Ministries, CHI filed an administrative fair housing complaint to the U.S. Department of Housing and Urban Development.  CHI anticipated that the City's entanglement with the Ministries would end up in discriminatory homeless services. Once CHI filed its complaint, the City suddenly took a dimmer view toward CHI's continued

---

that can be satisfied with only a portion of the property").

operation of the shelter, and after spending three months in internal review, the City ousted CHI
from shelter operations.  The City's actions violated several provisions of the Fair Housing Act.

> ### 1.      *The Single Adult Men-Only Ordinance is Invalid under the Fair Housing Act.*

The Fair Housing Act expressly preempts state and local law: "any law of a State, a
political subdivision, or other such jurisdiction that purports to require or permit any action that
would be a discriminatory housing practice under this title shall to that extent be invalid."  42
U.S.C. § 3615.  The act specifically identifies gender and familial status discrimination as
discriminatory housing practices.  42 U.S.C. § 3604(b) ("it shall be unlawful . . . to . . . make
unavailable or deny, a dwelling to any person because of . . . sex [or] familial status").  The
City's ordinance, no. 6404 (July 12, 2005), mandated:

> The property shall be operated and maintained in good working
> condition as . . .  a shelter for 66, single, homeless, men, ages, 18
> and older.

The ordinance violates the Act, and this Court should declare it invalid.  42 U.S.C. § 3613(c)(1).

> ### 2.      *The Men-Only Ordinance and Deed Restriction are Statements of Limitation.*

Ordinance 6404 not only limited the shelter to single adult males, it required a deed
restriction to be recorded, encumbering the shelter property with the same men-only limitation.
The Fair Housing Act prohibits these "statement[s] . . . that indicate[] a preference, limitation, or
discrimination" based on sex and familial status.  42 U.S.C. § 3604(c).  Recording discriminatory
statements in deeds is a violation of this section.  *Mayers v. Ridley*, 465 F.2d 630, 630 (D.C. Cir.
1972) (en banc); *id.* at 631 n.1 (Wright, J., concurring) ("Since a restrictive covenant is, by its
very nature, a statement of racial preference with regard to the sale of a dwelling, it is now
unlawful to include such covenants in deeds even if no effort is made to enforce them.").   The

regulations governing the Fair Housing Act make this clear.  24 C.F.R. § 100.75(b) ("Written notices and statements include any . . . deeds . . . .").  The jury determines actual and punitive damages for this violation, and this Court should reform the deed to prohibit discrimination and enjoin the City from ever again limiting shelter based upon race, color, religion, sex, national origin, familial status, or disability.

> **3.    With a Gender and Familial Status Limitation Written Right into the Deed, the Discrimination was Part of the Transaction.**

The City made Ordinance 6404 and the resulting single adult men-only deed restriction part of its leasing transaction with the Ministries.  Under 42 U.S.C. § 3605(a), the City could not "discriminate against any person . . . in the terms or conditions of [a real-estate related] transaction, because of . . . sex [or] familial status . . . ."  The plaintiffs and CHI are entitled to damages and the broad injunctive relief authorized by the Act.  42 U.S.C. § 3613(c)(1).

> **4.    Kicking out All the Women, Children, and Families Violated the Act, Too.**

To clear the way for the Ministries, the City also evicted (by self-help and without a court order) all the women, children, and intact families from the shelter.  The Fair Housing Act pretty clearly prohibits this conduct.  42 U.S.C. §§ 3604(a) (making it unlawful to "make unavailable or deny, a dwelling to any person because of . . . sex [or] familial status"); 3604(b) (making it unlawful to "discriminate against any person . . . in the provision of services or facilities in connection [with the sale or rental or a dwelling], because of . . . sex [or] familial status").  Even pretextual evictions are unlawful under the Act.  *See Harris v. Itzhaki*, 183 F.3d 1043, 1052 (9th Cir. 1999).  The City is liable to the female and family plaintiffs for damages for its blatant eviction of women, children, and families.

In equity, this Court must also remedy the effects of the City's discriminatory plan to

PLAINTIFFS' TRIAL BRIEF – Page 15

hand over shelter operation to the Ministries.  Once illegal discrimination has occurred, a federal court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship & Training Comm.*, 94 F.3d 1366, 1370 (9th Cir. Cal. 1996) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)); *see also Brown v. Plata,* 131 S. Ct. 1910, 1944 (2011) ("the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies" (internal quotation marks and citation omitted)).  Equitable relief is especially broad under the Fair Housing Act.  *See* 42 U.S.C. § 3613(c)(1).  Equitable relief under the Act should both ensure that the defendants do not violate the Act again in the future and "remov[e] any lingering effects of past discrimination."  *Marable v. Walker*, 704 F.2d 1219, 1221 (11th Cir. 1983).

In *Resident Advisory Bd. v. Rizzo*, for example, local government actions blocking a housing project kept black families out of homes where they would otherwise be living.  564 F.2d 126, 150 (3d Cir. 1977).  The court affirmed a broad injunction requiring the government to "immediately take all necessary steps for the construction" of the project.  *Id.* at 138, 150.  In *Sanborn v. Wagner*, the court rescinded contracts that a real estate firm had obtained to drive unwanted families out of a neighborhood.  354 F. Supp. 291, 295–296 & n.1 (D. Md. 1973).  The court in *Zuch v. Hussey* recognized its authority under the Act to order that all benefits received as a result of violating the Act be disgorged.  394 F. Supp. 1028, 1055 n.13 (E.D. Mich. 1975).

Both CHI and the individual plaintiffs in this case "act not only on their own behalf but also as private attorneys general in vindicating a policy that congress considered to be of the highest priority." *Trafficante v. Metropolitan Life Ins. Co.*, 409 us 205, 209, 211 (1972) (quoting

Solicitor General).  Accordingly, the jury must first determine CHI's damages for the loss of its personal property and contributions to the construction of the shelter; loss of rental income, donations, grants, and program fees; frustration of its mission; loss of related opportunities (including for forgiveness of its FHLB loan); and the replacement value of the non-discriminatory shelter it operated in partnership with the City.  The jury must also determine the individual plaintiffs' damages, including their embarrassment, humiliation, and emotional distress, and then assess punitive damages.

After the jury has reached its verdicts, then this Court must craft equitable remedies, including injunctions, to prevent the City from violating the Act in the future and to remedy the violations that occurred when the City closed the shelter to all but single, adult men.  *See Rogers v. 66-36 Yellowstone Boulevard Coop. Owners*, 599 F. Supp. 79, 81–87 (E.D.N.Y. 1972) (determining equitable remedies for Fair Housing Act violations after reviewing jury's findings).  An equitable decree that makes any effort to remedy the past wrongs will provide restitution to CHI for its lost rent and opportunities and ensure that an integrated, family-friendly shelter is replaced and operated by a non-discriminatory association such as CHI.

### 5.    *The City Would Not Even Let Residents with Disabilities Stay Put.*

The individual plaintiffs have disabilities that qualify them as having a "handicap" under the Fair Housing Act.  42 U.S.C. § 3602(h).  Faced with eviction from the only shelter they had, they all made requests for the most basic accommodation one could make under the circumstances: to be allowed to stay in the shelter.  Denying a reasonable accommodation is a violation of the Act.  42 U.S.C. § 3604(f)(3)(B).  Rather than let the plaintiffs stay put, or begin an interactive process with them to identify suitable alternatives, the City forced the plaintiffs

out, leaving some with no place at all to go, like Greg Luther, who ended up living in an old, inoperable van in a friend's driveway.  Their accommodation requests were especially reasonable considering that the City, through its lease with the Ministries, maintained a shelter at the same place after its forcible eviction.  Neutral, across-the-board policies must yield to requests for reasonable accommodation from residents with disabilities.  *See Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1152 (9th Cir. 2003).  The individual plaintiffs, who were displaced into substandard and less supportive housing, are entitled to damages for their displacement, including their distress and suffering and the exacerbation of their disabilities, and for punitive damages.  42 U.S.C. § 3613(c)(1).[8]

> **6.      *CHI was Damaged by the City when it Retaliated against CHI for Complaining about Fair Housing Issues.***

Shortly after the Ministries made a formal proposal to buy the shelter and convert it into a men-only facility, CHI filed an administrative Fair Housing complaint with the U.S. Department of Housing and Urban Development.  In response, the City made it effectively impossible for CHI to continue operations at the shelter.  The City went public about its secret negotiations with the Ministries, resulting in a grave decrease in the number and amounts of private contributions that CHI relied on for revenue.  The City suddenly changed the grant year for the Community Development Block Grant ("CDBG") funds that CHI had budgeted: the City would not award

---

[8] Females with disabilities were excluded altogether from the shelter after the City handed it over to the Ministries.  As a result, the City made the shelter "unavailable" and discriminated in the provision of services to those with disabilities, in violation of 42 U.S.C. § 3604(f)(1) and (2).  Likewise, those with disabilities were "excluded from the participation in," "denied the benefits of," and "subjected to discrimination" by the City, in violation of Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794(a).  Damages and equitable relief are appropriate on both claims.  *See Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001); 42 U.S.C. § 3613(c)(1).

the 2004 grant until April or May of the following year, leaving CHI with a further shortfall.
Even though the City had approved a loan to remedy a similar CHI cash-flow issue in 2002, and
initially proposed in 2003 to provide another loan due to the CDBG grant-year change, when
CHI asked for this loan the City refused it.  Instead, it spent two months internally reviewing the
CHI fair housing complaint.  As soon as it finished that internal review, in February 2004, the
City threatened at a CHI board meeting to close the shelter, evict all the residents, and hold CHI
board members personally liable for federal grants.  Before the end of that month, the City had
replaced CHI with the Salvation Army as operator of the shelter.

The Fair Housing Act protects against this kind of retaliation.  42 U.S.C. § 3617.  If CHI
shows (1) that it engaged in a protected activity, (2) that the City subjected it to adverse action,
and (3) a causal link between the protected activity and the adverse action, then the City has the
burden of articulating a legitimate reason for its conduct. *Walker v. City of Lakewood*, 272 F.3d
1114, 1128 (9th Cir. 2011).  Even if the City articulates a legitimate reason, CHI may still prove
that the reason was pretextual.  *Id.*  Filing a fair housing complaint is a protected activity covered
by the Act's anti-retaliation section.  24 C.F.R. § 100.400(c)(5).  The adverse actions that section
covers include subjecting another to "pressure" or threats of "injury, or other damage." *Walker*,
272 F.3d at 1129.  The "interference" prohibited by the section is "broadly applied to reach all
practices which have the effect of interfering with the exercise of rights under the federal fair
housing laws." *Id.* (citation and internal quotation marks omitted).  Thus, supervising a
nonprofit association more closely than before or refusing to renew its contract or allow it to
compete for a new contract are prohibited by 42 U.S.C. § 3617.  *Id.*

Here, the City effected an ouster of CHI from shelter operations within months of CHI's

fair housing complaint and almost immediately after the City completed its internal review of that complaint.  Timing is important, and it is often the only clear evidence on retaliation claims. *See San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998); *Walker*, 272 F.3d at 1130; U.S. DEPT. OF HOUS. & URBAN DEVEL., TITLE VIII COMPLAINT INTAKE, INVESTIGATION, AND CONCILIATION HANDBOOK 8024.1 CHG-1 at 8-36 (2005) ("The timing of events is frequently critical to a showing that the respondent's articulated non-discriminatory explanation is pretextual.").  The jury will decide liability on CHI's retaliation claim, and then this Court should further remedy the retaliation through an appropriate equitable decree.

> **G.     All of the Plaintiffs will be Entitled to Costs and Fees.**

The plaintiffs have statutory rights under 42 U.S.C. §§ 1988 and 3613(c)(2) to attorney fees and costs, and CHI has contractual rights under the MOU, operating agreement, and lease agreement to recover costs and fees.  Indeed, the plaintiffs have already prevailed for the purposes of a 42 U.S.C. §§ 1988 and 3613(c)(2) fee award by obtaining a preliminary injunction, even though the shelter was later sold.  *See Richard S. v. Dept. of Dev. Servs.*, 317 F.3d 1080, 1088–1089 (9th Cir. 2003); *Watson v. County of Riverside*, 300 F.3d 1092, 1097 (9th Cir. 2002).

## IV.  CONCLUSION

For all the reasons explained above, and the facts and argument that the plaintiffs will submit at trial, CHI and the individual plaintiffs will prevail on their claims.  The plaintiffs will be entitled to damages for their federal claims and to broad equitable remedies.

DATED this 12th day of March, 2012.

IDAHO LEGAL AID SERVICES, INC.

/s/ Howard Belodoff
Attorneys for Plaintiffs

PLAINTIFFS' TRIAL BRIEF – Page 20

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of March, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Robert Anderson         raanderson@ajhlaw.com
Phillip Collaer           pcollaer@ajhlaw.com
Scott Muir              BoiseCityAttorney@cityofboise.org


/s/ Howard Belodoff