# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

COMMUNITY HOUSE, INC., et al.,

                Plaintiff,

v.

CITY OF BOISE, Idaho; JIM
BIRDSALL and BRUCE
CHATTERTON, in their official
capacities,

                Defendants.

Case No. 1:05-cv-00283-CWD

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

The Court has before it Defendant City of Boise's Motion for Judgment

Notwithstanding the Verdict, and Motion for Remittitur or, in the alternative, New Trial,

filed pursuant to Fed. R. Civ. P. 50(b) and 59. (Dkt. 388.) The motion was fully briefed,

and the Court conducted a hearing on the motion on May 15, 2013. For the reasons more

fully explained below, the Court will deny the City's motion in its entirety, as the Court

finds the verdict was supported by substantial evidence.

## BACKGROUND

After a long and protracted history which included two appeals to the United

States Court of Appeals for the Ninth Circuit, this matter was tried before a jury in

September 2012. Of the seven counts remaining for trial before the jury,[1] the jury found

that Plaintiffs Community House, Inc. ("CHI"), Marlene Smith, and Jay Banta[2] proved

their claim that Defendants discriminated against them on the basis of gender or familial

status in violation of the Fair Housing Act, and that CHI proved its claim that Defendants

interfered with CHI in violation of the Fair Housing Act. The jury concluded also that

Plaintiffs proved Defendants violated the Free Exercise clause of the Idaho State

Constitution.

The jury returned a special verdict on September 12, 2012, awarding Plaintiff CHI

$1,000,000 in damages for the Defendants' conduct in violation of the Fair Housing Act.[3]

The individual Plaintiffs Jay Banta and Marlene Smith were awarded no damages for

their claims.[4] The City of Boise now seeks alternative relief, either in the form of a

judgment as a matter of law, a new trial, or remittitur.

## ANALYSIS

### 1.    Legal Standards

#### A.    *Rule 50*

Fed. R. Civ. P. 50 governs a request for a renewed motion for judgment as a

matter of law, and may include an alternative or joint request for new trial under Rule 59.

Fed. R. Civ. P. 50(b). The Court may allow judgment on the verdict; order a new trial; or

direct the entry of judgment as a matter of law. *Id.* The motion may be made at any time

---

[1] Additional equitable claims were tried before the Court on May 13 and 14, 2013. The Court's findings of fact and conclusions of law are forthcoming.
[2] Ms. Smith and Mr. Banta were the only remaining named Plaintiffs.
[3] The damages for the Idaho Constitutional violation remained for the Court to determine as part of its ruling regarding equitable relief.
[4] In connection with their individual disability discrimination claims, the jury found Smith and Banta failed to prove their accommodation claims. Plaintiffs Banta and Smith have not contested the verdict.

before the case is submitted to the jury, and if the Court declines to grant the motion at that time, the Court is considered to have submitted the action to the jury subject to the Court later deciding the legal questions raised by the motion. Fed. R. Civ. P. 50(a)(2), (b). The failure to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of the Court later considering a Rule 50(b) motion. *Tortu v. Las Vegas Metropolitan Police Dep't.*, 556 F.3d 1075, 1083 (9th Cir. 2009).

A Court can grant a Rule 50(a) motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). "[I]n entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence." *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Reeves*, 530 U.S. at 150). And although taking a motion under submission and ruling on it after the jury returns a verdict is proper practice, *see* Fed. R. Civ. P. 50(b) advisory committee's note, the Court "may not substitute its view of the evidence for that of the jury." *Krechman v. County of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (quoting *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001)).

A jury's verdict must be upheld if it is supported by substantial evidence. *Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir. 2007). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* at 624. In making this determination, the Court

must not weigh the evidence, but should simply ask whether the party presented

sufficient evidence to support the jury's conclusion. *Id*. While the Court must review the

entire evidentiary record, it must disregard all evidence favorable to the moving party that

the jury is not required to believe. *Id*. The evidence must be viewed in the light most

favorable to the nonmoving party, and all reasonable inferences must be drawn in favor

of that party. *Id*.

**B.** *Rule 59*

Fed. R. Civ. P. 59 permits the Court to alter or amend a judgment, or order a new

trial. Fed. R. Civ. P. 59(a), (e). "Rule 59 does not specify the grounds on which a motion

for a new trial may be granted." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir.

2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)).

Rather, the court is "bound by those grounds that have been historically recognized." *Id*.

Historically recognized grounds include, but are not limited to, claims "that the verdict is

against the weight of the evidence, that the damages are excessive, or that, for other

reasons, the trial was not fair to the party moving." *Molski*, 481 F.3d at 729 (quoting

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). In the Ninth Circuit,

"[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of

the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of

justice." *Molski*, 481 F.3d at 729 (quoting *Passantino v. Johnson & Johnson Consumer

Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir. 2000)).

The Court has "the duty ... to weigh the evidence as [the court] saw it, and to set

aside the verdict of the jury, even though supported by substantial evidence, where, in

[the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729 (quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir.1957)). The determination of "the clear weight of the evidence" is a fact-specific endeavor, and there must only be some "reasonable basis" for the jury's verdict. *Molski*, 481 F.3d at 729. "Although the court's ruling on an alternative motion for a new trial involves the exercise of some discretion, a stringent standard applies when the motion is based on insufficiency of the evidence." *E.E.O.C. v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997). A motion will be granted on this ground only if the verdict "is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Id.*

## C.    *Remittitur*

In considering the City's alternative motion for remittitur, the Court must view the evidence in the light most favorable to CHI as the non-moving party. *See  Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir. 1983). Further, it is settled beyond reasonable dispute that the jury's verdict must be upheld if supported by substantial evidence. *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). Substantial evidence is relevant evidence reasonable minds might accept as adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 651 n. 5 (9th Cir. 2005). The Court cannot weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists. *Id*. Ultimately, the Court must determine if the damage award is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation and

guesswork." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986); *see also Del Monte Dunes at Monterey, Ltd. v. Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).

The Court has discretion to grant a remittitur, reducing the damages to the maximum authorized under the evidence, and then offer the plaintiff the choice of accepting a remittitur (a reduction) of the award in lieu of a new trial on the issue of the damages only. *Morgan v. Woessner*, 997 F.2d 1244 (9th Cir. 1993); *Munguia v. Grelyn of Maui*, LLC, 2011 WL 1364026, *26 (D. Haw.2011).

2. **The Parties' Motions At Trial**

On September 6, 2012, at the conclusion of Plaintiffs' presentation of evidence, the City moved for judgment as a matter of law under Rule 50(a) on three issues. First, with respect to individual Plaintiff Jay Banta, the City contended that his disability claim for failure to accommodate should be dismissed because he did not request an accommodation. Second, regarding Marlene Smith's individual disability discrimination claim, the City argued the evidence established she was not entitled to any reasonable accommodation because she was not a tenant or resident. Finally, the City argued CHI's establishment clause claim should be dismissed because there was insufficient evidence that the City gave aid or assistance to the Boise Rescue Mission. The Court denied the motion at that time.

At the conclusion of the City's evidence on September 11, 2012, the City again moved for judgment under Rule 50(a), on the grounds that there was no evidence of CHI's future damages. The City asked also for a ruling that the construction costs to build

the Community House shelter and transitional housing rooms[5] could not be awarded as an element of CHI's damages. The Court granted the City's motion that CHI's damages could not include construction costs, and jury Instruction number 32 instructed the jury that CHI's damages could include "[a]n amount that will reasonably compensate for any loss of personal property or liquid assets *other than the building itself*, or the loss of use of any personal property, as a result of any retaliation or other violation of the Fair Housing Act." The jury was cautioned that its award must not be based upon speculation, guesswork or conjecture. Further, the jury was instructed that it could award damages for the value of business opportunities and revenue, less expenses, lost as a result of any retaliation "which are reasonably related in time to" CHI's filing of the FHA complaint in August of 2003.

Also on September 11, 2012, Plaintiffs moved for a judgment as a matter of law prior to submission of the matter to the jury. Plaintiffs requested a ruling that Ordinance 6404, passed by the City, was facially discriminatory because it stated a preferential treatment to serve men, and the ordinance was incorporated by reference in the lease between the City and the Boise Rescue Mission. The Court granted Plaintiffs' motion, resulting in jury Instruction number 20,[6] which the City now contends was error.

---

[5] The shelter building will be referred to as Community House. Community House Inc. (CHI) operated the shelter under the terms of a lease and operating agreement with the City. Construction of the building itself commenced in 1994.

[6] Instruction number 20 stated, in pertinent part, that "[t]he Court has found that Ordinance 6404 (Exhibit 333) was… unlawful under the Fair Housing Act. Therefore, …you must find in favor of the plaintiffs on this claim. I will instruct you in later instructions regarding damages you may award the plaintiffs on this claim."

**3.      Analysis**

The jury found Plaintiffs proved their claim that the City discriminated against them on the basis of gender or familial status in violation of the Fair Housing Act, and that CHI proved its claim that the City interfered with it in violation of the Fair Housing Act. The jury found also that Plaintiffs proved their claim that the City violated the Free Exercise Clause of the Idaho State Constitution.[7] The jury did not differentiate the amount of damages it awarded on any specific claim, nor was it asked to. It simply awarded CHI the gross sum of one million dollars and no damages to the individual Plaintiffs.

The City makes the following arguments in support of its renewed motion under Rule 50(b), and its alternative motions under Rule 59 or for remittitur: (1) there was no evidence of retaliation; (2) CHI did not have standing to claim damages for diversion of resources and frustration of mission; and (3) the damage award was not supported by the evidence, because (a) there was no specific evidence of CHI's lost business opportunities and revenue; and (b) the award was not supported by the evidence of CHI's personal property and liquid assets lost. Further, the City contends the Court erroneously granted Plaintiffs' Rule 50(a) motion and instructed the jury that City Ordinance 6404 was unlawful under the Fair Housing Act. *See* Instruction No. 20 (Dkt. 374.) And finally, the City claims the state constitutional claims are preempted by Federal law.

---

[7] The jury was instructed not to award damages for this claim. The Court considered the issue of equitable relief at the later bench trial on May 13 and 14, 2013.

## A.    Waiver

Plaintiffs initially argue that the City waived all grounds for a renewed motion for judgment as a matter of law because the City failed to so move at the close of evidence. However, the City made two motions at different times---the first at the close of Plaintiffs' case, and the second at the close of all the evidence. Fed. R. Civ. P. 50(a) requires only that the motion be made at "any time" before the case is submitted to the jury, and the motion may be renewed and combined with a motion for new trial under Rule 59. Fed. R. Civ. P. 50(b).

The damage issue was squarely presented in the City's motion. And, if not entirely fleshed out during the oral motions, the City alternatively argues post-verdict that CHI's damages should be reduced, because the jury's verdict must have been based upon speculation. The Court finds the City's motion in that regard is proper.

Second, Plaintiffs argue that the City waived its objection to damages by not requesting a special verdict on each element of damages. In other words, because the Special Verdict Form did not require the jury to assign an amount corresponding to the alternative claims for relief, the Court cannot speculate how the jury calculated the damages awarded for each claim. The jury found for Plaintiff CHI on two claims--- first for discrimination on the basis of gender or familial status in violation of the FHA, and second being the retaliation claim.[8]  The jury awarded a collective sum of $1,000,000 to CHI, with no breakdown between the two claims for relief.

---

[8] All Plaintiffs were included in Question 1 regarding the discrimination claim, while only CHI was included in Question 7 regarding the retaliation claim and only the individual Plaintiffs were included in questions 5 regarding their individual disability discrimination claims. Question 1, the discrimination claim, related to Ordinance 6404.

When a verdict form fails to request that the jury allocate damages between alternative theories of relief, the verdict is to be construed as responsive to any and all material issues in the case, including alternative theories of damages. *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1374 (9th Cir. 1987). When considering the sufficiency of the evidence to sustain the verdict, the Court must view the evidence in a light "most favorable to the prevailing party, accepting as established all facts which the evidence reasonably tended to prove and giving to the prevailing party the benefit of all inferences which may be reasonably drawn from the evidence." *Bank of Am. Nat'l Trust & Sav. Ass'n. v. Hayden*, 231 F.2d 595, 603 (9th Cir. 1956).

Here, the jury was tasked with considering damages under two alternative theories of relief---retaliation and discrimination---under the FHA. It awarded a general verdict for CHI in the sum of $1,000,000. There was no separate damage award for each cause of action or theory of recovery under the FHA. Accordingly, the verdict is to be construed as responsive to any and all material issues in the case, including the alternative theories of damages. It was the jury's task to sort through the evidence and determine the basis for the award and amount of damages suffered. The Court cannot now second guess how the jury arrived at the sum of one million dollars, but may consider only whether substantial evidence supports the award.

### B.     Retaliation Claim

The City asserts that the jury's verdict in favor of CHI finding retaliation under the FHA was not supported by substantial evidence. The Court notes that the City did not include this theory in its motions, discussed above, prior to submission of the case to the

jury. Because a Rule 50(b) motion is a renewal of a pre-verdict motion, it may be granted

only on grounds advanced in the pre-verdict motion. Cmt., 2006 Amendment, Fed. R.

Civ. P. 50(b). Accordingly, the City waived grounds to assert, post-verdict, an argument

that the evidence did not support a claim for retaliation. Notwithstanding such an

omission, the Court finds that substantial evidence was presented to the jury upon which

the jury could find retaliation.

CHI's retaliation claim asserted that the City, by its conduct, unlawfully coerced,

intimidated, threatened, or interfered with CHI on account of having aided or encouraged

other persons in the exercise or enjoyment of the rights granted or protected by the FHA.

Jury instructions explained that the FHA makes it unlawful for the City to coerce,

intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on

account of his having exercised or enjoyed, or on account of his having aided or

encouraged any other person in the exercise or enjoyment of, any right granted or

protected by the FHA. Instruction number 27 outlined that CHI was required to prove it

engaged in a protected activity under the FHA; actions or conduct by the City coerced,

intimidated, threatened or interfered with CHI's exercise of a protected activity; and a

causal link between the protected activity that CHI engaged in, and the coercive,

intimidating, threatening, or interfering actions or conduct of the City. *See Brown v. City

of Tucson*, 336 F.3d 1181, 1192 (9th Cir. 2003).

The Court instructed the jury regarding conduct that could be considered unlawful.

Instruction number 27 stated that unlawful conduct includes coercing a person, either

orally, in writing, or by other means, to deny or limit the benefits provided that person in

connection with the sale or rental of a dwelling because of sex or familial status; threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of sex or familial status; threatening an employee or agent with dismissal for any effort to assist a person seeking access to the rental of a dwelling because of sex or familial status of the person; intimidating or threatening any person because the person is engaging in activities to make others aware of their rights under the FHA; or retaliating against a person because that person has made a complaint, or participated in any manner in a proceeding under the FHA. *See also* 24 C.F.R. § 100.400.

The language of the FHA is "broad and inclusive." *Brown*, 336 F.3d at 1192. It is enough to threaten a person in the exercise or enjoyment of a right protected by the FHA, so long as an injury occurred as a result of the threat. *Id*. at 1192-93. The injury could consist of either the giving up of one's rights under the FHA, or some other injury which resulted from the refusal to give up rights, or from the threat itself. *Id.* at 1193.

The City argues CHI's retaliation claim was based upon allegations that, in January 2004, CHI's request to the City for emergency funding was rejected. The City contends it had no obligation, under the terms of its lease and operating agreement with CHI, to provide emergency funding, or any funding at all, to CHI; consequently, the City argues the jury's verdict was not supported by the evidence because the City's decision to refuse CHI's request for emergency funding did not violate the FHA. The City argues additionally that it did not interfere with any resident continuing to live in the Community House shelter, because the City continued to operate the shelter after March of 2004.

The evidence at trial established that CHI was protesting the City's negotiations with the Boise Rescue Mission in 2003 to assume operation of Community House, which precipitated CHI's filing of the August 2003 FHA complaint with HUD. The City makes much of its argument that negotiations with the Boise Rescue Mission did not violate the FHA, and therefore the filing of the 2003 FHA complaint was not a protected activity. The City relies upon the holding in *Intermountain Fair Housing Council v. Boise Rescue Mission Ministries*, 657 F.3d 988 (9th Cir. 2011). In *IFHC*, the Ninth Circuit held that the plaintiffs' religious discrimination claims asserted against the Boise Rescue Mission failed because the Mission, as a private religious organization, is exempt from the discrimination provisions of the FHA. *IFHC*, 657 F.3d at 996. In turn, because the plaintiffs' interference claims were dependent upon the validity of their religious discrimination claims, the court concluded the plaintiffs could not maintain a claim for interference because neither plaintiff had exercised a protected right.

Here, CHI's retaliation claim is not dependent upon its claim for discrimination. Rather, CHI's retaliation claim relates to its filing of the August 2003 FHA complaint with HUD, which CHI filed upon learning the City was engaged in private negotiations with the Boise Rescue Mission, a men-only shelter, to assume operations of Community House when CHI had an existing lease and operating agreement with the City. The filing of a complaint with HUD constitutes a protected activity in the sense that it constitutes opposition to statutorily prohibited discrimination.

In this case, CHI filed its FHA complaint because the City's negotiations with the Boise Rescue Mission, if they had come to fruition in 2003, fell within the prohibitions of

42 U.S.C. § 3604(a)—Community House would no longer be available to "any person" because of the well-known men-only policy of the Boise Rescue Mission. In contrast, CHI's discrimination claim under the FHA arises from conduct that occurred after August of 2003, and is based upon the publication of Ordinance 6404 in July of 2005, and the eventual lease and sale of the Community House Shelter to the Boise Rescue Mission in September of 2005. Considering these events did not precede the events giving rise to the retaliation claim, CHI's retaliation claim is not dependent upon the validity of its discrimination claim and the holding in *IFHC* does not apply.

Further, the evidence at trial indicated the relationship between the City and CHI deteriorated in 2003 and 2004, which the jury could have concluded was causally and temporally related to CHI's August 2003 filing of the FHA complaint with HUD. *See Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2nd Cir. 2002) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."). In early January of 2004, CHI notified the City that it lacked sufficient resources to meet its financial obligations, and requested financial assistance from the City. Shortly thereafter, a meeting occurred at which CHI representatives Deanna Watson and Peggy Sedivy, and City Council Members Vern Bisterfeldt and Mary Ann Jordan, were present. Ms. Watson testified about statements made by City Council Member Vern Bisterfeldt at that meeting. During the course of the conversation, Mr. Bisterfeldt recommended that the FHA complaint filed by CHI against the City be

dropped, and that "things would be a whole lot better if you [CHI] would just drop that complaint."[9]

Then, on February 20, 2004, CHI held a special board meeting at which Theresa McLeod, on behalf of the City, indicated the City was ordering CHI to turn over operations to it lest CHI incur financial obligations it lacked the resources to pay. Ms. Watson, a CHI board member, testified that all of CHI's books, records, assets, bank accounts, and other property were turned over to the City as a result of the vote at the board meeting, because otherwise Community House residents would have no shelter. There was evidence and testimony from Mr. Bruce Chatterton, a City employee, and Ms. Watson, that the City had been able to loan funds or provide funding advances to CHI before,[10] but that it refused to do so beyond the $55,000 the City used to pay certain CHI obligations related to Community House in February of 2004.[11]

The City's reliance upon its contractual lease agreement and operating agreement with CHI, and its argument that its acts may have been contractually permitted, does not bar a suit for retaliation. *Walker v. City of Lakewood*, 272 F.3d 1114 1126 (9th Cir. 2001).[12] CHI was required only to present evidence at trial that the City's decision to refuse further funding was motivated by CHI's participation in a HUD approved (and protected) activity, which in this case was the filing of the FHA complaint to protest the

---

[9] Ms. Watson testified as to Mr. Bisterfeldt's statements on August 29, 2002, on day three of the trial.
[10] Ms. Watson testified about Exhibit 534, which was a letter written by City employee Jim Fackrell in 2003 that the City could enter into a funding agreement with CHI prior to the City receiving its federal grant funds and "float" a loan to CHI to cover its operating expenses, and that such a loan would not affect the City's finances.
[11] There was evidence that CHI may have been solvent, and did not require further funds from the City. However, it is not for the Court to second-guess the jury's determination.
[12] In *Walker*, the court explained that at-will employees are permitted to pursue retaliation claims against an employer after their employment was terminated, because the FHA prohibits employers from canceling an at-will contract in retaliation for fair housing advocacy. *Id.*

possible turnover of Community House to the Boise Rescue Mission. *See* Def.'s Brief at

15 (Dkt. 388-1.) (citing *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 475

(9th Cir. 1988)). Although the City continued to operate Community House after

February 20, 2004, there was substantial evidence presented, as discussed above, for the

jury to find that the City engaged in unlawful retaliation against CHI because CHI filed a

complaint under the FHA, and that the City engaged in threats directly attributable to the

FHA complaint. Soon after, the City demanded CHI transfer all of its assets to the City,

or close the doors of the Community House shelter, because the City's financial

assistance to CHI was ending.

Based upon the evidence at trial, there was substantial evidence to support the

jury's finding of retaliation.

### C.      Rule 50(a) Motion

The Court directed a verdict that Ordinance 6404 was facially discriminatory

under the FHA because it stated a preferential treatment to serve men. Evidence was

introduced at trial regarding the September 2005 lease agreement and purchase option

between the City and the Boise Rescue Mission. Although the lease contained a provision

that the Boise Rescue Mission was to operate "an emergency homeless shelter with a

capacity to serve not fewer than sixty-six (66) guests," Ordinance 6404, which had not

been repealed at the time of trial, required that Community House be operated as "a

shelter for a minimum of 66, single, homeless men, ages 18 years or older." Evidence at

trial established that City Resolution 18765, approving the lease of Community House to

the Boise Rescue Mission, specifically incorporated the restrictions of City Ordinance

6404. Moreover, evidence at trial established the City knew the Boise Rescue Mission had no intent to allow women and families to stay at its shelter, and that it planned to operate Community House as a men-only shelter.

The Court's ruling was based upon *Community House, Inc. v. City of Boise*, (*Community House I*) 490 F.3d 1041 (9th Cir. 2007). In that appeal, the Ninth Circuit held the City's "men-only policy is facially discriminatory" under the FHA, specifically referring to Ordinance 6404. 490 F.3d at 1045-46. The appellate court further held that Plaintiffs had established a prima facie case of facial discrimination under the Fair Housing Act "because they have explicitly been excluded from Community House based on their gender and familial status." *Id.* at 1050. The court did not foreclose the possibility that, at trial, the City could establish its affirmative defense to the discrimination claim. *Id.* at 1051. But at trial, the City failed to do so.

The City now argues Ordinance 6404 did not prohibit the Boise Rescue Mission from operating Community House as a family shelter, only that it required Community House to provide shelter for at least 66 men. Further, the City contends the jury's determination that the lease and sale to the Boise Rescue Mission "did not violate the Fair Housing Act" cannot be reconciled with the Court's directed verdict ruling. But the City's arguments ignore the context in which the Ordinance was enacted and the lease approved, as well as the Ninth Circuit's holding and the Court's instructions. Further, the jury's verdict regarding discrimination can be reconciled with its alternate determination that the lease and sale did not violate the Fair Housing Act.

First, the City ignores the express language of the FHA, and the context of events. The starting point is the language of the FHA and the specific instruction to the jury. Under 42 U.S.C. § 3604(c), it is unlawful to "make, *print, or publish*, or cause to be made, printed or published *any notice, statement* or advertisement, *with respect to* the *sale or rental of a dwelling that indicates <u>any</u> preference*, limitation, or discrimination *based on . . . sex, . . . familial status*, . . . or an intention to make any such preference, limitation, or discrimination." (emphasis added). Instruction number 20 was based upon § 3604(c), instructing that Ordinance 6404 (Exhibit 333) "was such a statement" and that Plaintiffs had "proven the elements of this claim . . . ." In response to Question 1 on the Special Verdict Form, the jury determined that Plaintiffs proved their claim that the City had discriminated against them on the basis of gender or familial status in violation of the FHA, and that the City did not prove its affirmative defense.

Under the FHA and the instruction given, as well as the holding in *Community House I*, the mere act of publishing the statement granting a preference to single men, and the context in which it was published, constituted a violation under § 3604(c). The City intended to lease the building to the Boise Rescue Mission, and evidence at trial established that the Boise Rescue Mission had no intent to allow women, families, or children to reside or seek shelter at Community House. The evidence established also that the City knew the Rescue Mission's intent was to operate a men-only shelter. *See* note 5, supra. Against that backdrop, the Court's directed verdict was proper and consistent with the evidence at trial, as was the jury's verdict.

Second, the City is incorrect that the jury's finding conflicts with its other finding that no violation of § 3605 of the FHA occurred. Under 42 U.S.C. § 3605, the FHA makes it unlawful for an entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction because of sex or familial status. The jury was instructed that Plaintiffs claimed discrimination on the grounds enumerated in § 3605. Instr. No. 22 (Dkt. 374.) The jury was informed that the term "residential real estate-related transaction" means providing "financial assistance for *purchasing*, constructing, improving, repairing, or maintaining a dwelling; or the *selling* of residential real property." *See* 42 U.S.C. § 3605(b). The jury was informed further that Plaintiffs had to establish the City's business included engaging in residential real estate-related transactions; and the City discriminated against Plaintiffs because of gender or familial status. The jury determined, in response to Question 3 on the Special Verdict form, (Dkt. 375), that Plaintiffs did not prove the City discriminated against them on the grounds of gender or familial status in the terms of a residential real estate-related transaction.

The jury's verdict finding against Plaintiffs on Question 3 is consistent with the evidence presented at trial, and consistent with the jury's finding in favor of Plaintiffs on Question 1 regarding discrimination. The jury heard evidence about the lease and sale of Community House to the Boise Rescue Mission, and the price the Boise Rescue Mission paid for Community House when the Boise Rescue Mission exercised its purchase option under the lease. However, the jury also heard evidence concerning the public auction of Community House, which Sue Cobley attended on behalf of CHI and made a credit bid

that the City rejected as nonconforming. The auction occurred *prior* to the lease

negotiations with the Boise Rescue Mission.

The jury's verdict is consistent with the evidence at trial, because the only

evidence of the City engaging in a residential real estate-related transaction at which the

public was invited to *purchase* the property was the public auction, which the evidence

established was open to anyone who submitted a Request for Proposal.[13]  By the time the

Boise Rescue Mission exercised its purchase option, the City had entered into a lease

with the Boise Rescue Mission contractually giving it the exclusive right to purchase the

property under the terms of its agreement with the City. Considering the auction had

already occurred, the jury could have determined, consistent with the evidence, that the

City was no longer engaged in a public transaction affecting other groups by the time the

Boise Rescue Mission exercised its option to purchase Community House.

Accordingly, the jury's verdict is consistent with the evidence at trial, and the

Court finds that the two provisions under which CHI sought damages are not mutually

exclusive under the facts presented at trial.

### D.     Damages

When construing the evidence in a light most favorable to CHI, the nonmoving

party, the Court finds there is substantial evidence to uphold the jury's verdict awarding

$1,000,000 in damages to CHI. The Court's damage instruction (No. 32) allowed the jury

to consider four components comprising damages: frustration of mission; past and future

---

[13] Mr. Eberle testified on September 11, 2012, that there was no limitation preventing participation in the IFP/RFP process.

diversion of resources; the reasonable value of business opportunities and revenue, less

expenses, lost; and personal property or liquid assets. The various components of the

damage award contested by the City are addressed in further detail below.

(1) *Past and Future Diversion of Resources and Frustration of Mission (Standing)*

Instruction number 18 instructed the jury that CHI, as an organization, is permitted

to sue under the Fair Housing Act on its own behalf for injuries or damages it sustained

as a result of any discriminatory housing practices and for injury to its ability to carry out

its efforts to assure equal access to housing and to eliminate housing discrimination.

Instruction number 32 stated that damages could include damages for past and future

diversion of resources, including out-of-pocket expenses, and any other expenses that

could be attributed to the drain on the organizations' resources related to any violation of

the Fair Housing Act. The instruction stated also that damages could include what it

would cost the organization to redress the harm done by the defendants to the community

at large and to the organization's mission as a result of the retaliation or any other

violation of the Fair Housing Act.

The City argues CHI lacked representational standing, because CHI did not

operate as an advocacy or other organization that investigated or carried out efforts to

assure equal access to housing and to eliminate housing discrimination. The City further

alleges CHI failed to substantiate the damages suffered as a result of its frustration of

mission.

The City defines frustration of mission too narrowly. In *Havens Realty Corp. v. Coleman*, the United States Supreme Court held that Congress intended standing under the FHA to "extend to the full limits of Article III," and that "the courts lack the authority to create prudential barriers to standing in suits brought under that section. Thus the sole requirement for standing to sue under § 812 is the Article III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'" *Havens*, 455 U.S. 363, 372 (1982). CHI was required, therefore, to demonstrate a "demonstrable injury to the organization's activities" and a "consequent drain on the organization's resources." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002) (quoting *Havens*, 455 U.S. at 379).

CHI defined its mission as a non-profit corporation that provided housing services to homeless and low income persons, which included men, women, and families. Testimony at trial by Mr. Brown on August 28, 2012, established that, upon his tenure as manager of the Community House shelter, both in 1994 and again in 2004 after the City assumed operations, there was no restriction regarding sex, gender, or familial status for either shelter occupancy or single family residency occupancy at Community House. Additional testimony established no other organization provided such comprehensive services in Boise prior to Community House's opening in November of 1994, and that no organization provided similar services after the City leased Community House to the Boise Rescue Mission on September 2, 2005.

There was conflicting evidence at trial concerning the events culminating in the City's assumption in March of 2004 of the Community House shelter operations. But

CHI introduced evidence and testimony supporting its contention that the City increased

hostilities toward CHI after CHI filed its Fair Housing Act complaint with HUD in

August of 2003 alleging discrimination based on sex and familial status upon learning

that the City had been discussing a deal with the Boise Rescue Mission to assume

ownership of Community House. Further, evidence was introduced that the City never

intended to continue operating Community House after it stepped in to operate

Community House in March of 2004.

Once the City assumed operation of Community House on March 2, 2004, there

was evidence that CHI expended resources to regain control of Community House, by

submitting a proposal for consideration by the City under its Request for Proposal

Process, attending and bidding at the public auction on July 15, 2005, testifying at public

hearings, and advocating against the City's lease of the Community House shelter

building to the Boise Rescue Mission.

CHI's activities---filing the FHA Complaint, participating in the RFP process, and

attending the auction---certainly fall within the concept of standing articulated in *Havens*.

And the City's actions can reasonably be viewed as impairing CHI's ability to provide

the services to the homeless it was formed to provide. Mr. Bruce Chatterton testified on

September 10, 2012, that the City understood that there would be "service gaps" to the

homeless population because the Boise Rescue Mission was going to operate Community

House as a men only shelter, and there was no other service provider operating in 2005

providing homeless services for intact families or single parents with opposite sex

children over 12 years of age. By eliminating CHI as a participant in the provision of

comprehensive services to the homeless, including men, women, and intact families, the evidence was sufficient to support the jury's verdict that CHI suffered frustration to its mission of providing those services. With that being the case, "there can be no question that the organization suffered injury in fact." *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991).

As for substantial evidence to support the damage award, on September 11, 2012, the jury heard testimony from Ms. Mary Ann Jordan, the City's own witness, that the City was spending over one million dollars in unanticipated funds to annually operate the Community House shelter during 2004 and 2005. Ms. Jordan was asked also to clarify the composition of the $2.5 million dollar public auction bid price for the shelter building. She testified that the $2.5 million dollar figure included the value of the service, which service, she explained, was the provision of shelter services in the community. Ms. Jordan explained that the value of the building, "with no attendant services," was "around $850,000" per the assessment that was done. Ms. Jordan confirmed that the Community House property was ultimately sold for $2 million in cash. Ms. Jordan was then asked to calculate the difference to arrive at the value of the "service" provided by subtracting the value of the building from the sales price. Ms. Jordan subtracted the value of the building ($850,000) to arrive at the value of the "service" provided by taking the sale price of two million dollars and subtracting $850,000. She arrived at a figure of $1,150,000.

The jury could easily have performed the same math calculation as Ms. Jordan. That they may have chosen to round the figure to one million dollars cuts against the City's request for remittitur. The Court therefore finds that substantial evidence was

presented to the jury upon which it could find damages of one million dollars, and that no reduction is warranted.[14]

### (2) *Lost Business Opportunities and Revenue*

The jury was asked to consider the reasonable value of business opportunities and revenue, less expenses, lost as a result of any retaliation or other violation of the Fair Housing Act reasonably related in time to CHI's filing of the Fair Housing Act complaint in August of 2003 and the events that occurred thereafter. The City argues CHI failed to present any evidence of specific lost business opportunities or lost profits, and contends that the damage award was, therefore, based upon speculation.

However, evidence was introduced at trial regarding CHI's revenue and expenses related to operating the Community House shelter. Ms. Frances Wray testified about lost rental income from CHI's duplex, which was a separate building from the Community House shelter. CHI lost rent collected for the transitional housing units located on one floor of the Community House shelter, in which tenants resided for up to eighteen months, in the amount of $51,000. (Ex. 606-617.) CHI presented evidence about the revenue it collected from donations and other fundraising activities (Ex. 554) and the revenue obtained through government grants administered by the City (Ex. 554). CHI introduced its 2004 budget, indicating it expected to recognize income in 2004. (Ex. 554.) Tax returns for several years prior to February of 2004 were introduced in evidence. CHI's 2002 tax return indicated net income of $63,102. (Ex. 841.) CHI's 2004 tax return

---

[14] Further, it is unclear how the jury incorporated CHI's alternative theories of relief for either retaliation or discrimination, or the other components of damages, such as the loss of personal property and cash. It would appear that those items of damages are included in the jury's award, again undercutting the City's contention that a remittitur is in order.

indicated it reported revenue of $165,166 and expenses of $129,818 for net earnings of $35,348. (Ex. 843.) And pro-forma projections of operating expenses and income were given to the City in January of 2004 showing a positive cash flow. The jury heard also from the City's witnesses about how much it cost the City to run the Community House shelter once it began managing the facility (both the shelter and transitional housing) in February of 2004.

Further, once the City assumed operations of Community House in February of 2004, the jury could have determined that CHI was, effectively, out of business. With no building, no further grant funding from the City, and no center of operations, CHI essentially lost the opportunity to continue in business at all.[15]

Although the City presented its own evidence disputing the veracity of CHI's financial data and providing its interpretation of the evidence, the jury was not required to believe it. The City contends CHI should have hired an expert to calculate its damages with more certainty. But if a tort is of such a nature that the amount of damages may not be proven with certainty, it is enough if the evidence shows "the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). "Thus, while a plaintiff seeking to recover lost profits must ordinarily prove the fact of injury with reasonable certainty, proof of the amount of damages may be based on a reasonable

---

[15] There was conflicting evidence at trial about CHI's duplex building, or CHDO, which CHI claimed was seized by the City in February of 2004, and later returned. Ms. Francis Wray testified that CHI did not regain control of the duplex until 2006, and at that time it was badly damaged and in need of repairs. The City presented alternate evidence that title to the duplex remained in CHI's name. Again, the jury was not required to believe the City's version of the evidence.

estimate." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997). *See also DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1222 (9th Cir. 2010) (finding the financial statements and the corporate president's testimony about the financial impact of the tort sufficient to support the plaintiff's claim for damages). CHI presented such evidence in the form of its tax returns and revenue projections, as well as the testimony of its officers and managers.

Therefore, the jury had sufficient evidence of CHI's income and expenses from which to consider damages.

### (3)     *Personal Property and Liquid Assets*

The City argues that the Court's admission of the Memorandum of Understanding ("MOU") into evidence (Ex. 503) contributed to the jury's speculative award. The MOU referred to CHI's initial obligation to contribute $1,000,000 toward construction costs of the Community House shelter building. The MOU was signed on February 8, 1994, and later incorporated by reference in the terms of the lease agreement between CHI and the City, which was executed on November 2, 1994. Because the jury's award is equivalent to the one million dollar figure in the MOU, the City contends the jury must have erroneously considered the MOU when it determined CHI's damages.

The jury, however, was instructed that damages must be based upon evidence and not upon speculation, guesswork or conjecture. Concerning the specific component of damages for loss of personal property and liquid assets, the damage instruction stated that the amount had to be based on something other than the loss of the building itself, and be causally related to any retaliation or other violation of the FHA. *See* Instr. No. 32 (Dkt.

374.) The Court will not second guess the jury and assume, as the City has, that the jury disregarded the Court's instruction that evidence had to support the damage award, and the jury was not to award damages for the loss of the building. *See U.S. v. Cook*, 497 F.2d 753, 761 (9th Cir. 1972) (holding the court must presume that the jury did not wilfully disobey the judge's instructions).

Moreover, there was evidence presented to the jury of the value of personal property lost and the amount of CHI's liquid assets. When the City assumed operation of Community House in February of 2004, the City obtained all of the personal property belonging to CHI located inside the Community House shelter building, and assumed control over CHI's bank accounts. These assets included cash on hand in various bank and investment accounts of over $95,000, and personal property located inside the shelter building and the kitchen area, with estimated values for the property. Ex. 570-575 and 836-37. Exhibit 836 documented personal property estimated at $37,201. The City never returned these assets or accounted for them, nor did it contest the estimated value of them at trial.

### G.     Constitutional Claim

In Instruction number 31, the Court instructed the jury that, to prove its claim that the City violated the Idaho State Constitution, Plaintiffs must prove that the City made an appropriation, or paid from any public fund or public monies, anything in aid of a religious society or for a religious purpose; or the City required a person to attend or support any ministry or place of worship, religious sect, or denomination; or the City gave a preference by law to any religious denomination or mode of worship.

The City contends the Court's instruction to the jury should have been limited with an instruction directing the jury that the Idaho Constitution would not apply if it would cause the City to violate federal law. The City contends that it could not discriminate against a religious organization—in this case, the Boise Rescue Mission—simply because it is religious. In other words, the City was required to consider the Mission's proposal, and could not refuse to enter into negotiations with the Boise Rescue Mission for the lease of Community House. The City argues the Idaho Constitutional claim is preempted by federal law, in this case the FHA, if it would cause the City to discriminate against the Boise Rescue Mission.

Plaintiffs argue that the City waived this particular argument because it never raised the issue in its oral motions before the case was submitted to the jury. However, the City did argue that CHI's establishment clause claim should be dismissed because there was insufficient evidence that the City gave aid or assistance to the Boise Rescue Mission. The Court finds the issue regarding insufficiency of the evidence was raised, albeit in the context of the Establishment Clause claim, but that the City never raised a preemption argument or the other arguments presented in its renewed motion prior to submission of the case to the jury.[16] In any event, the Court indicated it would consider the legal issue in the context of the equitable phase of the trial. For purposes of the instant motion, however, the Court will limit its discussion to whether there was substantial evidence to support the state constitutional claim.

---

[16] The City raised an objection to the Court's proposed instruction on the grounds that Federal law preempted Plaintiffs' Idaho Constitutional claim. The Court at that time indicated it would consider the legal issue presented in the context of its determination on remedies during the equitable phase of the trial, because this was the first time the City raised a preemption argument.

During the course of the trial, evidence was presented that the City engaged in negotiations with the Boise Rescue Mission during 2003, and again in 2004-2005 during the RFP process. The RFP process was intended to be a public process. However, there was evidence of e-mails and communications between City officials and the Boise Rescue Mission regarding how to proceed under the RFI/RFP process, which e-mails other participants in the RFP process did not receive---such as the valuation of the building, possible rent terms, and the like. Ultimately, the City considered the public auction, which CHI attended and submitted a credit bid, unsuccessful because CHI's bid was not cash. The failed auction enabled the City to engage in negotiations with the Boise Rescue Mission exclusively. And, it was no secret that the Boise Rescue Mission was a faith based, Christian organization.

The jury certainly could have inferred from the negotiations and conversations between the City and the Boise Rescue Mission that the City intended all along to enable the Boise Rescue Mission to wind up with the Community House facility. Mr. Eberle, a City Councilmember, testified that it was the City's intent to find another operator to manage the facility as soon as possible after February of 2004. Mayor Beiter testified that he began receiving inquiries from the Boise Rescue Mission as early as March of 2004 about the City's plans for the Community House property, and the Mission's plans for expansion. (Ex. 853). The jury saw also an e-mail from the Mayor in March of 2005 (Ex. 755) indicating that the City would be in a "world of hurt" if it could not transfer Community House to the Boise Rescue Mission. These communications occurred prior to the conclusion of the RFP process and the later public auction.

Mr. Eberle testified also that another nonprofit, specifically Giraffe Laugh, was not treated as favorably as the Boise Rescue Mission. Giraffe Laugh had submitted a proposal during the RFP process for running the daycare that CHI provided at Community House. The jury heard evidence that in August of 2005, after the RFP process had concluded, Giraffe Laugh sought to rent a city owned property, and it was charged $300 per month after the first year of occupancy for a smaller building. In contrast, the Boise Rescue Mission continued to enjoy a $1.00 per year lease rate for the larger Community House facility. Mr. Eberle testified that the primary objective in setting lease rates was to meet certain needs in the community, but also to charge "as close to market rate" for city owned property to protect taxpayers. In contrast, Mr. Eberle testified that the lease with the Boise Rescue Mission of $1.00 per year for the first four years was to incentivize the Mission to the "greatest degree possible to accelerate the purchase of the property by putting a disincentive clause in there that the purchase price goes up the longer they kept it in lease status."

Finally, the jury could have inferred from the timing of the passage of Ordinance 6404, which contained the deed restriction requiring Community House to be operated as a homeless shelter for a minimum of 66 homeless men, and the communications with the Boise Rescue Mission throughout 2004 and 2005, that the Ordinance was intended to facilitate the sale to the Boise Rescue Mission. The City Council passed the Ordinance on June 28, 2005, and it was signed by the Mayor on July 12, 2005. At that time, the City knew that the Boise Rescue Mission was looking for properties to expand their shelter for homeless men. No other organization had, during the RFP process in the spring of 2005,

submitted a proposal to operate a homeless shelter for such a large population of single men. The Mayor testified that the Boise Rescue Mission was the only shelter he was aware of that was exclusively for men. Then, the auction was held in mid-July 2005, with no cash bidders. Yet communications continued with the Boise Rescue Mission thereafter. In August of 2005, City employees received an e-mail from the Boise Rescue Mission that it "wouldn't locate sex offenders at Community House."[17] The lease was executed with the Boise Rescue Mission on September 2, 2005.

The Court finds, based upon the above, that there was substantial evidence from which the jury could infer that the City provided aid or gave a preference, albeit indirectly, by law to a faith based, religious organization during what was otherwise portrayed to be a public RFP and auction process.

## CONCLUSION

The Court cannot grant a new trial simply because it may have arrived at a different verdict. Nor can Defendants advocate for a new trial because they believe the jury should have believed Defendants' interpretation of the evidence. If the jury's verdict is not against the clear weight of the evidence, the Court should not grant the request for a new trial. Here, the weight of the evidence is not grossly imbalanced, and there are no grounds for granting a new trial.

The jury had substantial evidence upon which to base its determination and its finding in favor of CHI for damages in the amount of $1,000,000. The Court finds no reason to reduce it. Because the amount of the verdict is not "so excessive as to indicate

---

[17] Mayor Beiter testified regarding an e-mail received on August 8, 2005, from Mr. Bruce Chatterton addressed to him regarding an update from the Boise Rescue Mission.

passion and prejudice on the part of the jury," and can be accounted for based upon the evidence, the Court has no basis to substitute its judgment regarding the damage award. *Dixon v. City of Coeur d'Alene*, No. 2:10–cv–00078–LMB, 2012 WL 2923149 *9 (D. Idaho July 18, 2012).

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Defendants' Motion for Judgment Notwithstanding the Verdict, for Remittitur, or In the Alternative, New Trial (Dkt. 388) is **DENIED**.

Dated: **January 30, 2014**

Honorable Candy W. Dale
United States Magistrate Judge