UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COMMUNITY HOUSE, INC., et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>CITY OF BOISE, Idaho; JIM BIRDSALL and BRUCE CHATTERTON, in their official capacities,<br><br>              Defendants. | Case No. 1:05-cv-00283-CWD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

Plaintiffs brought this action against the City of Boise alleging violations of the Fair Housing Act, Idaho and United States Constitutions, and various laws of the State of Idaho. In its July 22, 2008 memorandum decision and order disposing of Defendants' motion to dismiss, the Court determined that Plaintiffs' Notice of Tort Claim had not been timely filed. Therefore, Plaintiffs were precluded from seeking monetary damages on their state law claims for relief. These state law claims encompassed Counts 11-16 of the Second Amended Complaint, alleging breach of contract and breach of partnership claims, as well as their claims for violation of the Idaho nonprofit corporations act,

landlord tenant act, and the sale of city owned property. The Court's order regarding the state law claims was not contested on appeal.

A jury trial was conducted on the surviving FHA and constitutional claims. The Jury rendered a verdict in favor of Plaintiff Community House, Inc. ("CHI"). Defendants filed post trial motions for judgment notwithstanding the verdict, new trial, or remittitur, which the Court denied. (Dkt. 439.) Later, the Court conducted a bench trial regarding the Plaintiffs' equitable claims and took those matters under advisement.

For the reasons explained below, the Court finds that Plaintiffs failed to prove entitlement to equitable relief on any of their remaining claims.

## FINDINGS OF FACT[1]

1. Plaintiff CHI executed a Memorandum of Understanding ("MOU") with the City on February 8, 1994. Ex. 503.

2. The MOU expressed, as its purpose, that "it is the intent of the City and Community House to enter into a cooperative public/private partnership with the primary objective being to provide housing and comprehensive services for the homeless" in the Boise community. Ex. 503.

3. The MOU further expressed in the "purpose" section: "like any good partnership, this one must be based on trust, common interest and philosophy, good communication, and a fair and clearly defined method of dissolving the partnership." Ex. 503.

---

[1] To the extent that any conclusions of law contained herein can be considered to be or are deemed to be findings of fact, they are incorporated by reference into these findings of fact.

4.  The City committed funds necessary to make the homeless shelter project successful, including $149,000 toward Community House's operating budget for 1994-1995, and $1.6 million toward construction costs of the Community House shelter facility.

5.  The MOU further expressed that the parties expected the MOU to be "supplemented by a written lease agreement and a written operating agreement between the City and Community House, which agreements will clarify the rights and duties of each party to such agreements along the lines, and within the framework, of this Agreement." Ex. 503.

6.  The Lease Agreement, approved by the City Council on November 1, 1994, and executed by the parties on November 2, 1994, detailed that the City leased the real property owned by the City and known as Community House to Plaintiff CHI for a term of fifty years commencing with issuance of a certificate of occupancy upon completion of construction, and ending October 1, 2044. Ex. 503.

7.  The Lease Agreement "incorporated by reference" the MOU.

8.  The Lease Agreement required CHI to maintain liability insurance in which the City was named as an additional insured, and required CHI to maintain the Community House shelter building. Ex. 503.

9.  The Lease Agreement contained the following provision regarding default:

> In the event [CHI]'s right to Operate the Building is terminated (see "The Operating Agreement" attached as Exhibit B to this Lease Agreement), [CHI] shall assign the lease to a Successor Operator, provided, however, [CHI] shall be under no obligation to assign the lease unless the Federal

Home Loan Bank of Seattle (the Bank) consents to the assignment and releases [CHI] from all liability under the construction loan obtained from the Bank by [CHI]; provided further that before [CHI] assigns its rights under the lease to a Successor Operator, [CHI] shall first offer to assign the lease to the City on the condition that the City first repay the construction loan obtained from the Bank or obtain a release of [CHI's] liability under such loan.

In the event [CHI's] right to Operate the Building is terminated, and in the event the Bank has not consented to the assignment of the lease and has not released [CHI] from all liability stemming from the loan to [CHI] from the Bank, [CHI] shall have the exclusive right to continue to manage and operate the building. Nothing in this paragraph shall be construed as a limitation on the City's right to purchase [CHI's] lease upon termination of the Operating Agreement by repaying the construction loan obtained from the Bank or obtaining a release of [CHI's] liability under such loan.

10. The Operating Agreement, approved by the City Council on November 29, 1994, and executed by the City and CHI on November 30, 1994, provided for a term of sixty consecutive months, with a provision that it could be renewed for an additional sixty months with the consent of both parties. Ex. 504.

11. The Operating Agreement was renewed once, but was not renewed again, and therefore expired on November 30, 2004.

12. The Operating Agreement granted CHI the exclusive right to manage the Community House shelter building, including developing staffing requirements, the operating budget, admittance standards, "and the like," as well as requiring CHI to comply with all federal laws.

13. The Operating Agreement contained the following provision:

If in any year during the term of this AGREEMENT the City does not provide to Community House an amount, in real dollars, equal to the level of the City's funding for the prior year, then Community House shall make a good faith effort to replace such funds from other sources. In the event Community House is unable to replace such funds from other sources, then Community House shall have the right to reduce the level of services which it provided proportionately without being deemed to be in breach of this AGREEMENT; provided further, however, that if such reduction in services causes Community House to violate the terms of all regulations and laws applicable as a result of the use of HOME, CDBG, and Affordable Housing Program monies in the construction of the building, then Community House shall be deemed to be in default of this AGREEMENT.

Ex. 504.

14. The Community House shelter operated smoothly until CHI experienced financial difficulties beginning in the later part of 2003, and it could no longer meet the operating expenses of the shelter.

15. In January of 2004, CHI asked the City for financial assistance.

16. On February 19, 2004, Board President Deanna Watson presided over a special board meeting of the CHI Board. Ex. 668.

17. Board members and others in attendance on February 19, 2004, included, among other board members, Sue Cobley and Jill van Heel; Executive Director Peggy Sedivy; and Theresa McLeod from the City of Boise.

18. Deanna Watson informed the Board that CHI asked the City for assistance with CHI's financial crisis, but that the City Council will "not allow more money to go toward Community House with the current board in control." Ex. 668.

19. During the February 19, 2004 meeting, Theresa McLeod noted that Community House would need to "close tomorrow if the liability insurance for the agency is not paid." Ex. 668.

20. At the meeting, the Board voted on and passed two motions---the first being to support the City's interim plan for keeping Community House in operation, and the second motion adopting the following conditions:

- That the Community House Board grant overall operational responsibility for the facility to the City.
- That the City gives the Salvation Army responsibility, on an interim basis. For management oversight of all aspects of the facility including client services, staffing and finances. Effective this Friday, February 20, 2004.
- That the Salvation Army includes current Community House staff in its interim operation of the facility.
- That the City bear all costs & liabilities not covered by the Salvation Army associated with the operation and upkeep of the facility during the interim period.
- That a limited number of board members led by Deanna [Watson] act as the Community House Advisory Committee, provide input and expertise to the interim operator, and assist in developing a permanent plan for management of the facility.
- That the Mayor and City Council work with local businesses, non-profits and other interested parties in a fund-raising campaign to put Community House back on a sound financial footing.

21. The Salvation Army provided interim operational assistance for two weeks, after which the City assumed all responsibility for the Community House shelter facility.

22. On February 24, 2004, the City Council adopted a resolution to assume all oversight for Community House, which resolution was approved by the Mayor of the City of Boise. Ex. 559.

23. On March 18, 2004, Deanna Watson signed, as President of CHI, a letter drafted by Theresa McLeod of the City accepting, on behalf of the CHI Board, the six points the Board adopted at its February 19, 2004 board meeting. Ex. 562.

24. On May 25, 2004, CHI's Board conducted a special board meeting, and board members Sue Cobley and Deanna Watson were in attendance as was Theresa Sobotka of the City of Boise, among others. Ex. 667.

25. At the May 25, 2004 CHI board meeting, Ms. Sobotka presented the Board with a proposal by the City to agree to "give Community House to the City of Boise."

26. The CHI Board did not vote to accept the City's proposal at its May 25, 2004 board meeting, although board member Vincent Goods indicated that additional items needed to be in the agreement before it could be signed. Ex. 667.

27. On June 2, 2004, Deanna Watson, in her capacity as Chair of the Board for CHI, signed the Community House Management Agreement, which stated, in pertinent part, that the "Board of Community House, Inc., . . . with the authority to enter into this agreement, shall: Transfer to the City of Boise, all assets, both liquid and physical, . . . relinquish all oversight of Community House Shelter, . . . [and] stipulate to terminate the lease and operating agreement . . . ." Ex. 563.

28. The Management Agreement further provided that the City would assume operations of Community House, including all financial liabilities and the Federal Home Loan Grant.

29. The Management Agreement provided that "[t]he parties warrant that the person executing the agreement is, at the time of execution, duly authorized and fully vested by its governing body to bind the other party in all respects." Ex. 563.

30. The Management Agreement was adopted by the City Council on June 8, 2004. Ex. 563.

31. Ms. Sue Cobley, Vice President of the Board for CHI, had no knowledge of the Management Agreement at the time it was signed, but she did have knowledge about the future operations of the Community House facility after the City had taken over its management in February of 2004.

32. Several City Council members and City employees were board members and officers of CHI during the period between February of 2004 and June of 2004.

33. Other Board members of CHI other than Sue Cobley, had knowledge of the Management Agreement by virtue of their positions as city council members and city employees, as did Deanna Watson, the individual who signed the Management Agreement on behalf of CHI.

34. In February of 2004, CHI turned over all of its records, financial and otherwise, as well as its bank accounts, to the City, and CHI's 2004 tax return (Ex. 843) reflected the turnover of assets.

35. The City assumed operational control over the Community House shelter facility from approximately February 24, 2004, until it was leased to the Boise Rescue Mission in September of 2005.

36. CHI made no attempt to refute the City's authority to manage the Community House facility during 2004 and 2005.

37. CHI's 2004 tax return provides conclusive evidence that CHI acquiesced in the turnover of its assets to the City.

38. On June 28, 2005, the City Council held a public surplus hearing during which the City Council proposed to declare Community House surplus property. (Ex. 670; 767.)

39. On June 29, 2005, the City adopted Ordinance No. 6402, which declared the intent of the City to convey real property (Community House) for a set minimum price and that the property "has been surplused as it has ceased to be used for a city public purpose and will be underutilized if maintained by the city. . . ." (Ex. 332.)

40. In support of the City's claim that Community House "is found to no longer be needed for the City's public purposes," the Ordinance explained the "core mission of the City does not include the provision of emergency shelter services . . . [or] running a soup kitchen[;] there is a shortage of structures designed as emergency shelters[; and] this building would be better used by private entities trained to manage emergency shelters and other programs for the homeless." (Ex. 332.)

41. The City based its finding that the property "will be underutilized by the City in the future" on the grounds that "the building was designed as a shelter[;] operating an emergency shelter is not a core mission of the city[; and] it will cost more than the city has to invest to convert the property to a use that is within the core mission of the City." (Ex. 332.)

42. The City declared the value of Community House to be 2.5 million dollars. (Ex. 332.)

43. On July 5, 2005, public notice of Ordinance No. 6402 was published. (Ex. 332.)

44. On July 12, 2005, the City amended Ordinance No. 6402 by approving Ordinance 6404. (Ex. 333.)

45. Ordinance 6404 was, in all material respects, identical to Ordinance 6402, with the exception of the deed restriction included in the terms of conveyance.

46. Ordinance 6404 changed the deed restriction from operation as a homeless shelter to require a homeless shelter for a minimum of 66 single homeless men, ages 18 years or older. (Ex. 333.)

47. The City scheduled an auction for the sale of Community House on July 15, 2005, and the minimum bid was either at or "just about 2 million dollars." (Eberle Testimony.)

48. On July 8, 2005, the Boise Rescue Mission informed the City that it would not participate in the auction to purchase Community House. (Ex. 334.)

49. CHI had a representative attend the July 15, 2005, public auction, and CHI submitted a response to the solicitation for bids, which was forwarded to the City Council for consideration at its meeting on July 26, 2005. (Ex. 335.)

50. CHI's auction response, prepared by Sue Cobley, CHI's President, proposed a credit bid of 2.5 million dollars, which is "less than the value of [CHI's] equitable ownership interest in Community House that is held in trust by the City." (Ex. 673.)

51. Mr. Bruce Chatterton attended the auction on behalf of the City, and witnessed that no cash bids were received.

52. The City Council met on July 26, 2005, and rejected CHI's bid as non-responsive and non-conforming.

53. Shortly after the auction date, the City Council, through Mr. Chatterton, initiated discussions with the Boise Rescue Mission for the purpose of negotiating for the purchase of the Community House property.

54. Negotiations for the purchase of the property with the Boise Rescue Mission stalled during July of 2005, and lease negotiations ensued beginning in late July or early August.

55. On September 2, 2005, the City passed Resolution Number 18765, approving the lease agreement, (Ex. 337), between the City and the Boise Rescue Mission for the lease of Community House as a shelter with an option to purchase the real property in the future. (Ex. 336.)

56. Resolution Number 18765 declared the lease terms between the City and the Boise Rescue Mission to be "just and equitable,"[2] recognized that the sale through the public auction process did not generate "responsive or conforming bids," and again declared that it was not within the City's core mission to provide shelter and meal service to the homeless, and further that the property "is not used for a public purposes [sic]." (Ex. 336.)

57. The City and the Boise Rescue Mission signed the Lease Agreement on September 2, 2005. (Ex. 337.)

58. On September 2, 2005, the existing occupants of the Community House shelter were told they had to exit the facility.

59. The Boise Rescue Mission re-opened the Community House shelter facility on September 6, 2005, pursuant to the terms of its lease with the City of Boise.

60. Also on September 6, 2005, the City wired $1,354,091.00 in City general funds to the HUD to repay the Federal Home Loan grant used to construct Community House. (Ex. 338.)

61. On January 9, 2007, the Boise Rescue Mission exercised the option in the Lease Agreement to purchase the Community House facility and real property.

62. The City repealed Ordinance 6404 on May 7, 2013. (Ex. 393.)

**The Individual Plaintiffs**

---

[2] The deed restriction requiring the shelter to house a minimum of 66 single homeless men was dealt with in the context of CHI's claim under the FHA.

63. Plaintiff Marlene Smith and her four-year old son lived at the Community House facility on the second floor beginning on April 15, 2004.

64. The second floor of the Community House facility housed both emergency shelter guests and long term residents in SRO, or single residence occupant, units.

65. The SRO units did require residents to sign a written lease or rental agreement. (Ex. 582.)

66. Smith and her son lived on the "emergency side" of the second floor, which was a shelter.

67. Smith did not pay rent to live at Community House, but sometimes did chores when she was physically able to do so.

68. On June 21, 2005, Smith attended a meeting at which she was told the Community House facility would be closed at some time in the future.

69. On September 2, 2005, Smith was informed by the director of Community House, Mr. Greg Morris, that she and her son needed to vacate Community House by the end of the day.

70. Plaintiff Jay Banta lived at the Community House facility beginning December of 2003.

71. During the time Mr. Banta stayed at the Community House facility, he stayed in the men's dormitory on the first floor.

72. Mr. Banta was guaranteed a bed that would be held for him during the day, and he was able to keep his belongings in a locker.

73. Mr. Banta was expected to leave the premises during the day, but could return to the Community House facility at night.

74. When Mr. Banta first stayed at the Community House facility, he paid $1 per night, but after some time, he was no longer asked to pay anything.

75. On September 2, 2005, Banta saw a sign or poster telling him he had to leave the Community House facility by the end of the day.

76. Prior to September 2, 2005, Banta knew Community House might be closing.

77. Mr. Greg Morris, the director of Community House, conducted several presentations to the shelter guests at Community House during May and June of 2005, informing them that Community House might be closed.

78. Plaintiffs Smith and Banta were shelter guests that did not pay rent or have a written lease agreement to reside at the Community House facility.

## CONCLUSIONS OF LAW[3]

**Breach of Partnership Agreement**

1. Plaintiffs allege in Count Twelve of the Second Amended Complaint that the City's acts or omissions violated the fiduciary and other duties imposed upon partners by Idaho law, which duties allegedly arose out of CHI's and the City's "public/private partnership" to build, operate, and manage Community House.

---

[3] To the extent any of the above findings of fact are deemed to be conclusions of law, they are incorporated by reference into these conclusions of law. The Court has set forth some introductory facts for each claim, and although they may not truly be conclusions of law, they are set forth here for context and readability.

2. Plaintiffs assert the MOU formed a legally recognized partnership between the City and CHI, and that the parties' relationship is therefore governed by Idaho law applicable to partnerships.

3. The MOU was not between the City and either Plaintiffs Jay Banta or Marlene Smith, and therefore the individual plaintiffs are not entitled to any relief under the breach of partnership claim.

4. When the City and CHI entered into the MOU in 1994, the partnership law in effect was the Uniform Partnership Law (UPL), formerly Idaho Code §§ 53-301, *et. seq.*

5. The UPL was repealed in 1998, effective July 1, 2001, by S.L. 1998, ch. 65, § 3, and the Uniform Partnership Act (RUPA), Idaho Code §§ 53-3-101 *et. seq.* was enacted effective January 1, 2001.

6. In construing the provision of a partnership agreement that was allegedly breached, the terms of the agreement must be viewed in the context of the law in effect when the parties entered into the agreement. *St. Alphonsus Diversified Care, Inc. v. MRI Assoc., LLP*, 224, P.3d 1068, 1074-75 (Idaho 2009).

7. The provisions of the UPL would therefore apply when interpreting the meaning of the MOU.

8. Under the UPL, Idaho Code § 53-306 (Id. Stat. Ann. 1994), a partnership was defined as an association of two or more persons to carry on as co-owners a business for profit.

9. Under the RUPA, no substantive change in the law under the UPL was intended, and a partnership is similarly defined as "the association of two or more persons to carry on as co-owners of a business for profit, . . . whether or not the persons intend to form a partnership." Idaho Code § 53-3-202(a).

10. Under either the UPL or the RUPA, a partnership is presumed if the individual partners each receive a share of the profits of the business. Idaho Code § 53-307(4) (Id. St. Ann. 1994); Idaho Code § 53-3-202(c)(3).

11. Other indicia of a partnership include shared losses and shared control. *Widmer Brewing Co. v. Rolph*, 877 P.2d 112, 115 (Or. Ct. App. 1994).

12. The terms of the Lease Agreement and the Operating Agreement between the City and CHI gave exclusive control to manage the building, including staffing and budget requirements, to CHI.

13. The MOU, which is incorporated by reference into the Lease Agreement, does not contain any provision establishing shared profits or losses.

14. Instead, the Operating Agreement permits the City to reduce funding, and allows CHI to unilaterally reduce services, thereby indicating both the City and CHI have exclusive control over their operations.

15. Although the MOU uses the term "partnership," the MOU did not create a partnership as that term is defined under either the UPL or the RUPA, because the City did not share in any of the profits realized by CHI, there was no shared control over the affairs of the Community House shelter facility, and there was no sharing of losses.

16. The use of the word "partnership" may have intended to convey some level of cooperation, but the use of the term, by itself, did not create a partnership under Idaho law, and neither the MOU nor the Lease Agreement or Operating Agreement constituted a partnership agreement.

17. The Court concludes that the Partnership Law, either the UPL or RUPA, does not apply to any of these three agreements between the City and CHI; therefore, CHI is not entitled to any equitable remedies that might otherwise be available upon the dissolution of a partnership or breach of a partnership agreement.

**Breach of Contract and the Covenant of Good Faith and Fair Dealing**

18. Plaintiffs in their eleventh claim for relief allege that the MOU, Lease Agreement, and Operating Agreement constituted a contract between the parties, and that the City breached the parties' agreement as well as the covenant of good faith and fair dealing. Second Am. Compl. ¶¶ 206-210.

19. None of the agreements were between the City and either Plaintiffs Jay Banta or Marlene Smith, and therefore the individual plaintiffs are not entitled to any relief under the breach of contract claim asserted.

20. To establish a prima facie case for breach of contract, CHI has the burden of proving each of the following propositions by a preponderance of evidence: (1) a contract existed between CHI and the City; (2) the City breached the contract; (3) CHI has been damaged on account of the breach; and (4) damages.[4] *Schilder*

---

[4] CHI is not entitled to monetary damages in this matter.

*Dairy, LLC v. Delaval, Inc.*, No. CV 09–531–REB, 2012 WL 976077 *13 (D. Idaho 2012).

21.  The implied covenant of good faith and fair dealing is a covenant implied by law in the parties' contract, and requires that the parties perform in good faith the obligations imposed by their agreement. *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 863 (Idaho 1991).

22.  A violation of the covenant of good faith and fair dealing occurs when "either party . . . violates, nullifies or significantly impairs any benefit of the . . . contract… ." *Idaho First Nat'l Bank,* 824 P.2d at 863 (quoting *Sorensen v. Comm Tek, Inc.*, 799 P.2d 70, 75 (1990)).

23.  CHI has not established or argued that any specific term contained within the parties' Lease Agreement and Operating Agreement was breached, other than claiming generally that the City breached the partnership agreement.

24.  As the Court concluded above, no partnership agreement existed because no partnership was formed; therefore, CHI has not carried its burden of proof on its breach of contract or covenant of good faith and fair dealing claim.

**Violation of Idaho Nonprofit Corporation Act**

25.  CHI alleges that the unauthorized actions and omissions of CHI's President, Deanna Watson, in signing the Management Agreement violated CHI's bylaws and breached the Idaho Nonprofit Corporations Act, Idaho Code § 30-3-1 *et. seq.,* and the Management Agreement is therefore void. Second Am. Compl. Count Fourteen, ¶¶ 226-227.

26. CHI contends it is entitled to equitable relief in the form of an order returning all property, both real property and personal property, that the City retained after it assumed operation of the Community House shelter facility in February of 2004.

27. CHI is a nonprofit corporation governed by the Idaho Nonprofit Corporation Act.

28. Under the Act, Idaho Code § 30-3-87:

> Any contract or other instrument in writing executed or entered into between a corporation and any other person is not invalidated as to the corporation by any lack of authority of the signing officers in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the contract or other instrument if it is signed by any two (2) officers in category 1 below or by one (1) officer in category 1 below and one (1) officer in category 2 below.
> Category 1 - The presiding officer of the board and the president.
> Category 2 - A vice president, the secretary, treasurer and executive director.

29. During the period between March and June of 2004, Deanna Watson was both the President of CHI and the Chair of the Board, and signed documents in each of those capacities.

30. Nothing in the Act indicates that one person cannot sign a document in a dual capacity.

31. The Management Agreement, although signed by only one person, was signed by Deanna Watson, who was at the time both the President of CHI and the Chair of the Board, therefore fitting the requirement that a contract be signed by two officers in Category 1.

32. The Management Agreement contained a provision whereby Watson represented to the City she had the authority to enter into the Management Agreement, and warranted she was authorized and vested by the Board of CHI to bind it to the Agreement.

33. Given the above unambiguous and express provisions in the Management Agreement, the Court cannot draw any inference other than the City and Watson believed Watson had the authority to execute the Management Agreement despite CHI's arguments that she did not have such authority.

34. The Court therefore finds that the requirements of Idaho Code § 30-3-87 were met, and the Management Agreement is not invalidated by any lack of authority of Deanna Watson.

35. Ratification of an unauthorized act of an agent may be "implied if the principal, with full knowledge of the material facts, receives, accepts and retains benefits from the contract; remains silent, acquiesces in or fails to repudiate or disaffirm the contract; or otherwise exhibits conduct demonstrating an adoption and recognition of the agent's act as binding." *Carpenter v. Payette Valley Co-op, Inc.*, 578 P.2d 1074, 1078 (Idaho 1978).

36. Even if Watson did not have authority to sign the Management Agreement and bind the Board to its terms, CHI, whose board members included City Council members and city employees, substantially complied with its terms by turning over operations of the Community House facility as well as CHI assets and

personal property to the City; CHI did nothing to repudiate the City's continued management of the Community House facility.

37. Further, given that several board members knew of the Management Agreement and all of the Board members knew of the events that occurred after the City took control of Community House, the Court concludes that CHI had knowledge of all of the material terms of the Management Agreement.

38. Thus, the Court alternatively finds CHI ratified the June 2004 Management Agreement, which finding is consistent with the Court's earlier finding in its July 29, 2009 Memorandum Decision and Order granting in part and denying in part Defendants' Motion for Summary Judgment. (Dkt. 261.)

39. CHI is not entitled, therefore, to any equitable relief on its claim for violation of the Idaho Nonprofit Corporation Act.

**Violation of Idaho Landlord Tenant Act**

40. The individual Plaintiffs claim the City violated Idaho Code § 6-304 and § 6-310 by failing to provide legal notice of eviction before asking them to vacate the Community House facility. Second Am. Compl. Count Sixteen, ¶ 236-238.

41. The only remaining individual plaintiffs were Jay Banta and Marlene Smith, who were shelter guests at Community House, because they did not pay rent, they did not have written lease agreements, and they resided in the shelter areas of the Community House facility.

42. Idaho recognizes several types of tenancy, including a tenancy at sufferance, tenancy at will, periodic tenancy (month-to-month or year-to-year) or fixed term

tenancy. *Lewiston Pre-Mix Concrete, Inc. v. Rohde*, 718 P.2d 551, 556 (Idaho Ct. App. 1985).

43. A landlord-tenant relationship generally arises under the terms of a lease agreement. *Id.*, and involves the payment of rent, *see Lindsey v. Normet*, 405 U.S. 56, 74 (1972) (Constitution does not recognize the "right of a tenant to occupy the real property of his landlord beyond the term of his lease without the payment of rent or otherwise contrary to the terms of the relevant agreement."). *See also Smith v. Royal Ins. Co.*, 111 F.2d 667, 670-71 (9th Cir. 1940) (noting that the relationship of landlord and tenant is created by contract, either express or implied, whereby a landlord grants possession of land to a tenant in exchange for rent).

44. The Idaho Landlord-Tenant Act, Idaho Code §§ 6-301 *et. seq.*, although not defining "landlord" and "tenant," generally contemplates the existence of a lease agreement and the payment of rent by the tenant to the landlord.

45. Unlawful detainer by a tenant is defined generally as the nonpayment of rent; the continuation of possession after the expiration of the lease term; or the continued possession of the leased premises without permission of the landlord. Idaho Code § 6-303.

46. To commence a lawsuit for unlawful detainer, written notice must be served. Idaho Code § 6-304.

47. The City never sought nor received any rent for the use of or occupancy of the Community House facility by Plaintiffs Smith and Banta.

48. Thus, Plaintiffs Smith and Banta were occupants of a shelter, and were not tenants entitled to notice under Idaho Code § 6-303. *See Robbins v. Reagan*, 616 F.Supp. 1259, 1270-71 (D.D.C. 1985) (dismissing suit to prevent shut down of a homeless shelter because shelter occupants did not pay rent and were not tenants entitled to notice).

49. Consequently, Plaintiffs Smith and Banta are not entitled to equitable relief on their claims for violation of the Idaho Landlord-Tenant Act.

**Violation of Surplus Property Act**

50. Plaintiffs allege that the City violated the statutory requirements under Idaho Code §§ 50-1401 *et. seq.* for selling city owned real property, or alternatively, violated the statutory requirements because the City did not complete the sale of the property to CHI at the public auction pursuant to CHI's bid. Second Am. Compl. Count Thirteen, ¶¶ 217-224.

51. There is a comprehensive statutory scheme for the sale or lease of real property by an Idaho city.

52. Idaho Code § 50-1401 provides:

> It is the intent of this chapter that cities of the state of Idaho shall have general authority to manage real property owned by the city in ways which the judgment of the city council of each city deems to be in the public interest. The city council shall have the power to sell, exchange or convey, by good and sufficient deed or other appropriate instrument in writing, any real property owned by the city *which is underutilized or which is not used for public purposes.*

53. When the city council proposes to convey or offer for sale any real property, it first must declare the value it intends to receive as a result of such conveyance and provide notice of a public hearing before the city council. Idaho Code § 50-1402.

54. After conducting a public hearing, the city council may proceed to convey or offer for sale the real property, subject to the restrictions of Idaho Code Section 50-1401. Idaho Code § 50-1403.

55. If the property is offered for sale,

> the property shall be sold at a public auction to the highest bidder and no bids shall be accepted for less than the minimum declared value previously recorded on the record at a public meeting of the council, provided however, *if no bids are received, the city council shall have the authority to sell such property as it deems in the best interest of the city*.

Idaho Code § 50-1403(1).

56. "Real property *may be sold for cash* or on contract for a period not exceeding ten (10) years . . . ." Idaho Code § 50-1404.

57. If the city desires to lease real property, "[t]he mayor and council may, by resolution, authorize the lease of any real or personal property not otherwise needed for city purposes, upon such terms as the city council determines may be just and equitable." Idaho Code § 50-1407.

58. Municipal corporations, such as cities, can "exercise only such powers as are expressly granted or necessarily implied from the powers granted; doubt as to the existence of powers, must be resolved in favor of the granting power." *Mtn. States Telephone & Telegraph Co. v. City of Boise*, 506 P.2d 832, 834 (Idaho 1973).

59. CHI argues that the ordinance declaring Community House "will be underutilized" does not comply with the statute, because the statute requires the City to find that the property actually "is," as in "presently is," underutilized.

60. CHI argues also that the City must simultaneously find that the property is not "presently" being used for a public purpose, and that the City could not have made that determination because the MOU specified the City had a public purpose to provide services for the homeless in the community.

61. The Court concludes that that any minor error in the resolution language declaring Community House to be surplus property because it "will be underutilized" rather than "is underutilized" is irrelevant, because there were no conforming bids received at the auction.

62. Under Idaho Code § 50-1404, the City was permitted to accept only cash; it therefore could not accept Sue Cobley's credit bid in the form of CHI's purported "equitable ownership" of Community House.

63. If no bids are received, the City has the power to sell the property as it sees fit, and can then negotiate with interested parties.

64. Second, the Court finds that the statute is expressed in the alternative---either the property is underutilized or is not used for public purposes.

65. Nothing in Idaho Code § 50-1401 prohibits the City from deciding that property will not be needed at some future date. The statute reads "real property which is underutilized," not "real property which is presently underutilized."

66. Alternatively, the City decided that the Community House property was not being used for a public purpose.

67. The City possesses the discretion to determine what is or is not a "core" service for it to provide, and although the provision of homeless services may be one of the City's objectives, the City was within its discretion to conclude that operating, staffing, and funding an actual shelter for the homeless was not part of its core mission.

68. The City could continue to provide services to the homeless without operating and staffing a homeless shelter.

69. Alternatively, the City possessed the power to lease real property.

70. In both Ordinance 6402 and 6404, the City found that the Community House property has "ceased to be used for a city public purpose," and was "no longer needed for the City's public purposes," which satisfies Idaho Code § 50-1404 requiring the City to find the real property "was not otherwise needed for city purposes" before it could lease the property to another entity. [5]

71. Further, Resolution Number 18765 approving the lease agreement between the City and the Boise Rescue Mission conforms to Idaho Code § 50-1404, because it declared the lease terms between the City and the Boise Rescue Mission to be "just and equitable," and again declared that the property "is not used for a public purposes [sic]."

---

[5] Ordinance 6404's deed restriction requirement was discussed by the Court in its January 30, 2014 memorandum decision and order in the context of CHI's claim that the ordinance expressing a preference to serve single men violated the FHA. (Dkt. 439.)

72. Therefore, whether the City complied with Idaho Code § 50-1401's requirements is of no moment once no cash bids were received at the auction—the auction process was over, and the City could simultaneously consider leasing the property or sell it as it deemed in its best interest. *See Community House, Inc. v. City of Boise*, 623 F.3d 945, 972 (9th Cir. 2010) ("Because the facility did not sell at the auction, the City Council was specifically empowered by Idaho law to dispose of the property however it believed was "in the best interest of the [C]ity.").

73. There is no statutory requirement that the City must consider a sale before considering a lease of real property, and there was therefore no need to conduct the auction at all prior to the lease negotiations and the passage of Resolution Number 18765 approving the Lease Agreement with the Boise Rescue Mission

74. That Community House was presently being used for a homeless shelter and serving the needs of the Boise community is also irrelevant.

75. Idaho Code § 50-1409 "does not prohibit a city council from deciding that property will not be needed at some future date. The statute reads 'property not needed for city purposes,' not 'property not presently needed for city purposes.' Whether property will or will not be needed for city purposes, presently or in the future, is within the power of the City Council to decide." *Mtn. States Telephone & Telegraph Co.*, 506 P.2d at 833.

76. Therefore, the City Council had the power to find that city owned property proposed to be leased would not be needed for city purposes at some date in the future even though the property was being presently used.

77. Furthermore, CHI lacks standing to contest the City's ordinances, and the City's alleged lack of statutory compliance.

78. To have standing, a litigant must "allege or demonstrate an injury in fact and a substantial likelihood the relief requested will prevent or redress the claimed injury." *Young v. City of Ketchum*, 44 P.3d 1157, 1159 (Idaho 2002).

79. Standing requires a showing of a "distinct palpable injury" and a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Young*, 44 P.3d at 1159 (quoting *Miles v. Idaho Power Co.*, 778 P.2d 757, 761 (Idaho 1989)).

80. Even if a showing can be made of an injury in fact, standing may be lacking when the asserted harm is "a generalized grievance shared by all or a large class of citizens." *Young*, 44 P.3d at 1159.

81. "An interest, as a concerned citizen, in seeing that the government abides by the law does not confer standing." *Troutner v. Kempthorne*, 128 P.3d 926, 928 (Idaho 2006).

82. CHI has not shown that it suffered some injury because of the City's failure to strictly adhere to the language set forth in Idaho Code § 50-1401 for declaring real property underutilized or not used for public purposes, other than its general interest in seeing that the City abides by the law.

83. CHI did not own property adjacent to Community House, and was therefore not affected by the ordinances and resolutions. *See Bopp v. City of Sandpoint*, 716 P.2d 1260, 1261-2 (Idaho 1986) (holding that citizen lacked standing to challenge

Sandpoint's ordinances and lease because his injury was not special to him, and he did not own property abutting or adjoining the property being leased." *C.f. Mtn. States Telephone & Telegraph Co.*, 506 P.2d at 833 (finding in favor of plaintiff when the City of Boise refused to perform in accordance with the lease agreement with plaintiff that had been approved by city council resolution).

84. CHI cannot rely upon its rejected credit bid as grounds to assert an injury because, by law, the City could accept only cash.

85. Moreover, although CHI offered to purchase the property for $2.5 million of its "equitable interest," CHI had no equitable interest to bid because it ratified the Management Agreement in 2004, thereby terminating the Lease Agreement and Operating Agreement, and it had transferred all of its assets to the City. *See also Community House, Inc. v. City of Boise*, 623 F.3d at 972 n.5 (noting that CHI had no equitable interest to bid because of the 2004 Management Agreement and transfer of its assets to the City).

86. The Court concludes that CHI lacks standing to challenge the City's ordinances in the first instance, and that the City did not violate the statutory requirements for either auctioning or leasing real property.

87. CHI is not entitled to equitable relief on its claim of violation of the surplus Property Act.

**Equitable Claims for Estoppel, Rescission, and Constructive Trust**

88. Plaintiff CHI's Fifteenth claim for relief alleges that the City should be estopped from asserting its claims of ownership of CHI assets and terminating CHI's rights

under the Contracts, and that the City made false representations and concealed material facts resulting in reliance by CHI and the termination of CHI's contractual rights for no or minimal consideration.

89. As and for a remedy to the above conduct, CHI proposes that the Management Agreement be rescinded and a finding that the Management Agreement resulted in a constructive trust, not a transfer of any assets or property of CHI.

90. Equitable estoppel requires proof of the following elements:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Boesiger v. Freer*, 381 P.2d 802, 806-7 (Idaho 1963).

91. "A constructive trust arises where legal title to property has been obtained through actual fraud, misrepresentations, concealments, taking advantage of one's necessities, or under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in the property." *Witt v. Jones*, 722 P.2d 474, 477 (Idaho 1986).

92. A party alleging a claim of constructive trust premised on fraud must plead the allegations of fraud. *Id.*

93. The elements of a cause of action for fraud are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Id.* (quoting *Faw v. Greenwood*, 613 P.2d 12338, 1340 (Idaho 1980)).

94. For a constructive trust to arise, there must be evidence that the City obtained the property by violation of confidence or fiduciary relationship, or other unconscionable or fraudulent manner. *Erb v. Kohnke*, 824 P.2d 903, 911 (Idaho Ct. App. 1992).

95. CHI's reliance upon the alleged fiduciary relationship of the parties under a partnership agreement is misplaced, as there was no legal partnership between the parties under the Partnership Law, and therefore no breach of any fiduciary duty.

96. CHI had no equitable interest in the Community House facility or property once it ratified the 2004 Management Agreement transferring all assets to the City.

97. And finally, the Lease Agreement provides conclusive evidence that title to the Community House real property always resided with the City, such that the City could not have obtained the real property by fraud because the City already owned it.

98. CHI has not made any showing as to the other elements of fraud.

99. CHI has not identified or addressed what statements it considered to have been false or identified specific statements that were false.

100. Because CHI did not prove all of the elements of fraud, or address which statements by the City or its officials constituted false representations, it has not proven equitable estoppel or established the elements for imposing a constructive trust.

101. For the same reasons, rescission of the Management Agreement is not an available remedy.

102. Rescission is an equitable remedy which ideally brings the parties to their pre-contract status quo. It abrogates the contract and restores the parties to their original position, as if the contract had never occurred. *O'Connor v. Harger Const., Inc.,* 188 P.3d 846, 851 (Idaho 2008).

103. CHI contends the Management Agreement should be rescinded, and CHI should be restored as the operator of the Community House facility.

104. But this Court previously denied CHI's claim of rescission of the Management Agreement on the grounds that CHI ratified the Management Agreement and, thus, terminated the Operating Agreement and Lease Agreement. CHI has no continued interest in the Community House facility and the property has been sold. Mem. Decision and Order, July 29, 2009 (Dkt. 261), *rev'd and remanded on other grounds*, *Community House, Inc. v. City of Boise*, 623 F.3d 945 (9th Cir. 2010) (the appeal reversed the Court's decision finding the mayor, city employees, and council members were not entitled to legislative or qualified immunity).

105.     Additionally, rescission requires the return of any consideration or benefit received by the rescinding party before the rescission is valid, and the party must "exhibit an actual intent and willingness to pay to constitute a valid tender." *O'Connor*, 188 P.3d at 912.

106.     As and for consideration, the City agreed in the Management Agreement to assume CHI's financial liabilities and payment of the Federal Home Loan Grant.

107.     The City paid the Federal Home Loan Grant in full on September 6, 2005.

108.      There was no evidence presented that CHI tendered back or returned any consideration received for the Management Agreement.

109.     Therefore, the Court cannot return the parties to their pre-contract positions and CHI's claim for equitable rescission fails.

**Equitable Remedies for Fair Housing Act and Idaho Constitutional Claims**

110.     CHI in its Seventeenth Claim alleges that the City violated the Idaho Constitution because the lease and sale of Community House to the Boise Rescue Mission constituted a subsidy and had the effect of advancing the religious philosophy of the Mission.

111.     The jury found liability on CHI's state Constitutional claim, and now CHI seeks equitable relief for its constitutional claim that is not distinct from its claim for equitable relief under the FHA.

112.     Under the FHA, CHI prevailed on its Third and Sixth claims for relief for retaliation and the publication of the ordinance indicating a preference based upon sex, and the Court declined to grant the City's request for judgment

notwithstanding the verdict, new trial, or remittitur of the $1,000,000 damage award.[6]

113.     Now, CHI seeks the following injunctive and prospective equitable relief as and for a remedy for both the Idaho Constitutional Claim and under the FHA:

    a.  Ordering the City to implement policies, training and education regarding the FHA;

    b.  Enjoining the City from discriminating against or segregating persons who are protected under the FHA in the lease or sale of any housing it owns, operates or manages, or in its housing or federally funded housing grant programs (CDBG and HOME);

    c.  Prohibiting the City from providing financial assistance to any organization known to discriminate in the provision of housing, aid, benefits or services;

    d.  Publication by the City in the newspaper for a period of 12 consecutive months of a public apology to the citizens of Boise for discriminating against women, children and families who were evicted or prevented from residing in Community House;

    e.  Conversion of the City owned Grand Avenue building into a fully functioning homeless shelter comparable to Community House and specifically for women, children, and intact families, and including the provision of necessary funding for such a conversion;

---

[6] The Defendants field a notice of appeal of the Court's Order on February 14, 2014.  (Dkt. 441.)

f. An order requiring the City to provide all necessary funding to the Interfaith Sanctuary to renovate, upgrade and improve its shelter facility so it can house women, children and families in an environment similar to the facilities offered by Community House;

g. An order requiring the City to provide funding to pay for two additional social workers to assist Interfaith Sanctuary residents;

h. An order requiring the City to allocate from its housing stock twenty units to service as transitional housing for up to six months for families who are residing in the Grand Avenue or Interfaith Sanctuary;

i. Disgorgement of the benefits and profits the City obtained from the sale of the Community House property to the Boise Rescue Mission, based upon the $3.2 million dollar appraised value, for the financial and in-kind contributions CHI made to the construction of Community House and for the assets and property that were taken as a result of the City's retaliatory conduct under the FHA.

114. Under the FHA, the Court may award "such preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation . . . as is necessary to assure the full enjoyment of the rights granted" by the FHA, and may 'award such other relief as the court deems appropriate." 42 U.S.C. § 3614(A), (B).

115.    To obtain injunctive relief against government actions which allegedly violate the law, "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" Injunctive relief is available "to combat a persistent pattern of misconduct violative of a plaintiff's rights," and is not designed to remedy a single violation absent a showing of a deliberate policy or practice on the part of the named defendants. *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 557-558 (9th Cir. 1990) (citations omitted).

116.    The Court has broad discretion in fashioning a remedy, which remedy must be narrowly tailored to give only the relief to which the plaintiffs are entitled. *Orantes-Herndandez*, 919 F.2d at 558.

117.    "Appropriate relief for violations of [the FHA] is to be determined on a case-by-case basis, with relief tailored in each instance to the needs of the particular situation." *U.S. v. Pac. Northwest Elec., Inc.*, No. CV–01–019–S–BLW, 2003 WL 24573548 at *15 (D. Idaho Mar. 21, 2013) (citing *United States v. Jamestown Center–In–The–Grove Apartments*, 557 F.2d 1079, 1080 (5th Cir.1977)).

118.    "Relief should be aimed toward twin goals [of] insuring that no future violations of the Act occur and removing any lingering effects of past discrimination." *Id.*

119.    The violations of the FHA and the Idaho Constitution have already occurred, and are not ongoing:

   a.   Ordinance 6404 was repealed;

b. The retaliatory acts against CHI occurred in 2004 and 2005; and

c. The lease to the Boise Rescue Mission commenced in September of 2005, and the sale of the Community House facility was finalized in 2007.

120.     The Court finds there is no ongoing act or policy of discrimination by the City that it can enjoin or otherwise remedy.

121.     CHI has not presented the Court with evidence that there is any "lingering effect" of the acts of discrimination, other than the fact that no current organization provides comprehensive services to all aspects of the homeless population in Boise like CHI provided during its operation of the Community House facility.

122.     CHI did not present the Court with evidence that the City, in its current efforts to provide assistance to the homeless population, is engaging in discriminatory practices.

123.     Yet, CHI proposes that this Court order prospective relief requiring the City to earmark funds to re-create the Community House concept, either via another building, or by funding other service providers who can provide comprehensive services to men, women, and intact families.

124.     CHI has cited the Court to *U.S. v. City of Parma*, 661 F.2d 562 (6th Cir. 1981), *cert. denied*, 456 U.S. 926 (1982), as an example of the type of prospective relief it seeks.

125.     In *City of Parma*, the district court found that an extreme condition of racial segregation existed in the Cleveland metropolitan area caused, in part, by housing authority policies, and by lenders and insurers who engaged in "red lining" practices, which ultimately contributed to the establishment and maintenance of a black ghetto on the east side of Cleveland. 661 F.2d at 465-566.

126.     The district court found also that the city of Parma refused to enact a housing assistance plan and stymied plans for the development of low-income housing in certain areas, which acts were based upon a desire to keep minorities out of the community. *Id.* at 566.

127.     Because of these practices, the district court fashioned a broad, comprehensive remedial plan that, in addition to requiring remedial education, required the city to adopt a plan for creating low income housing, required the city to apply for government grant funds earmarked for providing low income housing, and required the city to provide at least 133 units of low income housing within the city of Cleveland. *Id.* at 569.

128.     The court appointed a special master to ensure the provisions of its order were carried out. *Id*.

129.     On appeal, the United States Court of Appeals for the Sixth Circuit upheld the remedial aspects of the district court's order, and with few exceptions, found the affirmative provisions reasonable to combat the lasting effects of the city's discriminatory practices. *Id.* at 577.

130.     Here, in contrast, there was no evidence that the City engaged in or currently engages in widespread discriminatory practices with respect to the homeless populations it does serve.

131.     There is no comprehensive scheme preventing private service providers, such as CHI or others, to recreate the services that Community House once provided to the homeless population.

132.     Absent such evidence, and absent conditions analogous to those that existed in the City of Parma, the Court declines to dictate the City's policy and fiscal decisions with respect to providing services to the homeless. *See Brock v. Big Bear Market No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987) (where there is no pattern of repetitive violations or a finding of bad faith, coupled with efforts to prevent recurrence, the court is within its discretion in declining to grant injunctive relief).

133.     Further, the Court cannot undo the effects of the sale of the Community House facility to the Boise Rescue Mission, as that would be tantamount to granting rescission, a remedy this Court cannot effectuate because it can no longer return the parties to their pre-contract positions. *See also* Mem. Decision and Order, July 29, 2009 (Dkt. 261.)

134.     The Court therefore finds that equitable relief in the form requested by CHI is not warranted under the facts of this case, because the relief sought is not narrowly tailored to the violations of the FHA and Idaho Constitution that the jury found occurred.

135.    Because the Court concludes that equitable relief is not warranted, the

Court declines to reach the City's preemption argument, in which the City argued

that, to the extent the Idaho Constitution would require the City to discriminate

against the Boise Rescue Mission (i.e., not lease or sell the Community House

facility to the Boise Rescue mission because of the Rescue Mission's religious

purpose), CHI's Idaho Constitutional claim was preempted by Federal law.


## FINAL CONCLUSION

The Court finds for the City on all equitable claims asserted by Plaintiffs. The

Court will file a separate Judgment amending the Partial Judgment on the Verdict (Dkt.

382) as required by Rule 58(a).

Dated: **March 18, 2014**

Honorable Candy W. Dale
United States Magistrate Judge